UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway
Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to the Official Committee of
 Unsecured Creditors*

|  |  |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT<br>ADVISORS, LLC, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No:  22-14539-JKS<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF NATIONAL REALTY<br>INVESTMENT ADVISORS, LLC, *et al.*,<br><br>       Plaintiff,<br><br>v.<br><br>S3 RE BERGENLINE FUNDING LLC<br><br>-and-<br><br>S3 RE 1300 MANHATTAN FUNDING LLC,<br><br>       Defendants. | Adv. Pro. No.  23-_____-JKS |

## COMPLAINT FOR: (I) AVOIDANCE OF MORTGAGES AND ASSIGNMENTS OF RENTS UNDER 11 U.S.C. § 544 AND STATE LAW, AND RECOVERY AND PRESERVATION UNDER 11 U.S.C. §§ 550 AND 551; (II) AVOIDANCE OF

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.  The location of the Debtors' service address is: 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

**PREPETITION TRANSFERS UNDER 11 U.S.C. §§ 544 AND 548 AND STATE LAW, AND RECOVERY AND PRESERVATION UNDER 11 U.S.C. §§ 550 AND 551; (III) RECOVERY OF POSTPETITION TRANSFERS UNDER 11 U.S.C. §§ 542 AND 549, AND RECOVERY AND PRESERVATION UNDER 11 U.S.C. §§ 550 AND 551; (IV) UNJUST ENRICHMENT; (V) OBJECTIONS TO CLAIMS OF UNDER 11 U.S.C. § 502(b) AND (d); (VI) DETERMINATION OF SECURED STATUS OF CLAIMS UNDER 11 U.S.C. § 506; AND (VII) FOR RELATED RELIEF[2]**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") of National Realty Investment Advisors, LLC ("NRIA") and its debtor affiliates (collectively, the "Debtors"), by and through the Committee's undersigned counsel, as and for its complaint (the "Complaint") against Defendants, S3 RE Bergenline Funding LLC ("S3 Bergenline") and S3 RE 1300 Manhattan Funding LLC ("S3 Manhattan" and together with S3 Bergenline, the "S3 Lenders"), hereby alleges as follows:

## NATURE OF COMPLAINT

1.       This Complaint is the culmination of months of discovery, including Rule 2004 subpoenas, a motion to compel, investigation and analysis into challenges that could be brought against two construction mortgage loans that the S3 Lenders purportedly entered into with Debtor Bergenline Capital 4901 LLC (the "Bergenline Debtor") and Debtor Manhattan Avenue Capital 1300 LLC (the "Manhattan Debtor") by and through one of Debtors' former principals, Rey E. Grabato II ("Grabato"), who was also the purported sole guarantor of such loans.

2.       The Committee has identified a number of challenges to the secured claims asserted by the S3 Lenders, including objecting to the extent, validity and priority of the claims and interests asserted by S3 Lender, avoiding S3's liens, and requiring the S3 Lenders to repay avoided prepetition and postpetition payments, estate property, and/or obligations to the estate.

---

[2] This title is a summary, not a verbatim recitation of all Counts of this Complaint and should not be construed as such or in any way to limit the claims and causes of action hereinafter asserted.

3.      Notwithstanding five (5) productions of documents by the S3 Lenders to the Committee during the period from January 4, 2023 to March 21, 2023, plus a final production on April 25, 2023, in response to this court's order compelling production in response to Rule 2004 subpoenas [Docket No. 2238], the S3 Lenders never once produced a recorded copy of the purported mortgage on the property owned by the Bergenline Debtor, commonly known as 4901 Bergenline Avenue, West New York, New Jersey 07093, sometimes also referred to as the Bergenline Station Apartments (the "Bergenline Property").[3]

4.      S3 Bergenline also did not attach a recorded copy of its purported mortgage on the Bergenline Property to either its proof of claim or its motion to designate the Bergenline Debtor as a single asset real estate debtor.

5.      S3 Bergenline actively hid and did not produce the recorded copy of the purported mortgage on the Bergenline Property because it clearly evidences, in conjunction with email communications between counsel for the S3 Lenders and the Debtors, that there is no possibility that Grabato signed the final version or even a full copy of such mortgage, if he even signed the signature page at all.

6.      The reason for not producing the recorded mortgage is clear: the mortgage on the Bergenline Property was never properly acknowledged or recorded and is therefore invalid and avoidable.

7.      The purported mortgage on the Bergenline Property was never properly executed, was not properly recorded, and is invalid and avoidable pursuant to 11 U.S.C. § 544(a), applicable

---

[3] The Committee reserves all rights with respect to the S3 Lenders' conduct and production (or lack of production) in discovery and to pursue sanctions for costs, attorney's fees, and other penalties, pursuant to the Order compelling the S3 Lenders to produce documents [Docket No. 2238] entered by this Court on April 14, 2023 and applicable law.

provisions of the New Jersey Revised Statutes (N.J.S.A. 46:14-2.1, 46:14-6.1, 46:26A-2(d), 46:26A-3(a)(3), 46:26A-12(c), *et seq.*), as well as case law, including but not limited to *In re Buchholz*, 224 B.R. 13 (Bankr. D.N.J. 1998) and *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013).

8.      The purported mortgage on the property owned by the Manhattan Debtor, which is commonly known as 1300 Manhattan Avenue, Union City, New Jersey (the "Manhattan Property"), also suffers from defects that render it likewise invalid and avoidable.

9.      Because their liens are defective, invalid, and avoidable, the S3 Lenders are not secured creditors. Yet they have received, subject to a stipulated reservation of rights for the Committee to challenge the same, approximately $3,007,727.90 (as to the loan for the Bergenline Property) and $220,734.08 (as to the loan for the Manhattan Property), through June 6, 2023, in payments of postpetition interest[4] that they would not have received as unsecured (or undersecured) creditors under applicable bankruptcy law. This money should be returned to the Debtors' estates for the benefit of other unsecured creditors.

10.     Moreover, the S3 Lenders also received postpetition payments of both pre- and post-petition interest, shortly after the Petition Date on or about June 17, 2022, prior to any stipulation or consent order, in the amounts of $443,783.84 (as to the loan for the Bergenline Property) and $32,137.35 (as to the loan for the Manhattan Property), which are also avoidable and should be returned to the estate.

11.     Likewise, the S3 Lenders received substantial payments of interest, as well as a loan extension fee, prepetition from NRIA and the Fund (neither of which is indebted to the S3

---

[4] Notably, all of the postpetition payments of interest have been made by Debtor, NRIA Partners Portfolio Fund I LLC, not by either of the Bergenline Debtor or the Manhattan Debtor.

Lenders or received any real value for the payments) in the amounts of $493,071.11 (as to the loan on the Bergenline Property) and $255,518.29 (as to the loan for the Manhattan Property), which should be avoided and returned to the estates.

12.     In addition to the foregoing, the Committee has identified a number of bases upon which to object to the claims of the S3 Lenders, just a few of which, without limitation to the objections asserted herein below or that may be identified in the course of discovery, are: (a) the 24% default rate interest on the Bergenline Loan, which is an "unenforceable penalty" under New Jersey law; (b) the minimum yield interest on the 1300 Manhattan Loan in the amount of $3,897,790.22 as of December 19, 2022, which is unmatured interest, unliquidated damages, and/or unreasonable interest at an effective rate of 94.6% per annum on the principal balance of $2,143,085.39 that Debtor estimated to be owed on the Petition Date, and is subject to disallowance under 11 U.S.C. §§ 502(b)(2) and 506(b), state law, and applicable precedent; (c) also concerning the minimum yield interest at an effective rate of 94.6% per annum, disallowance based upon New York's criminal usury statute, N.Y. Penal Law § 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511, which voids the entire Manhattan Loan; and (d) the 24% default rate interest on the Manhattan Loan, which is an "unenforceable penalty" under New York law.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the *Standing Order*, dated July 23, 1984, referring all cases under the Bankruptcy Code to the bankruptcy judges for this District, as amended on September 18, 2012. Standing Order of Reference 12-1 (Simandle, C.J.).

14.     The claims asserted in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (H), (K), and (O).

15.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

16.     Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the Chapter 11 Cases of NRIA, jointly administered under Case No. 22-14539-JKS.

17.     This Court has personal jurisdiction over the Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f).

18.     Also pursuant to Bankruptcy Rule 7008, the Committee consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

## BASIS FOR RELIEF REQUESTED

19.     The statutory and legal bases for the relief requested in this Complaint are sections 105, 363, 502, 506, 542, 544, 548, 549, 550, 551, and 553 of Title 11 of the United States Code (the "Bankruptcy Code"); New Jersey Statutes Annotated ("N.J.S.A.") 25:2-25(a)(1), 25:2-25(a)(2), and 25:2-27(a); N.J.S.A. 46:14-2.1, 46:14-6.1, 46:26A-2(d), 46:26A-3(a)(3), 46:26A-12(c), *et seq.*; N.Y. Penal Law § 190.40; N.Y. General Obligations Law §§ 5-501 and 5-511, and the relief requested herein is sought in compliance with Bankruptcy Rules 3007, 3012, 7001, and 7004 and D.N.J. LBR 3007-1(a).

## PARTIES

20.     Plaintiff, the Committee in these Chapter 11 Cases, was appointed on June 30, 2022, by Andrew R. Vara, United States Trustee for Region 3 (the "U.S. Trustee"), pursuant to section 1102(a) of the Bankruptcy Code, effective June 29, 2022. *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 94].

21.     On July 21, 2022, the U.S. Trustee filed the *Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 175], effective as of July 19, 2022.

22.    On November 22, 2022, this Court entered the *Consent Order and Stipulation (A) Providing Adequate Protection, and (B) Granting Related Relief* [Docket No. 1573] (the "Consent Order"), which obligated the Bergenline Debtor and the Manhattan Debtor to pay certain adequate protection to the S3 Lenders, subject to a stipulated reservation of rights in favor of the Committee, and granted the Committee standing to pursue any and all claims and defenses of the Debtor against the S3 Lenders, including the standing to prosecute this Complaint.  Specifically, the S3 Lenders and the Bergenline Debtor and Manhattan Debtor stipulated, and the Court ordered, as follows:

> 4.    This Stipulation shall be binding upon and inure to the benefit of the Parties hereto, and their successors and/or assigns; *provided, however*, that the entry of this Order and the Stipulation of the Parties hereto is without prejudice to only the right of the Official Committee of Unsecured Creditors (the "Committee") *to examine and challenge the extent, validity and/or priority of the Lenders' interest, if any, in the Properties, as well as to raise any claim against the Lenders in the nature of a setoff, counterclaim, or defense to the indebtedness under the Loan Documents, or any other causes of action (each and collectively, a "Challenge")*, provided that any such Challenge must be commenced within ninety (90) days after the date this Stipulation is entered by the Court (the "Challenge Period"), subject to the Committee's right to seek an extension of the Challenge Period.  *For the avoidance of doubt, upon the Court's approval of this Stipulation, the Committee shall be granted standing to bring and shall be authorized to pursue any Challenge without the need to file a separate standing motion.*

Order at 4-5, ¶ 4 [Docket No. 1573] (emphasis added).

23.    S3 Bergenline is a Delaware limited liability company with its principal place of business at 535 Madison Avenue, 19th Floor, New York, NY 10022 and a registered agent within the State of Delaware, which is Corporate Creations Network, Inc., with an address of 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

24.    S3 Manhattan is a Delaware limited liability company with its principal place of business at 535 Madison Avenue, 19th Floor, New York, NY 10022 and a registered agent within

the State of Delaware, which is Corporate Creations Network, Inc., with an address of 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

## BACKGROUND AND FACTS[5]

### Overview

25.     The first two sub-parts of this Background and Facts section below—NRIA's Business Structure and NRIA's Fraudulent Operation—The Ponzi Scheme—provide facts and details concerning the Debtors' structure and operations with respect to the Ponzi scheme relative to, amongst other things, the fraudulent transfer allegations herein.  Those two sub-parts are followed by two sub-parts concerning the Debtors' bankruptcy and proceedings and the Cease and Desist Order of the New Jersey Bureau of Securities.  Those sub-sections are followed by the facts and details specific to the Debtors' relationship and transactions with the S3 Lenders.

### NRIA's Business Structure

26.     NRIA is a Delaware limited liability company that was formed on November 27, 2006, by Thomas Nicholas Salzano ("Salzano" and sometimes, "Nick Salzano" herein) and Grabato.

27.     NRIA's principal place of business is located at 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

28.     At the times relevant to the dates of the S3 Lenders' loans to the Bergenline Debtor and the Manhattan Debtor, Grabato was the majority owner, President, and the Chief Executive Officer of NRIA, as well as the Bergenline Debtor and Manhattan Debtor.

---

[5] The allegations in this Complaint are based upon the documents and information available to the Committee at the time of this filing and expressly remain subject to amendment as further documents and information are discovered.

29.    Salzano served as a "Senior Independent Executive Advisor and Portfolio Manager" of NRIA, although his involvement in the company was more akin to a president or chief executive officer until he was terminated in October 2021.  Salzano used his middle name, Nick, to deliberately mislead investors about his connection to a prior fraud involving a company called NorVergence, Inc. ("NorVergence" and the "NorVergence fraud," respectively), which had also resulted in a bankruptcy in this Court.  *See In re Norvergence, Inc.*, Case No. 04-32079 (RG) (Bankr. D.N.J.).

30.    Arthur "Art" Scuttaro ("Scuttaro") served as Executive Vice President of Project Management at NRIA, but deliberately misspelled his name as "Scutaro" to mislead investors about his connection to the prior NorVergence fraud.  His son, Arthur "AJ" Scuttaro, was allegedly also involved in the operations of NRIA and also misspelled his last name as "Scutaro."  AJ Scuttaro is presently a Defendant to an adversary proceeding related to the Chapter 11 Cases of NRIA which is captioned *National Realty Investment Advisors, LLC v. Salzano, et al.*, Adv. Pro. No. 22-01233-JKS (Bankr. D.N.J.).

31.    NRIA claimed to operate as a real estate investment, management, and development firm that since its inception has developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania.  NRIA also claimed that it would return extraordinarily high guaranteed returns to its investors, and that its investors would be paid their return of capital first.  In reality, NRIA operated like a Ponzi scheme, using investors' own contributions to pay investor distributions and to pay the personal expenses of Salzano, Grabato, and their family members.  And any actual profits were not allocated in full to investor returns as promised, but instead went to Salzano, Grabato, their family members, and other affiliated persons and entities.

32.    Since its inception, NRIA offered investors interests in a series of limited liability companies ("LLCs") as investments in developing real estate properties.  Each LLC purportedly held a single investment property, and NRIA represented to each investor which property the investors were investing in and from which property the investors would purportedly receive profits.  This opportunity was marketed to investors as securities exempt from registration under applicable securities laws.

33.    Principals and management of the Debtors also created NRIA EB-5, LLC to solicit international investors, mainly from India, to invest up to $1,800,000 per investor in exchange for help obtaining permanent residency green card status in the United States.  In furtherance of this scheme, NRIA advertised the investment opportunities on Indian television networks and in an Indian newspaper and opened three offices in India.  NRIA raised millions of dollars from investors through this scheme.

34.    NRIA also advertised heavily to solicit investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio and YouTube advertisements.

35.    On February 5, 2018, Salzano, Grabato, and Scuttaro, with the assistance, participation and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund").  Since its inception, NRIA has served as manager of the Fund and its investments.  The primary goal of the Fund was to "roll up" pre-existing investors in individual property LLCs into one pooled fund, and to solicit investments from additional investors.  The creation of the Fund made it more difficult for investors to track the progress on any particular property in which they were invested and the profits supposedly flowing therefrom.

36.     Existing investors were encouraged to "roll up" into the Fund.  Most of the pre-Fund investors were offered a "bonus" interest in the Fund in exchange for rolling up, with no other payment or consideration needed to get the bonus interest.  These bonuses were not disclosed to other investors despite the fact that the bonuses diluted the investments of the other investors.

37.     NRIA purportedly purchased properties at below-market value prices to allegedly develop and then sell the properties for a profit.  The Fund owned interests in more than one-hundred limited liability companies, which owned a portfolio of properties in Florida, New Jersey, New York, and Pennsylvania.

38.     The Fund was purportedly managed and operated by Salzano, Scuttaro, D. Coley O'Brien ("O'Brien"), and Grabato (collectively, the "Managers").  Grabato participated in management as a signatory, and his name was used extensively. However, it appears that Grabato permitted Salzano full license to use his name and signature stamp to handle NRIA's affairs.

39.     According to its Private Placement Memoranda ("PPM") and amendments thereto, for all relevant time periods, Grabato was president of the Fund, and the Fund was managed by NRIA.

40.     NRIA was owned by Grabato and NRIA Capital Partners, Inc. ("NRIA Capital").  O'Brien, who served as Managing Director of the Fund, wholly owned NRIA Capital.

41.     Shortly before the bankruptcy filing, Grabato stepped down as Manager, President, and Chief Executive Officer of NRIA, and, upon information and belief, fled the country.

### NRIA's Fraudulent Operations—The Ponzi Scheme

42.     From the Fund's inception in 2018, until at least January 2022, NRIA raised more than $600 million for the Fund from approximately 2,000 investors ("Investors").  Three hundred and eighty-two Investors were retirees who contributed more than $94.8 million from hard-earned retirement accounts.

43.     Because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

44.     NRIA had little to no revenue and used Investor funds to pay Investor distributions.

45.     To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial Investor monies.  To do so, NRIA advertised on radio and television nationwide and had multiple billboards in New Jersey.  For example, billboards in high traffic areas in New Jersey lured investors into the scheme by promising 12% returns and the opportunity of obtaining up to 21%.

46.     NRIA spent over $56 million on advertising and promotional costs, which amounts to nearly 10% of the monies received from Investors.

47.     To raise money from Investors, NRIA offered and sold membership units in the Fund and promised an annual return of at least 12%.  NRIA also guaranteed an annual distribution of 6% during the first four years of an investment.

48.     In actuality, the 6% distributions were paid not by profit generated from NRIA operations but by a return of Investor money that had been contributed to the Fund.  NRIA repeatedly represented in PPMs that the 6% return to investors would be paid out of cash flow distributed to NRIA by the Fund.

49.     NRIA failed to disclose many conflicts of interest and misused investor funds to personally benefit the NRIA Managers and their families and friends.  Many of the employees and contractors of NRIA were family members or friends of Salzano, Grabato, and other NRIA Managers.

50.     For example, Salzano's son was chief financial officer and co-owner of one of the Fund's general contractors, U.S. Construction, and co-founder of the main residential marketing

and leasing company used by NRIA, Premier Access Management.  NRIA also paid hundreds of thousands of dollars to Salzano's son-in-law's marketing company (this same son-in-law was Vice President of Information Technology at NRIA).  Other relatives of Salzano were paid for business entity formation fees, purchasing and leasing equipment, real estate commissions, and other services that they did not perform or were not qualified to perform.

51.    NRIA charged the Fund annual development fees of up to 4.5 percent of the overall value of any given project and failed to disclose the development fees were paid at the outset of the projects, not when the project was completed and sold as required by standard business practices and Generally Accepted Accounting Principles ("GAAP").  This practice grossly inflated NRIA's revenue, and the violations of standard business practices and GAAP were flagged by NRIA's accountant.  These practices, the violations of standard business practices and GAAP, and the inflated revenues were never disclosed to Investors.

52.    NRIA also used "straw" purchasers to complete transactions with the intent of giving a false appearance of a high demand for NRIA properties when the demand for these properties was in fact much lower.  These "straw" purchasers were individuals close to or entities owned by individuals close to the NRIA Insiders, who often purchased the properties using loans from NRIA itself.  This scheme and the resulting inflated demand were not disclosed to Investors.

53.    In September 2020, NRIA began using investor funds to purchase risky Commercial Mortgage Backed Securities ("CMBS").  This practice involved purchasing CMBSs using a small portion of NRIA funds.  This practice increased the risk to Investors, and NRIA did not clearly disclose that Investor funds were being used to purchase CMBSs.  Instead, NRIA simply mentioned in the PPMs that it *might* use Investor funds for this type of investments.

54.    NRIA and the Fund continuously misrepresented to Investors that their money was being used to further the Fund's actual purpose, developing real estate, when in reality, NRIA was misusing investor money in the variety of ways described above.

55.    NRIA continued these misrepresentations despite explicit and direct questions from Investors with concerns that NRIA was operating like a Ponzi scheme.   In response to such questions, AJ Scuttaro prepared scripts for NRIA's salespeople to use in quelling Investor concerns that contained further misrepresentations.   For example, in September 2020, AJ Scuttaro claimed that:

a.    NRIA was thoroughly diligenced by banks and lenders that provided $73,000,000 in loans to NRIA;

b.    NRIA could "easily pay investors from existing stand alone [sic] projects, capital, reserves, and revenues in sales coming in of over 100 million dollars currently over the next 12 months";

c.    NRIA, unlike other Ponzi schemes, did not operate with forged investment documents;

d.    NRIA has "plenty of sales revenue cash flow to pay [its] customers monthly, and overhead expenses, and bank pre funded loans and set aside construction borrowing availability to build everything"; and

e.    NRIA would guarantee 12% returns that put the employees "reputations and livelihoods and families at risk" but that the Fund's average returns were 18 to 21%.

56.    Despite emails putting the average returns between 18% and 21%, other representations to investors only adopted the high end and claim that NRIA has paid out a 21% return annually to its investors over 14 years.

57.    Although NRIA financed many purchases, it also claimed in these emails that the reason it could turn such a high profit is because NRIA would come in as a cash buyer seeking to make purchases from distressed sellers.

58.    To the extent that NRIA did disclose its use of lenders, it represented to Investors that it utilized institutional lenders and hedge funds that offered non-recourse loans. NRIA further represented that these loans have no monthly carrying charges until the project is built and sold, which eliminates the risk of foreclosure.

59.    Further emails and internal scripts regarding responses to concerns that NRIA was a Ponzi scheme included directives to inform potential investors and Investors that NRIA "maintains at all times $10,000,000" of reserves.

60.    In another email sent in response to an investor's concern that NRIA was in effect a Ponzi scheme, Scuttaro and another NRIA employee planned to tell the investor that NRIA could not be a Ponzi scheme because it advertised heavily on Sirius XM radio and national television, and therefore its advertisers and advertisers' attorneys had completed "rigorous research" before they went "on air" and "put their reputation on the line."

61.    Earlier that year, an internal email had circulated among the NRIA salespeople, including AJ and Art Scuttaro, with the definition of a Ponzi scheme. The email, which originated from Investopedia, stated "A Ponzi scheme is a fraudulent investing scam promising high rates of return with little risk to investors." It goes on to explain that the scheme pays old investors with

funds from new investors, and that it bottoms out when there are not enough new investors to keep the money flowing.

62.     NRIA, of course, was offering Investors exactly that:  the "likelihood" of 18 to 21% returns with no downside, because Investors would be fully guaranteed at least 12% in returns over a certain, usually very short, time horizon.   And each of the employees on the email were desperately trying to keep new money coming in at all costs, even at the cost of over $56 million in advertising fees.  Nonetheless, NRIA continued to represent to Investors that it shared none of the common characteristics of a Ponzi scheme.

63.     NRIA also repeatedly represented to many investors that it had "skin in the game" and had invested 50/50 alongside the Investors, but that the Investors would be paid back first, including their guaranteed returns.  In reality, NRIA did not have independent capital sufficient to invest 50/50 on projects and the bulk of projects were funded by loans and investments.

64.     In summary, NRIA and the Fund failed to disclose at least the following material issues to investors:

> a.     the various conflicts of interest and transactions with related entities;
>
> b.     the true ability of NRIA to invest equivalent "skin in the game," its reserves, and its outstanding capital;
>
> c.     that nearly 10% of investor monies were used to advertise and solicit subsequent investors and investments;
>
> d.     that the annualized 6% distributions were a return of the investor's contributions, not profits from investments;
>
> e.     that investor funds were used for personal use by the NRIA Managers and their families;

f.   Salzano and Scuttaro's involvement in the NorVergence Fraud and the payments to reputation companies to cover up this involvement;

g.   the improper booking of development fees;

h.   the use of straw purchasers to mislead investors and purchasers;

i.   Salzano's attempts to defraud individual investors and TD Bank by presenting forged documentation to induce TD Bank to pay $20 million in connection with a real estate project; and

j.   the extent of NRIA's use of investor funds to purchase CMBSs.

**Bankruptcy Proceedings**

65.   On June 7, 2022 (the "Petition Date"), NRIA, along with the Fund and over 130 affiliated limited liability company Debtors, including but not limited to the Bergenline Debtor and the Manhattan Debtor, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

66.   The Debtors are currently operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

67.   These Chapter 11 Cases are being jointly administered pursuant to the Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief [Dkt. No. 27], entered on June 9, 2022.  This includes the Chapter 11 cases of the Bergenline Debtor (Case No. 22-14568-JKS) and the Manhattan Debtor (Case No. 22-14596-JKS).

**New Jersey Bureau of Securities Cease and Desist Order**

68.   On June 21, 2022, just two weeks after the Petition Date, the New Jersey Bureau of Securities filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the NRIA Partners

Portfolio Fund I, LLC (defined therein as the "NRIA Fund"). *See* Letter to Honorable John K.

Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS

(Bankr. D.N.J. June 21, 2022), Docket No. 60.

69.     Attached to the New Jersey Bureau of Securities' letter response described above

was a Summary Cease and Desist Order against the NRIA Fund, its general partner, NRIA, NRIA

Capital Partners, Inc., NRIA Structured Credit Strategies, LLC, and four present or former officers

of NRIA Fund senior management (Nick Salzano, Grabato, O'Brien, and Arthur Scutaro,

collectively, the "Respondents") that described the violations described above. *See* Summary

Cease and Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau

of Securities June 21, 2022) (the "Summary Order").  On December 8, 2022, the Court entered an

order approving an Administrative Consent Order between the New Jersey Bureau of Securities,

NRIA, the Fund, and NRIA Structured Credit Strategies, LLC (the "Administrative Consent

Order"), Docket No. 1651.

70.     The Summary Order and the Administrative Consent Order are voluminous and

therefore not attached hereto; however, each is incorporated by reference herein as part of the

Court's docket [Docket Nos. 60 and 1651].  As stated in the first few findings of fact in each order:

> 1.     Respondents were involved in a massive, nationwide
> securities fraud, emanating from New Jersey, in which from 2018
> until at least January 2022, Respondents offered and sold at least
> $630 million in securities in the form of membership units ("Units")
> in the NRIA Fund to at least 1,800 investors, including at least 380
> New Jersey investors ("NRIA Fund Securities").
>
> 2.     Respondents executed their scheme by employing a
> nationwide advertising campaign including radio advertisements
> and billboards strategically located at the entrance to the Lincoln and
> Holland Tunnels that enticed investors with guaranteed returns of
> 12% and the possibility of obtaining up to 21% returns.

3.      Respondents told investors that the NRIA Fund is a billion-dollar-plus real estate development firm focused on "groundup" property development of townhomes, condominium complexes, luxury residences, and mixed-use rental developments. The NRIA Fund's model purported to rely on the opportunistic purchase of land or property at below-market value prices and strategically developing it to sell it for a large profit.

4.      The NRIA Fund purported to provide investors a guaranteed, annualized return of at least 12%. The NRIA Fund also promised a seemingly robust annual distribution of 6% during the initial years without disclosing to investors that these returns were not from profit, but were instead a return of the investors' own money in the form of their capital contribution to the NRIA Fund.

5.      The Respondents used a series of private placement memoranda (the "PPMs") in the offer and sale of the Units which were riddled with material misstatements and omissions.

6.      The PPMs and sticker supplements named Grabato as the President of the NRIA Fund. They also stated that the NRIA Fund would be managed by NRIA, which was owned by Grabato and O'Brien, the NRIA Fund's Managing Director, through O'Brien's wholly owned company, NRIA Capital. In reality, the NRIA Fund was actually controlled by Salzano. Salzano had been the subject of a complaint by the Federal Trade Commission in 2006, resulting in a permanent injunction barring Salzano from similar fraudulent conduct in the future, and imposing a $50 million consent judgment against him for his role in a fraudulent scheme involving a company known as NorVergence Inc. ("NorVergence").

7.      Scutaro, aka Arthur Scuttaro, the NRIA Fund's Vice President and Advisor, had previous ties with Salzano and was also implicated in the fraudulent conduct at NorVergence.

Summary Order at ¶¶ 1-7; Administrative Consent Order at ¶¶ 1-7.

## S3's Prior Relationship With NRIA

71.     The S3 Lenders and/or their parent or affiliated entities, such as S3 Capital Partners, had relationships with the Debtors and US Construction, Inc. that preceded the mortgage loans for the Bergenline Property and the Manhattan Property that are the subject of this Complaint.

72.     Without purporting to comprehensively describe the relationship, which will be further explored in discovery, as one such example, S3 Capital Partners or one of its affiliate or subsidiary entities extended a loan to NRIA (or one of its many property-level subsidiaries) for a project at 423 3rd Street, Brooklyn, New York, for which US Construction, Inc., upon information and belief, made requests for construction draws directly to S3 Capital Partners and made one or more payments of interest to the applicable S3 entity during the period from April 2018 to November 2018.

**The Bergenline Debtor**

73.     In its Voluntary Petition filed on June 7, 2022, the Bergenline Debtor did not describe its business (*see* item 7) as Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)).

74.     Also in its Voluntary Petition filed on June 7, 2022, the Bergenline Debtor listed its estimated assets to be $0 - $50,000.

75.     In its Schedules, the Bergenline Debtor listed assets totaling $56,869,866.89, comprised of: (a) what is described as the "book value" of the Bergenline Property in the amount of $56,864,755.20, which, based upon information subsequently obtained and provided to the Committee, was substantially higher than the market value several months postpetition; and (b) cash on hand of $5,111.69 in two accounts with PNC Bank ($2,611.21 and $2,500.48) with the last four digits 6597 and 6618.  Also in its Schedules, the Bergenline Debtor listed liabilities totaling $31,128,501.65, of which $29,280,567.44 was scheduled for the Bergenline Loan.

76.     The Bergenline Debtor is not and has never been solvent considering that its primary asset is the Bergenline Property, which was purchased with the proceeds of a loan from S3 Bergenline and funds fraudulently obtained from Investors.

77.     In its Statement of Financial Affairs [Docket No. 801] filed on October 3, 2022 (the "Bergenline SOFA"), the Bergenline Debtor declared that it had no gross revenues from business,

no non-business revenue, and made no payments or transfers to creditors within 90 days prior to

the Petition Date, nor any payments or other transfers of property within 1 year prior to the Petition

Date that benefitted any insider, which would include Grabato, as Guarantor of the Bergenline

Loan pursuant to the Completion, Debt Service, Carry and Non-Recourse Carve-Out Guaranty,

purportedly executed by Grabato to and for the benefit of S3 Bergenline on July 13, 2018 (the

"Bergenline Guaranty").  Grabato was listed in the Bergenline SOFA as the Bergenline Debtor's

Chief Executive Officer and President during the period from November 2006 to April 2022.

78.    The Bergenline Debtor has generated virtually no revenue and has generally not

been capable of servicing its debts as they become due.

**The Bergenline Loan and Mortgage**

79.    S3 Bergenline made a loan to the Bergenline Debtor of Eight Million to finance the

acquisition of the Bergenline Property and up to Thirty-One Million Dollars ($31,000,000.00)—a

total maximum amount of up to Thirty Nine Million Dollars ($39,000,000.00) (the "Bergenline

Loan") as set forth in certain transaction documents (the "Bergenline Loan Documents"),

including, amongst other documents, (i) a Building Loan and Term Loan Agreement dated as of

July 17, 2018 (the "Bergenline Loan Agreement"), (ii) a Promissory Note dated as of July 17, 2018

(the "Bergenline Promissory Note"), (iii) an Absolute Assignment of Leases and Rents dated as of

July 17, 2018 (the "Bergenline Assignment of Rents"); and (iv) a Mortgage and Assignment of

Leases and Rents and Security Agreement dated July 17, 2018 (the "Bergenline Mortgage"), the

last of which purportedly encumbers the Bergenline Property.  Each of the foregoing Bergenline

Loan Documents were purportedly entered into between the Bergenline Debtor and S3 Bergenline.

80.    As set forth and represented in the Consent Order (which representation is not

binding on the Committee by virtue of its reservation of rights), as well as the Bergenline Debtor's

Schedules, the Debtors estimate that $29,269,017.25 in principal remained outstanding on the Bergenline Loan as of the Petition Date.

81.    A true and accurate copy of the Bergenline Loan Agreement produced by S3 Bergenline is attached as **Exhibit <u>E</u>**[6] and incorporated by reference herein.

82.    A true and accurate copy of the Bergenline Promissory Note produced by S3 Bergenline is attached as **Exhibit <u>F</u>** and incorporated by reference herein.

83.    Attached as **Exhibit <u>G</u>**, and incorporated by reference herein, is a true and accurate copy of the Bergenline Assignment of Rents that was filed with the Register of Hudson County, New Jersey (the "<u>Hudson County Register</u>") on August 1, 2018 as Instrument Number 20180801060098860.

84.    Attached as **Exhibit <u>H</u>**, and incorporated by reference herein, is a true and accurate copy of an unrecorded version of the Bergenline Assignment of Rents produced by S3 Bergenline. The signatures on the acknowledgement page of the Bergenline Assignment of Rents produced by S3 Bergenline do not match the recorded copy of the Bergenline Assignment of Rents attached as Exhibit G.

85.    Attached as **Exhibit <u>I</u>**, and incorporated by reference herein, is a true and accurate copy of the Bergenline Mortgage that was recorded with the Hudson County Register on August 1, 2018 as Instrument Number 20180801060098860.

86.    Attached as **Exhibit <u>J</u>**, and incorporated by reference herein, is a true and accurate copy of an unrecorded version of the Bergenline Mortgage produced by S3 Bergenline.

---

[6] Exhibits A, B, C, and D are schedules of the pre- and post-petition transfers made to the S3 Lenders that subject to avoidance, recovery and preservation under various Counts of this Complaint, and are referenced in allegations below.

87.     In addition, S3 Bergenline attached an unrecorded copy of the Bergenline Mortgage as Exhibit B to its Motion for Designation of Bergenline Capital 4901 LLC as Single Asset Real Estate Debtor [Docket Nos. 2211 and 2212] filed on April 4, 2023, which is different from the unrecorded copy it produced and does not match the recorded copy of the Bergenline Mortgage attached as Exhibit I.

88.     The recorded copy and unrecorded copies of the Bergenline Mortgage are each different, and together with the facts alleged herein below, establish that the Bergenline Mortgage was not acknowledged.

89.     And S3 Bergenline did not attach any copy of the Bergenline Mortgage to the publicly available S3 Bergenline Claim (as defined below) filed December 20, 2022; however, the copy with all attachments obtained from counsel to S3 Bergenline reveals that, once again, an unrecorded copy that does not match the recorded copy was attached.

### The Manhattan Debtor

90.     In its Voluntary Petition filed on June 7, 2022, the Manhattan Debtor did not describe its business (*see* item 7) as Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)).

91.     Also in its Voluntary Petition filed on June 7, 2022, the Manhattan Debtor listed its estimated assets to be $0 - $50,000.

92.     In its Schedules, the Manhattan Debtor listed assets totaling $25,065,540.33, comprised of: (a) what is described as the "book value" of the Manhattan Property in the amount of $25,040,540.33, which, based upon information subsequently obtained and provided to the Committee, was significantly higher than the market value several months postpetition; and (b) cash on hand of $25,000.00 in a Signature Bank account with the last four digits 8397.  Also in its Schedules, the Manhattan Debtor listed liabilities totaling $4,373,657.51, of which $2,143,085.40 was scheduled for the Manhattan Loan.

93.    The Manhattan Debtor is not and has never been solvent considering that its primary asset is the Manhattan Property, which was purchased with the proceeds of a loan from S3 Manhattan and funds fraudulently obtained from Investors.

94.    In its Statement of Financial Affairs [Docket No. 806] filed on October 3, 2022 (the "Manhattan SOFA"), the Manhattan Debtor declared that it had no gross revenues from business, no non-business revenue, and made no payments or transfers to creditors within 90 days prior to the Petition Date, nor any payments or other transfers of property within 1 year prior to the Petition Date that benefitted any insider, which would include Grabato, as Guarantor of the Manhattan Loan pursuant to the: (a) Guaranty of Carry Costs; (b) Guaranty of Payment of Completion Costs; and (c) Guaranty of Recourse Obligations, each purportedly executed by Grabato to and for the benefit of S3 Manhattan on November 5, 2019 (the "Manhattan Guaranties").  Grabato was listed in the Manhattan SOFA as the Manhattan Debtor's Chief Executive Officer and President during the period from November 2006 to April 2022.

95.    The Manhattan Debtor has generated virtually no revenue and has generally not been capable of servicing its debts as they become due.

**The Manhattan Loan and Mortgage**

96.    S3 Manhattan made a loan to the Manhattan Debtor in the maximum principal amount of Forty-Four Millions Dollars ($44,000,000.00) (the "Manhattan Loan"), pursuant to, amongst other documents, a (i) Construction Loan Agreement dated as of November 15, 2019 (the "Manhattan Loan Agreement"), (ii) a Promissory Note dated as of November 15, 2019 (the "Manhattan Note"), (iii) an Absolute Assignment of Leases and Rents dates as of November 15, 2019 (the "Manhattan Assignment of Rents"), and (iv) a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of November 15, 2019 (the "Manhattan Mortgage"), the last of which purportedly encumbers the Manhattan Property.  Each of the

foregoing documents and all affiliated documents purportedly entered into in connection with the closing of the Manhattan Loan (the "Manhattan Loan Documents") were purportedly entered into between the Manhattan Debtor and S3 Manhattan, with Grabato as guarantor.

97.    As set forth and represented in the Consent Order (which representation is not binding on the Committee by virtue of its reservation of rights), as well as the Manhattan Debtor's Schedules, the Debtors estimate that $2,143,085.39 in principal remained outstanding on the Manhattan Loan as of the Petition Date.

98.    A true and accurate copy of the Manhattan Loan Agreement produced by S3 Bergenline is attached as **Exhibit K** and incorporated by reference herein.

99.    A true and accurate copy of the Manhattan Promissory Note produced by S3 Bergenline is attached as **Exhibit L** and incorporated by reference herein.

100.    Attached as **Exhibit M**, and incorporated by reference herein, is a true and accurate copy of the Manhattan Assignment of Rents that was filed with the Hudson County Register on November 26, 2019 as Instrument Number 20191126060148850.

101.    Attached as **Exhibit N**, and incorporated by reference herein, is a true and accurate copy of an unrecorded version of the Manhattan Assignment of Rents produced by S3 Bergenline. The signatures on the acknowledgement page of the Manhattan Assignment of Rents produced by S3 Manhattan do not match the recorded copy of the Manhattan Assignment of Rents attached as Exhibit M.

102.    Attached as **Exhibit O**, and incorporated by reference herein, is a true and accurate copy of the Manhattan Mortgage that was filed with the Hudson County Register on November 26, 2019 as Instrument Number 20191126060148840.

103.    Attached as **Exhibit <u>P</u>**, and incorporated by reference herein, is a true and accurate copy of an unrecorded version of the Manhattan Mortgage produced by S3 Manhattan.  The signatures on the acknowledgement page of the Manhattan Mortgage produced by S3 Manhattan do not match the recorded copy of the Manhattan Mortgage attached as Exhibit O.

104.    S3 Manhattan did not attach any copy of the Manhattan Mortgage to the publicly available S3 Manhattan Claim (as defined below) filed December 20, 2022; however, the copy with all attachments obtained from counsel to S3 Manhattan reveals that an unrecorded copy was attached.

### S3 Bergenline Scheduled Claim

105.    On October 5, 2022, the Bergenline Debtor filed its Schedules [Docket No. 856, Case No. 22-14539-JKS], including Schedule D, on which it listed S3 Bergenline as holding a claim in the amount of $29,280,567.44 secured by real property and assets (the "<u>S3 Bergenline Scheduled Claim</u>").

### S3 Manhattan Scheduled Claim

106.    On October 5, 2022, the Manhattan Debtor filed its Schedules [Docket No. 915, Case No. 22-14539-JKS], including Schedule D, on which it listed S3 Manhattan as holding a claim in the amount of $2,143,085.40 secured by real property and assets (the "<u>S3 Manhattan Scheduled Claim</u>").

### Bar Date Order and Proofs of Claim

107.    On July 21, 2022, the Court entered an order appointing Omni Agent Solutions (the "<u>Claims Agent</u>") as claims and noticing agent in these Chapter 11 Cases.

108.    On October 13, 2022, the Court entered an Order setting December 20, 2022 at 5:00 p.m., as the deadline to file nongovernmental proofs of claim, and granting related relief [Docket No. 1016] (the "<u>Bar Date Order</u>").

109.    The Bar Date Order, in paragraph 8(b) provides that persons or entities for whom

or which claims have been scheduled were "not required to file a proof of claim or interest on or

before the General Bar Date . . . provided that:

> (i) the claim is not scheduled as "disputed," "contingent" or
> "unliquidated;" (ii) such claimant does not disagree with the amount
> and priority of the claim set forth in the Schedules; and (iii) such
> person or entity does not dispute that its claim is an obligation only
> of the specific Debtor against which the claim is listed in the
> Schedules; . . . .

Bar Date Order at 5, ¶ 8(b).

110.    Paragraph 5(e)(i) of the Bar Date Order states that proofs of claim or interest must

"be signed."  And paragraph 12 of the Bar Date Order provides that if a proof of claim is not filed

"in the form and manner specified in this Order . . . on or before the applicable Bar Date, the

person, entity or governmental unit that is required to file a proof of claim:

> shall not, with respect to such claim, be treated as a creditor or equity
> security holder of the Debtors for the purpose of voting upon any
> chapter 11 plan, shall not receive or be entitled to receive any
> payment or distribution of property from the Debtors, their estates,
> their property, or their successors or assigns with respect to such
> alleged claim or interest, and shall be forever barred from asserting
> such alleged claim against or interest in the Debtors, their estates, or
> their successors or assigns, unless otherwise ordered by this Court.

Bar Date Order at 6-7, ¶ 12.

111.    On or about December 20, 2022, S3 Bergenline filed its unsigned[7] Proof of Claim

or Interest (the "S3 Bergenline Proof of Claim" and, together with the S3 Bergenline Scheduled

Claim, the "S3 Bergenline Claim"), which appears as Proof of Claim No. 45 on the Claims Agent's

register of claims for the Bergenline Debtor.  The S3 Bergenline Claim is asserted against

Bergenline Capital 4901 LLC in Case No. 22-14568 for the amount of $31,617,347.74,

---

[7] On both the publicly available copies and the copies provided by the S3 Lenders' counsel, the
signature line (set up for signature by counsel, not the S3 Lenders) is blank.

purportedly secured by real estate, based on a principal balance on the Petition Date of $29,269,017.25, plus floating rate interest and 24% per annum default rate interest.

112.    The documents attached to the non-public version of the S3 Bergenline Proof of Claim provided to the Committee include certain copies of the Bergenline Loan Agreement (Exhibit 1), the Bergenline Note, and the Bergenline Mortgage (unrecorded, clean version 5). There are no other documents attached to, and no other assertion of a basis for a secured claim within, the S3 Bergenline Proof of Claim or the Addendum thereto.

113.    On or about December 20, 2022, S3 Manhattan filed its unsigned Proof of Claim or Interest (the "S3 Manhattan Proof of Claim" and, together with the S3 Manhattan Scheduled Claim, the "S3 Manhattan Claim"), which appears as Proof of Claim No. 29 on the Claims Agent's register of claims for the Manhattan Debtor.  The S3 Manhattan Claim is asserted against Manhattan Avenue Capital 1300 LLC in Case No. 22-14956 for the amount of $6,040,875.61, purportedly secured by real estate, based on a principal balance on the Petition Date of $2,143,085.39, plus floating rate interest, minimum yield interest of $3,897,790.22, and 24% per annum default rate interest.

114.    The documents attached to the non-public version of the S3 Manhattan Proof of Claim provided to the Committee include certain copies of the Manhattan Note (Exhibit 1) and the Manhattan Mortgage (unrecorded).  There are no other documents attached to, and no other assertion of a basis for a secured claim within, the S3 Manhattan Proof of Claim or the Addendum thereto.

**Consent Orders and Stipulations**

115.    As noted above, the Court entered the Consent Order on November 22, 2022, which reserved the right of the Committee to assert a "Challenge" within the "Challenge Period", subject

to the Committee's right to seek an extension of the Challenge Period.  *See* Consent Order at 4, ¶ 4 [Docket No. 1573].

116.    The Committee and the S3 Lenders subsequently entered into a Consent Order and Stipulation Extending Challenge Period Set in the Consent Order and Stipulation (A) Providing Adequate Protection, and (B) Granting Related Relief [Docket No. 1573], which the Court entered on February 1, 2023 [Docket No. 1939], which extended the Challenge Period by sixty (60) days, through and including April 21, 2023, without prejudice to the Committee's right to seek a further extension of the Challenge Period.

117.    On February 28, 2023, the Committee filed its Motion of the Official Committee of Unsecured Creditors to Compel Production of Documents by S3 RE Bergenline Funding LLC and S3 RE 1300 Manhattan Funding LLC, Pursuant to Subpoenas for Rule 2004 Examinations, Dated January 13, 2023 [Docket No. 2040] (the "Motion to Compel").

118.    In conjunction with agreeing to adjourn the hearing on the Motion to Compel, the S3 Lenders and the Committee agreed to further extend the Challenge Period on the terms set forth in the Second Consent Order and Stipulation Extending Challenge Period [Docket Nos. 2195 and 2216], which further extended the Challenge Period through and including forty-five (45) days after the later of: (a) April 21, 2023; or (b) the date on which both S3 Lenders produce all further documents and/or communications to the Committee that the Committee deems to satisfy the production ordered by the Court.

119.    On April 14, 2023, the Court entered an order granting the Motion to Compel (the "Order Compelling Production") [Dkt. No. 2238], which gave the S3 Lenders until and including April 25, 2023 to substantially complete their production of communications and documents.

120.     The S3 Lenders produced certain communications and documents to the Committee on April 25, 2023, and stated they had thereby completed the document production.  Subject to the Committee deeming the S3 Lenders' productions to satisfy the Order Compelling Production, the earliest the Challenge Period would expire was June 9, 2023; however, in order to give the Committee, the S3 Lenders and the Debtors time to discuss the potential Challenges and to facilitate any potential settlement discussions, the S3 Lenders and the Committee agreed to further extend the Challenge Period through and including June 29, 2023, as set forth in the Third Consent Order and Stipulation Extending Challenge Period [Docket No. 2587] entered by the Court on June 7, 2023.

### S3 Lenders' SARE Motions

121.     On April 4, 2023, the S3 Lenders filed (1) S3 RE 1300 Manhattan Funding LLC's Motion for Designation of Manhattan Avenue Capital 1300 LLC as Single Asset Real Estate Debtor [Dkt. No. 2210]; and (2) S3 RE Bergenline Funding, LLC's Motion for Designation of Bergenline Capital 4901 LLC as Single Asset Real Estate Debtor [Dkt. No. 2211] (together, the "SARE Motions").

122.     At the hearing, the Court denied the SARE Motions for the reasons stated on the record, as later memorialized for the docket in the Orders [Docket Nos. 2406 and 2407] entered on both of the SARE Motions on May 3, 2023.

### Joint Chapter 11 Plan of Liquidation and Disclosure Statement

123.     On April 11, 2023 the Debtors and the Committee filed the Joint Plan of Liquidation of National Realty Investment Advisors, LLC And Its Affiliate Debtors (the "Plan") [Dkt. No. 2228], along with a proposed Disclosure Statement (the "Disclosure Statement") [Dkt. No. 2229].

124.     The S3 Lenders filed a Limited Objection to Joint Motion for Order Approving Disclosure Statement and Related Relief [Docket No. 2478] on May 9, 2023 (the "Limited

<u>Objection</u>"). Based upon subsequent revisions made to the Plan and Disclosure Statement by the Debtors and the Committee, the S3 Lenders withdrew their Limited Objection.

125.  As currently drafted, the Plan calls for substantive consolidation of the Debtors, including the Bergenline Debtor and the Manhattan Debtor.

## **Certain NRIA Business Practices**

126.  As stated above, upon information and belief, NRIA and its Managers had regularly engaged in and had a custom of improper and/or unlawful practices with respect to the execution of documents.

127.  As an example, upon information and belief, Natalie Petruic often notarized documents without actually witnessing the signatory's signature for the purposes of speeding up business and transactions, which was encouraged within NRIA.

128.  Furthermore, upon information and belief, documents that purport to bear the signature of Grabato, as an authorized signatory for various Debtors, may not have actually been signed by Grabato, were signed without a notary present, and/or were signed on signature pages separate from the documents that Grabato was purportedly signing, with the intention of later having those signature pages appended to the not yet finalized document in order to make them appear to have been validly executed.

## **Execution of the Bergenline Mortgage and Bergenline Assignment of Rents**

129.  The first page of the copy of the Bergenline Mortgage filed with the Hudson County Register is dated July 17, 2018, but the acknowledgement page is dated July 13, 2018 (the "<u>July 13, 2018 Acknowledgement Page</u>"). Grabato's signature purports to be on the July 13, 2018 Acknowledgement Page, which was purportedly notarized by Carolyn Pinkus ("<u>Pinkus</u>"), a legal assistant to Siobhan Bailey, attorney at Huntington Bailey.

130.    As noted above, upon information and belief, Grabato did not always sign documents purporting to bear his signature, and the Committee has been unable to determine at this point whether Grabato actually signed the July 13, 2018 Acknowledgment Page.   The Committee has not yet taken a deposition of Pinkus or had the opportunity to conduct sufficient discovery that might establish if Grabato did or did not execute the July 13, 2018 Acknowledgement Page.   Nonetheless, as set forth herein, the version of the Bergenline Mortgage that was filed with the Hudson County Register was not properly acknowledged and recorded regardless of the veracity of Grabato's signature.

131.    Even assuming the veracity of Grabato's signature, as set forth below, Grabato purportedly executed and Pinkus purportedly notarized only a separate signature page to a prior version of the Bergenline Mortgage, and not a full copy or final version of the Bergenline Mortgage.

132.    On July 11, 2018, Molly Daugherty at the law firm of Seyfarth Shaw LLP ("Seyfarth"), counsel to S3 Bergenline for the Bergenline Loan, sent an email asking NRIA's counsel to confirm the borrower signature block so Seyfarth could circulate "signature pages."

133.    On July 12, 2018, Stephanie Grimaldi at Seyfarth ("Grimaldi") emailed a meeting invite that included a list of "Open items for discussion purposes" that included an item labeled "Signature pages – Seyfarth Circulated 7/12."

134.    On July 13, 2018, Pinkus sent an email attaching copies of executed signature pages to various documents along with a closing escrow letter to the various parties working on the Bergenline Loan, including counsel for S3 Bergenline.   This email included a stand-alone copy of the acknowledgment page to the Bergenline Mortgage purportedly bearing the signatures of Grabato and Pinkus dated July 13, 2018 (the "July 13, 2018 Acknowledgement Page"), and an

acknowledgment page to the Bergenline Assignment of Rents purportedly bearing the same; the email did not include executed full copies of the Bergenline Mortgage or the Bergenline Assignment of Rents.

135.   Even if a full copy of a draft of the Bergenline Mortgage was present when the July 13, 2018 Acknowledgement Page was purportedly executed, that version was not the version of the Bergenline Mortgage that was ultimately recorded, which recorded version has never been produced or filed by the S3 Lenders in these Chapter 11 Cases.

136.   On July 11, 2018, counsel for S3 Bergenline sent an email attaching drafts of various documents for the Bergenline Loan, including a version of the Bergenline Mortgage labeled version 3.

137.   Version 3 was the latest version of the Bergenline Mortgage then in existence when Grabato would have purportedly executed the July 13, 2018 Acknowledgement Page.

138.   On July 16, 2018, after Grabato purportedly executed and Pinkus purportedly acknowledged July 13, 2018 Acknowledgement Page, counsel to S3 Bergenline sent an email attaching a revised version of the Bergenline Mortgage, labeled version 4.

139.   On July 17, 2018, counsel for S3 Bergenline sent an email attaching another revised version of the Bergenline Mortgage, this time labeled version 5.  This email asked Ellen Petrillo at Gotham Abstract ("Petrillo") to use a clean copy of version 5 "in lieu of the version you have and resend a pdf of the signed version to be recorded."

140.   Following that email, Petrillo sent an email attaching a "revised mortgage to be submitted for recording." The attachment is a redline from version 4 to version 5 of the Bergenline Mortgage, at the end of which the July 13, 2018 Acknowledgement Page had been inserted (in

place of the blank acknowledgment page).  This redline of the Bergenline Mortgage—version 4 to 5—is what was ultimately recorded on August 1, 2018 in the Hudson County Register.

141.    The evening of July 17, 2018, Grimaldi sent an email purporting to attach executed copies of the Bergenline Loan Documents.  This email included a clean (not redlined) copy of version 5 of the Bergenline Mortgage, at the end of which the July 13, 2018 Acknowledgement Page had been inserted (the original blank acknowledgement page from version 5 is still in this pdf following the July 13, 2018 Acknowledgement Page).[8]

142.    Ultimately, Grabato did not execute and Pinkus did not notarize the version of the Bergenline Mortgage that was recorded with the Hudson County Register.

**Execution of the Manhattan Mortgage and Manhattan Assignment of Rents**

143.    The first page of the versions of the Manhattan Mortgage and the Manhattan Assignment of Rents filed with the Hudson County Register are each dated November 15, 2019, but the acknowledgement pages are dated November 5, 2019 (the "November 5, 2019 Acknowledgement Pages").  Grabato's signature purports to be on the acknowledgement pages of the recorded versions of the Manhattan Mortgage and the Manhattan Assignment of Rents, which, like the Bergenline Mortgage and Bergenline Assignment of Rents, were purportedly notarized by Pinkus.

144.    As stated above, upon information and belief, Grabato did not always sign documents purporting to bear his signature, and the Committee has not yet been able to determine whether Grabato actually signed the November 5, 2019 Acknowledgment Pages.  However, as stated above, the signatures on the acknowledgment pages on the unrecorded copies of the

---

[8] Counsel for S3 Bergenline also produced this copy in discovery.

Manhattan Mortgage and Manhattan Assignment of Rents produced by S3 Manhattan in discovery do not match the signatures on the recorded copies of those documents.

145.    Upon information and belief, including the circumstances described above regarding the Bergenline Loan, even assuming Grabato actually signed, Grabato likely only signed and Pinkus only notarized stand-alone versions of the November 5, 2019 Acknowledgement Pages and not full versions of the copies of the Manhattan Mortgage and Manhattan Assignment of Rents that were recorded.

146.    After a review of the discovery that the Committee has received from S3 Manhattan and the Debtors to date, the Committee has not yet seen an email or other transmittal of a fully executed copies of the Manhattan Mortgage or Manhattan Assignment of Rents from Pinkus or Grabato on or near the date of the November 5, 2019 Acknowledgement Pages.  The Committee believes that additional discovery will establish that, like the Bergenline Mortgage, the Manhattan Mortgage and Manhattan Assignment of Rents were not properly acknowledged or recorded.

### Prepetition Transfers To or For the Benefit of S3 Bergenline

147.    The Bergenline Loan Documents purportedly require the Bergenline Debtor to pay to S3 Bergenline certain periodic interest and other payments.

148.    In the four-year period prior to the Petition Date, and not including the two-year transfer identified below, NRIA made the following transfers to or for the benefit of S3 Bergenline totaling $103,071.11 (collectively, the "Bergenline Four Year Transfers"):

a.    On December 13, 2018, NRIA transferred $36,402.22 from NRIA's bank account ending 1872, purportedly in satisfaction of interest obligations owed by the Bergenline Debtor to S3 Bergenline.

b.      On January 8, 2019, NRIA transferred $66,668.89 from NRIA's bank account
ending 1872, purportedly in satisfaction of interest obligations owed by the
Bergenline Debtor to S3 Bergenline.

149.    On February 19, 2021, NRIA transferred to or for the benefit of S3 Bergenline
$390,000.000 from NRIA's bank account ending 1872, purportedly in satisfaction of a loan
extension fee owed by the Bergenline Debtor to S3 Bergenline (the "Bergenline Two Year
Transfer", and with the Bergenline Four Year Transfer, the "Bergenline Prepetition Transfers").

150.    The Bergenline Prepetition Transfers total $493,071.11.

151.    A table summarizing the Bergenline Prepetition Transfers[9] is attached as **Exhibit A**
and incorporated by reference herein.

152.    NRIA is not a guarantor of the Bergenline Debtor's obligations to S3 Bergenline
under the Bergenline Loan Documents and was not otherwise liable to S3 Bergenline at the time
each of the Bergenline Prepetition Transfers was made.

**Prepetition Transfers To or For the Benefit of S3 Manhattan**

153.    The Manhattan Loan Documents purportedly require the Manhattan Debtor to pay
to S3 Manhattan certain periodic interest and other payments.

154.    In the two-year period prior to the Petition Date, NRIA and the Fund made the
following transfers to or for the benefit of S3 Manhattan (collectively, the "Manhattan Prepetition
Transfers"):

a.      On February 3, 2021, NRIA transferred $16,332.10 from NRIA's bank account
ending 1872, purportedly in satisfaction of interest obligations owed by the
Manhattan Debtor to S3 Manhattan.

---

[9] The Committee reserves the right to avoid and recover not only the transfers identified herein, but any other transfers
that may be identified in the course of discovery.

b.      On March 1, 2021, NRIA transferred $14,751.57 from NRIA's bank account ending 1872, purportedly in satisfaction of interest obligations owed by the Manhattan Debtor to S3 Manhattan.

c.      On April 2, 2021, NRIA transferred $16,332.10 from NRIA's bank account ending 1872, purportedly in satisfaction of interest obligations owed by the Manhattan Debtor to S3 Manhattan.

d.      On April 13, 2021, NRIA transferred $116,413.00 from NRIA's bank account ending 1872, purportedly in satisfaction of interest reserve funding obligations owed by the Manhattan Debtor to S3 Manhattan.

e.      On November 1, 2021, the Fund transferred $91,689.52 from the Fund's bank account ending 7560, purportedly in satisfaction of interest reserve funding obligations owed by the Manhattan Debtor to S3 Manhattan.

155.    The Manhattan Prepetition Transfers total $255,518.29.

156.    A table summarizing the Manhattan Prepetition Transfers[10] is attached as **Exhibit B** and incorporated by reference herein.

157.    NRIA and the Fund are not guarantors of the Manhattan Debtor's obligations to S3 Manhattan under the Manhattan Loan Documents and were not otherwise liable to the Manhattan Bergenline Lender at the time each of the Manhattan Prepetition Transfers was made.

### Postpetition Transfers To or For the Benefit of S3 Bergenline

158.    As set forth in more detail in Count IV below, on June 17, 2022, the Fund paid S3 Bergenline $443,783.84 on account of both pre- and post-petition interest on the Bergenline Loan, and, as of June 6, 2023, for the period from July 2022 through and including the end of May 2023, the Fund has paid S3 Bergenline a total of $3,007,727.90 for postpetition interest—together, total Bergenline Postpetition Transfers (as defined below) of $3,451,511.74.

---

[10] The Committee reserves the right to avoid and recover not only the transfers identified herein, but any other transfers that may be identified in the course of discovery.

**Postpetition Transfers To or For the Benefit of S3 Manhattan**

159.    As set forth in more detail in Count XI below, on June 17, 2022, the Fund paid S3

Manhattan $32,137.35 on account of both pre- and post-petition interest on the Manhattan Loan,

and, as of June 6, 2023, for the period from July 2022 through and including the end of May 2023,

the Fund has paid S3 Manhattan a total of $220,734.08 for postpetition interest—together, total

Manhattan Postpetition Transfers (as defined below) of $252,871.43.

### COUNT I
### AVOIDANCE OF MORTGAGE AND ASSIGNMENT OF RENTS PURSUANT TO
### 11 U.S.C. § 544(a) AND NEW JERSEY LAW AND RECOVERY AND PRESERVATION
### OF SAME PURSUANT TO 11 U.S.C. §§ 550 AND 551
### (against Defendant S3 RE Bergenline Funding LLC)

160.    The Committee repeats and realleges paragraphs 1 through 159 as if fully set forth

herein.

161.    The Committee has standing to assert any and all claims and defenses the Debtors

may have against S3 Bergenline by virtue of the Consent Order.

162.    As debtors in possession, the Debtors have the rights and powers of a trustee serving

in a case under chapter 11.

163.    Pursuant to section 544(a) of the Bankruptcy Code, a trustee in bankruptcy has,

upon commencement of a case under title 11, and without regard to any knowledge of the trustee

or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or

any obligations incurred by the debtor that is voidable by (1) a creditor that extends credit to the

debtor at the time of the commencement of the case, and that obtains, at such time and with respect

to such credit, a judicial lien on all property on which a creditor on a simple contract could have

obtained such a judicial lien, whether or not such a creditor exists; (2) a creditor that extends credit

to the debtor at the time of the commencement of the case, and obtains, at such time and with

respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

164.   As set forth above, the versions of the Bergenline Mortgage and Bergenline Assignment of Rents filed with the Hudson County Register were not properly acknowledged by Grabato and Pinkus, and therefore were not properly recorded.

165.   Under applicable New Jersey law, including but not limited to applicable provisions of the New Jersey Revised Statutes (N.J.S.A. 46:14-2.1, 46:14-6.1, 46:26A-2(d), 46:26A-3(a)(3), 46:26A-12(c), *et seq.*), as well as case law, including but not limited to *In re Buchholz*, 224 B.R. 13 (Bankr. D.N.J. 1998) and *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013), the recording of the defectively acknowledged Bergenline Mortgage and Bergenline Assignment of Rents is in violation of the New Jersey recording statutes, does not perfect a lien, and does not provide notice or constructive notice to, and is ineffective to perfect a lien or security interest as to, a bankruptcy trustee exercising the rights and powers of a creditor or bona fide purchaser under section 544(a).

166.   Accordingly, the Committee is entitled to a judgment (1) determining the Bergenline Mortgage and Bergenline Assignment of Rents are invalid under applicable New Jersey law, (2) avoiding the Bergenline Mortgage and Bergenline Assignment of Rents under applicable New Jersey law and section 544(a) of the Bankruptcy Code, and (3) preserving the lien for the benefit of the estate and recovering any proceeds of the lien on the Bergenline Property for the benefit of the estate under sections 550 and 551.

## COUNT II
### AVOIDANCE OF PREPETITION TRANSFERS AS ACTUAL FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544(b), N.J.S.A. 25:2-25(a)(1), AND 11 U.S.C. § 548(a)(1)(A) AND RECOVERY AND PRESERVATION OF SAME UNDER 11 U.S.C. §§ 550 AND 551
### (against Defendant S3 RE Bergenline Funding LLC)

167.    The Committee repeats and realleges paragraphs 1 through 166 as if fully set forth herein.

168.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

169.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

170.    As set forth above, Grabato, Salzano, and others, through the Debtors, fraudulently operated a Ponzi scheme through which millions of dollars in funds were obtained and transferred from innocent Investors to NRIA and its affiliates in furtherance of the Ponzi scheme.

171.    In the context of a Ponzi scheme, the Debtors' intent to defraud is presumed from the nature of the scheme itself.

172.    The Bergenline Prepetition Transfers constituted transfers of property of NRIA that were fraudulently obtained from innocent Investors.

173.    NRIA made the Bergenline Two Year Transfers within the two-year period prior to the Petition Date and made all of the Bergenline Prepetition Transfers within the four-year period prior to the Petition Date.

174.    The Bergenline Prepetition Transfers were made to or for the benefit of S3 Bergenline.

175.    The Bergenline Prepetition Transfers were made with the actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme.

176.    NRIA had at least one creditor with an allowable unsecured claim that remained unsatisfied as of the Petition Date.

177.    Accordingly, the Committee is entitled to a judgment (1) avoiding the Bergenline Two Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code, (2) avoiding all of the Bergenline Prepetition Transfers under section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (3) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

### COUNT III
**AVOIDANCE OF PREPETITION TRANSFERS AS CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544(b), N.J.S.A. 25:2-25(a)(2) AND 25:2-27(a), AND 11 U.S.C. § 548(a)(1)(B) AND RECOVERY AND PRESERVATION OF SAME UNDER 11 U.S.C. §§ 550 AND 551**
**(against Defendant S3 RE Bergenline Funding LLC)**

178.    The Committee repeats and realleges paragraphs 1 through 177 as if fully set forth herein.

179.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

180.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

181.    The Bergenline Prepetition Transfers constituted transfers of property of NRIA.

182.    NRIA made the Bergenline Two Year Transfers within the two-year period prior to the Petition Date and made all of the Bergenline Prepetition Transfers within the four-year period prior to the Petition Date.

183.    The Bergenline Prepetition Transfers were made to or for the benefit of S3 Bergenline.

184.    NRIA was not obligation on the Bergenline Loan and did not receive reasonably equivalent value in exchange for the Bergenline Prepetition Transfers.

185.    NRIA had at least one creditor whose claim arose before the Bergenline Prepetition Transfers were made and had at least one creditor with an allowable unsecured claim that remained unsatisfied as of the Petition Date.

186.    On the dates that each of the Bergenline Prepetition Transfers was made, NRIA was (1) insolvent or became insolvent as a result of such transfer; (2) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with NRIA was an unreasonably small capital; and/or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

187.    Accordingly, the Committee is entitled to a judgment (1) avoiding the Bergenline Two Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code; (2) avoiding all the Bergenline Prepetition Transfers under section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(1) and 25:2-27(a); and (3) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT IV
### RECOVERY AND PRESERVATION OF POSTPETITION TRANSFERS PURSUANT TO 11 U.S.C. §§ 542, 549, 550, AND 551 AND THE COMMITTEE'S RESERVATION OF RIGHTS UNDER THE CONSENT ORDER
### (against Defendant S3 RE Bergenline Funding LLC)

188.    The Committee repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

189.   The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

190.   As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

191.   On June 17, 2022, the Fund transferred $443,783.84 from its account ending 4997 to or for the benefit of S3 Bergenline (the "Bergenline June 17, 2022 Transfer"), purportedly for May 2022 and June 2022 interest owed by the Bergenline Debtor to S3 Bergenline.  Approximately $276,455.51 of the Bergenline June 17, 2022 Transfer was purportedly a payment of prepetition interest (May 2022 interest totaling $225,529.49 and prepetition interest for the first seven days of June 2022 totaling $50,926.02).   The remaining $167,328.34 was purportedly a payment of postpetition interest for the remainder of June 2022.

192.   Neither the Consent Order nor any other order of the Court retroactively authorized the Bergenline June 17, 2022 Transfer of unpaid prepetition interest or postpetition interest for the month of June 2022 from the Fund to S3 Bergenline.

193.   Further, the Consent Order authorized the Bergenline Debtor to pay S3 Bergenline postpetition interest payments from July 2022 forward as adequate protection, but such payments, which, in fact, were made by the Fund not by the Bergenline Debtor, were subject to the Committee's express and stipulated reservation of rights as contained therein.

194.   As a result of the avoidance of the Bergenline Mortgage and Bergenline Assignment of Rents as set forth herein, which renders the S3 Bergenline Claim unsecured, S3 Bergenline was not entitled to receive postpetition adequate protection or postpetition payments of interest.

195.    As of June 6, 2023, not including the Bergenline June 17, 2022 Transfer, S3 Bergenline has received in total $3,007,727.90 from the Fund as postpetition interest (the "Bergenline Adequate Protection Payments", and with the Bergenline June 17, 2022 Transfer, the "Bergenline Postpetition Transfers"), which amount may continue to increase if the Fund continues to pay postpetition interest to S3 Bergenline while the action is pending.

196.    The Bergenline Postpetition Transfers total $3,451,511.74 as of June 6, 2023; however, the term "Bergenline Postpetition Transfers" specifically includes, and by this Complaint the Committee also seeks to avoid and recover, all further payments of postpetition interest to S3 Bergenline.

197.    A table summarizing the Bergenline Postpetition Transfers is attached as **Exhibit C** and incorporated by reference herein.

198.    The Bergenline Adequate Protection Payments were property of the estate paid subject to the Committee's express and stipulated reservation of rights in the Consent Order, can be used by the Debtors in accordance with the provisions of section 363 of the Bankruptcy Code, and have more than inconsequential value.

199.    In light of the invalidity and avoidability of the Bergenline Mortgage and Bergenline Assignment of Rents, the Bergenline Adequate Protection Payments should not have been paid and must be returned to the estate or avoided pursuant to sections 542 and/or 549 of the Bankruptcy Code and the Committee's reservation of rights under the Consent Order.

200.    Accordingly, the Committee is entitled to a judgment (1) returning or avoiding the Bergenline Postpetition Transfers under sections 542 and/or 549 of the Bankruptcy Code, and (2) recovering and preserving for the benefit of the estate any such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

**COUNT V**
**UNJUST ENRICHMENT**
**(against Defendant S3 RE Bergenline Funding LLC)**

201.    The Committee repeats and realleges paragraphs 1 through 200 as if fully set forth herein.

202.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

203.    In the event the Court does not enter judgment in favor of the Committee on Count IV above, the Committee, in the alternative, seeks a judgment against S3 Bergenline for unjust enrichment in the amount of the Bergenline Postpetition Transfers.

204.    S3 Bergenline received a benefit on account of its receipt of the Bergenline Postpetition Transfers.

205.    Such benefit was at the Debtors' expense.

206.    In light of the facts that the Bergenline Mortgage and Bergenline Assignment of Rents are invalid and avoidable, which would render the S3 Bergenline Claim unsecured, it would be unjust for S3 Bergenline to retain the benefit of the Bergenline Postpetition Transfers, particularly given that S3 Bergenline expressly stipulated that all such Bergenline Postpetition Transfers would be subject to the reserved rights of the Committee.

207.    Accordingly, if relief is not granted on Count IV, the Committee is entitled to a judgment for unjust enrichment against S3 Bergenline in the amount of the Bergenline Postpetition Transfers requiring S3 Bergenline to return those amounts.

## <u>COUNT VI</u>
### <u>OBJECTION TO THE S3 BERGENLINE CLAIM – CLAIM NO. 45</u>
### <u>UNDER 11 U.S.C. § 502(b) and (d), and FED. R. BANKR. P. 3007</u>
### <u>(against Defendant S3 RE Bergenline Funding LLC)</u>

208.    The Committee repeats and realleges paragraphs 1 through 207 as if fully set forth herein.

209.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

210.    Pursuant to section 502(b) and (d) of the Bankruptcy Code and Bankruptcy Rule 3007, the Committee objects to the S3 Bergenline Claim on the following bases.

**A.    Objection to the S3 Bergenline Claim because it is unsigned.**

211.    Bankruptcy Rule 3001(b) requires a proof of claim to be executed by a creditor or the creditor's authorized agent, and Bankruptcy Rule 3001(f) provides that a proof of claim is only entitled to prima facie validity if it is executed and filed in accordance with the Bankruptcy Rules.

212.    The Bar Date Order required that unless S3 Bergenline agreed with the S3 Bergenline Scheduled Claim, it was required to file a proof of claim "in the form and manner" set forth therein, which required that it be signed.

213.    The S3 Bergenline Claim as filed with the Claims Agent is not signed, and the deadline to timely file proofs of claim as set by the Bar Date Order passed on December 20, 2022.

214.    The Committee therefore objects to the S3 Bergenline Claim and requests that it be disallowed as it does not meet the requirements of Bankruptcy Rule 3001(b) and the Bar Date Order.

215.    The Committee further objects because, as the S3 Bergenline Claim is unsigned, it is not entitled to prima facie validity under Bankruptcy Rule 3001(f).

**B.      Objection to secured status of the S3 Bergenline Claim based upon invalidity and avoidability of the Bergenline Mortgage.**

216.    The S3 Bergenline Claim indicates that it is a secured claim and lists the basis for perfection as a lien on real estate.

217.    As stated above, the Bergenline Mortgage is invalid under New Jersey law and should be avoided, which would render the S3 Bergenline Claim unsecured.

218.    The Committee therefore objects to the S3 Bergenline Claim and requests that it be disallowed, pursuant to section 502(b)(1) of the Bankruptcy Code, to the extent it was filed as a secured claim.

**C.      Objection to default interest rate of 24% asserted in the S3 Bergenline Claim as unenforceable penalty under applicable non-bankruptcy law.**

219.    S3 Bergenline asserts in the S3 Bergenline Claim that it is entitled to default interest under the Bergenline Loan Documents of 24%.

220.    The minimum non-default interest rate under the Bergenline Loan Document is 9.25%, and the current non-default interest rate thereunder is 12.375%

221.    A default rate of 24%, which is almost double the current non-default interest rate and almost 15 percentage points higher than the minimum non-default interest rate under the Bergenline Loan Document, constitutes a penalty and is therefore unenforceable under New Jersey law.

222.    The Committee therefore objects to the S3 Bergenline Claim to the extent it includes non-default interest at the rate of 24% and requests that the Court disallow the same pursuant to New Jersey law and section 502(b)(1) of the Bankruptcy Code.

**D.      Objection to inclusion of postpetition interest in the S3 Bergenline Claim based upon the invalidity and avoidability of the mortgage and resultant unsecured status of the claim.**

223.    The S3 Bergenline Claim asserts that S3 Bergenline is entitled to postpetition default rate interest on the principal balance of its claim, which totaled $3,765,946.89 as of December 16, 2022 (prior to accounting for postpetition adequate protection and interest payments received from the Debtors), with such postpetition default rate interest continuing to accrue.

224.    As stated above, the Bergenline Mortgage is invalid and should be avoided, which would render the S3 Bergenline Claim unsecured.

225.    The Committee therefore objects to the inclusion of postpetition interest in the S3 Bergenline Claim and requests that the Court disallow the same, pursuant to section 502(b) and section 506 of the Bankruptcy Code as further addressed in Count VII below.

**E.      Objection to the S3 Bergenline Claim based upon defenses of setoff and recoupment.**

226.    To the extent S3 Bergenline received payments that it was either not authorized to receive or are otherwise recoverable or avoidable as set forth herein, the Debtors should be entitled to setoff or recoup such payments against any amounts ultimately due and owing to S3 Bergenline on account of the S3 Bergenline Claim.

227.    The Committee therefore objects to the S3 Bergenline Claim and reserves any right of setoff or recoupment based upon the relief otherwise granted based on the claims asserted herein.

**F.      Objection to the S3 Bergenline Claim pursuant to 11 U.S.C. § 502(d) of the Bankruptcy Code, unless and until S3 Bergenline pays or turns over the property for which it is determined liable under sections 542, 550, and/or 553 of the Bankruptcy Code.**

228.    Under section 502(d), the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a

transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

229.    The Committee hereby objects to the S3 Bergenline Claim and, in addition to any declarations that may be rendered based upon Count VII below, requests complete disallowance of the S3 Bergenline Claim unless and until S3 Bergenline pays all amounts or turns over all such property as demanded herein that it is liable for under the above-referenced code sections pursuant to the preceding Counts of this Complaint directed to S3 Bergenline.

## COUNT VII
### DECLARATORY JUDGMENT FOR DETERMINATION OF SECURED STATUS UNDER 11 U.S.C. § 506 AND FED. R. BANKR. P. 3012
### (against Defendant S3 RE Bergenline Funding LLC)

230.    The Committee repeats and realleges paragraphs 1 through 229 as if fully set forth herein.

231.    Pursuant to Bankruptcy Rule 7001(9) and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

232.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Bergenline by virtue of the Consent Order.

233.    As stated above, the Bergenline Mortgage and Bergenline Assignment of Rents are invalid and should be avoided, which would render the S3 Bergenline Claim unsecured.

234.    As a result, the Committee also seeks, and is entitled to, a declaratory judgment that S3 Bergenline does not hold a lien on the Bergenline Property.

235.    Accordingly, the Committee further seeks, and is entitled to, a declaratory judgment that S3 Bergenline does not hold a secured claim, pursuant to section 506(a) of the Bankruptcy Code and other applicable law, and S3 Bergenline is not entitled to postpetition interest, fees, costs

or charges on account of the Bergenline Loan, pursuant to section 506(b) of the Bankruptcy Code or otherwise.

**COUNT VIII**
**AVOIDANCE OF MORTGAGE AND ASSIGNMENT OF RENTS PURSUANT TO**
**11 U.S.C. § 544(a) AND NEW JERSEY LAW AND RECOVERY AND PRESERVATION**
**OF SAME PURSUANT TO 11 U.S.C. §§ 550 AND 551**
**(against Defendant S3 RE 1300 Manhattan Funding LLC)**

236.    The Committee repeats and realleges paragraphs 1 through 235 as if fully set forth herein.

237.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

238.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

239.    Pursuant to section 544(a) of the Bankruptcy Code, a trustee in bankruptcy has, upon commencement of a case under title 11, and without regard to any knowledge of the trustee or any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligations incurred by the debtor that is voidable by (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that

obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

240.     As set forth above, upon information and belief, the versions of the Manhattan Mortgage and Manhattan Assignment of Rents filed with the Hudson County Register were not properly acknowledged by Grabato and Pinkus, and therefore were not properly recorded.

241.     Under applicable New Jersey law, including but not limited to applicable provisions of the New Jersey Revised Statutes (N.J.S.A. 46:14-2.1, 46:14-6.1, 46:26A-2(d), 46:26A-3(a)(3), 46:26A-12(c), *et seq.*), as well as case law, including but not limited to *In re Buchholz*, 224 B.R. 13 (Bankr. D.N.J. 1998) and *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013), the recording of the defectively acknowledged Manhattan Mortgage and Manhattan Assignment of Rents is in violation of the New Jersey recording statutes, does not perfect a lien, and does not provide notice or constructive notice to, and is ineffective to perfect a security interest as to, a bankruptcy trustee exercising the rights and powers of a creditor or bona fide purchaser under section 544(a).

242.     Accordingly, the Committee is entitled to a judgment (1) determining the Manhattan Mortgage and Manhattan Assignment of Rents are invalid under applicable New Jersey law, (2) avoiding the Manhattan Mortgage and Manhattan Assignment of Rents under applicable New Jersey law and section 544(a) of the Bankruptcy Code, and (3) preserving the lien for the benefit of the estate and recovering any proceeds of the lien on the Manhattan Property for the benefit of the estate under sections 550 and 551.

<u>COUNT IX</u>
**AVOIDANCE OF PREPETITION PAYMENTS AS ACTUAL FRAUDULENT
TRANSFERS PURSUANT TO 11 U.S.C. § 544(b), N.J.S.A. 25:2-25(a)(1), AND 11 U.S.C.
§ 548(a)(1)(A) AND RECOVERY OF SAME UNDER 11 U.S.C. §§ 550 AND 551
<u>(against Defendant S3 RE 1300 Manhattan Funding LLC)</u>**

243.    The Committee repeats and realleges paragraphs 1 through 242 as if fully set forth herein.

244.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

245.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

246.    As set forth above, Grabato, Salzano, and others, through the Debtors, fraudulently operated a Ponzi scheme through which millions of dollars in funds were obtained and transferred from innocent Investors to NRIA and its affiliates in furtherance of the Ponzi scheme.

247.    In the context of a Ponzi scheme, the Debtors' intent to defraud is presumed from the nature of the scheme itself.

248.    The Manhattan Prepetition Transfers constituted transfers of property of NRIA and/or the Fund that were fraudulently obtained from innocent Investors.

249.    NRIA and/or the Fund made the Manhattan Prepetition Transfers within the two-year period prior to the Petition Date.

250.    The Manhattan Prepetition Transfers were made to or for the benefit of S3 Manhattan.

251.    The Manhattan Prepetition Transfers were made with the actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme.

252.    NRIA and the Fund each had at least one creditor with an allowable unsecured claim that remained unsatisfied as of the Petition Date.

253.    Accordingly, the Committee is entitled to a judgment (1) avoiding the Manhattan Prepetition Transfers under section 548(a)(1)(A) of the Bankruptcy Code, and section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (2) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT X
### AVOIDANCE OF PREPETITION PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544(b), N.J.S.A. 25:2-25(a)(2), AND 11 U.S.C. § 548(a)(1)(B) AND RECOVERY OF SAME UNDER 11 U.S.C. §§ 550 AND 551
#### (against Defendant S3 RE 1300 Manhattan Funding LLC)

254.    The Committee repeats and realleges paragraphs 1 through 253 as if fully set forth herein.

255.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

256.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

257.    The Manhattan Prepetition Transfers constituted transfers of property of NRIA and the Fund.

258.    NRIA and the Fund made the Manhattan Prepetition Transfers within the two-year period prior to the Petition Date.

259.    The Manhattan Prepetition Transfers were made to or for the benefit of S3 Manhattan.

260.     Neither NRIA nor the Fund were obligated on the Manhattan Loan and neither NRIA nor the Fund received reasonably equivalent value in exchange for the Manhattan Prepetition Transfers.

261.     NRIA and the Fund each had at least one creditor whose claim arose before the Manhattan Prepetition Transfers were made and at least one creditor with an allowable unsecured claim that remained unsatisfied as of the Petition Date.

262.     On the dates that each of the Manhattan Prepetition Transfers was made, NRIA and the Fund was each (1) insolvent or became insolvent as a result of such transfer; (2) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with NRIA or the Fund, as applicable, was an unreasonably small capital; and/or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

263.     Accordingly, the Committee is entitled to a judgment (1) avoiding the Manhattan Prepetition Transfers under section 548(a)(1)(B) of the Bankruptcy Code, and section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(1) and 25:2-27(a), and (2) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

### COUNT XI
### RECOVERY AND PRESERVATION OF POSTPETITION TRANSFERS PURSUANT TO 11 U.S.C. §§ 542, 549, 550, AND 551 AND THE COMMITTEE'S RESERVATION OF RIGHTS UNDER THE CONSENT ORDER
### (against Defendant S3 RE 1300 Manhattan Funding LLC)

264.     The Committee repeats and realleges paragraphs 1 through 263 as if fully set forth herein.

265.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

266.    As debtors in possession, the Debtors have the rights and powers of a trustee serving in a case under chapter 11.

267.    On June 17, 2022, the Fund transferred $32,137.35 from its account ending 4997 to or for the benefit of S3 Manhattan (the "Manhattan June 17, 2022 Transfer"), purportedly for May 2022 and June 2022 interest owed by the Manhattan Debtor to S3 Manhattan.  Approximately $20,019.99 of the Manhattan June 17, 2022 Transfer was purportedly a payment of prepetition interest (May 2022 interest totaling $16,332.10 and prepetition interest for the first seven days of June 2022 totaling $3,687.89.  The remaining $12,117.36 was purportedly a payment of postpetition interest for the remainder of June 2022.

268.    Neither the Consent Order nor any other order of the Court retroactively authorized the Manhattan June 17, 2022 Transfer of unpaid prepetition interest or postpetition interest for the month of June 2022 from the Fund to S3 Manhattan.

269.    Further, the Consent Order authorized the Manhattan Debtor to pay S3 Manhattan postpetition interest payments from July 2022 forward as adequate protection, but such payments, which, in fact, were made by the Fund not by the Manhattan Debtor, were subject to the Committee's express and stipulated reservation of rights as contained therein.

270.    As a result of the invalidity, avoidance, and voidability of the Manhattan Mortgage and Manhattan Assignment of Rents as set forth herein, which renders the S3 Manhattan Claim unsecured, S3 Manhattan was not entitled to receive postpetition adequate protection or payments of postpetition interest.

271.     In the alternative, to the extent that the Manhattan Mortgage is not avoided, or void pursuant to the N.Y. Penal Law § 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511, and to the extent the S3 Manhattan Claim and/or the Minimum Interest Shortfall Amount (as defined below) is not disallowed, the S3 Manhattan Claim is, based upon information obtained and provided to the Committee postpetition concerning the market value of the Manhattan Property, undersecured, and S3 Manhattan was not, and is not, entitled to payment of any postpetition interest on the Manhattan Loan.

272.     As of June 6, 2023, not including the Manhattan June 17, 2022 Transfer, S3 Manhattan has received in total $220,734.08 from the Fund as postpetition interest (the "Manhattan Adequate Protection Payments", and with the Manhattan June 17, 2022 Transfer, the "Manhattan Postpetition Transfers"), which amount may continue to increase if the Fund continues to pay S3 Manhattan postpetition interest while the action is pending.

273.     The Manhattan Postpetition Transfers total $252,871.43 as of June 6, 2023; however, the term "Manhattan Postpetition Transfers" specifically includes, and by this Complaint the Committee also seeks to avoid and recover, all further payments of postpetition interest to S3 Manhattan.

274.     A table summarizing the Manhattan Postpetition Transfers is attached hereto as **Exhibit D** and incorporated by reference herein.

275.     The Manhattan Adequate Protection Payments were property of the estate paid subject to the Committee's express and stipulated reservation of rights in the Consent Order, can be used by the Debtors in accordance with the provisions of section 363 of the Bankruptcy Code, and have more than inconsequential value.

276.     In light of the invalidity, avoidability, and voidability of the Manhattan Mortgage and Manhattan Assignment of Rents, the Manhattan Adequate Protection Payments should not have been paid and must be returned to the estate or avoided pursuant to sections 542 and/or 549 of the Bankruptcy Code and the Committee's reservation of rights under the Consent Order.

277.     Accordingly, the Committee is entitled to a judgment (1) returning or avoiding the Manhattan Postpetition Transfers under sections 542 and/or 549 of the Bankruptcy Code, and (2) recovering and preserving for the benefit of the estate any such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT XII
### UNJUST ENRICHMENT
### (against Defendant S3 RE 1300 Manhattan Funding LLC)

278.     The Committee repeats and realleges paragraphs 1 through 277 as if fully set forth herein.

279.     The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

280.     In the event the Court does not enter judgment in favor of the Committee on Count XI above, the Committee, in the alternative, seeks a judgment against S3 Manhattan for unjust enrichment in the amount of the Manhattan Postpetition Transfers.

281.     S3 Manhattan received a benefit on account of its receipt of the Manhattan Postpetition Transfers.

282.     Such benefit was at the Debtors' expense.

283.     In light of the fact that the Manhattan Mortgage and Manhattan Assignment of Rents are invalid, avoidable, and void, which would render the S3 Manhattan Claim unsecured, it would be unjust for S3 Manhattan to retain the benefit of the Manhattan Postpetition Transfers,

particularly given that S3 Manhattan expressly stipulated that all such Manhattan Postpetition Transfers would be subject to the reserved rights of the Committee.

284.    Accordingly, if relief is not granted on Count XI, the Committee is entitled to a judgment for unjust enrichment against S3 Manhattan in the amount of the Manhattan Postpetition Transfers requiring S3 Manhattan to return those amounts.

**COUNT XIII**
**OBJECTION TO THE S3 MANHATTAN CLAIM – CLAIM NO. 29**
**UNDER 11 U.S.C. § 502(b) and (d), and FED. R. BANKR. P. 3007**
**(against Defendant S3 RE 1300 Manhattan Funding LLC)**

285.    The Committee repeats and realleges paragraphs 1 through 284 as if fully set forth herein.

286.    The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

287.    Pursuant to section 502(b) and (d) of the Bankruptcy Code and Bankruptcy Rule 3007, the Committee objects to the S3 Manhattan Claim on the following bases.

**A.    Objection to the S3 Manhattan Claim because it is unsigned.**

288.    Bankruptcy Rule 3001(b) requires a proof of claim to be executed by a creditor or the creditor's authorized agent, and Bankruptcy Rule 3001(f) provides that a proof of claim is only entitled to prima facie validity if it is executed and filed in accordance with the Bankruptcy Rules.

289.    The Bar Date Order required that unless S3 Manhattan agreed with the S3 Manhattan Scheduled Claim, it was required to file a proof of claim "in the form and manner" set forth therein, which required that it be signed.

290.    The S3 Manhattan Claim as filed with the Claims Agent is not signed, and the deadline to timely file proofs of claim as set in the Bar Date Order passed on December 20, 2022.

291.   The Committee therefore objects to the S3 Manhattan Claim and requests that it be disallowed as it does not meet the requirements of Bankruptcy Rule 3001(b) and the Bar Date Order.

292.   The Committee further objects because, as the S3 Manhattan Claim is unsigned, it is not entitled to prima facie validity under Bankruptcy Rule 3001(f).

**B.**     **Objection to secured status of the S3 Manhattan Claim based upon the invalidity, avoidability, and voidability of the Manhattan Mortgage, or, in the alternative, based on the undersecured status of the S3 Manhattan Claim.**

293.   The S3 Manhattan Claim indicates that it is a secured claim and lists the basis for perfection as a lien on real estate.

294.   As stated above, the Manhattan Mortgage is invalid under New Jersey law and should be avoided, which would render the S3 Manhattan Claim unsecured.

295.   The Committee therefore objects to the S3 Manhattan Claim and requests that it be disallowed, pursuant to section 502(b)(1), to the extent it was filed as a secured claim.

296.   In the alternative, to the extent that the Manhattan Mortgage is not invalid or avoided, or void (as alleged in part E. below) and to the extent the S3 Manhattan Claim and/or the Minimum Interest Shortfall Amount is not disallowed, the S3 Manhattan Claim is, based upon information obtained and provided to the Committee postpetition concerning the market value of the Manhattan Property, undersecured, and the Committee therefore objects to the S3 Manhattan Claim and requests that it be disallowed to the extent it was filed as a fully secured claim.

**C.**     **Objection to default interest rate of 24% asserted in the S3 Manhattan Claim as unenforceable penalty under applicable non-bankruptcy law.**

297.   S3 Manhattan asserts in the S3 Manhattan Claim that it is entitled to default interest under the Manhattan Loan Documents of 24%.

298.    The minimum non-default interest rate under the Manhattan Loan Document is 8.85%, and the current non-default interest rate thereunder is 12.125%

299.    A default rate of 24%, which is almost double the current non-default interest rate and over 15 percentage points higher than the minimum non-default interest rate under the Manhattan Loan Document, constitutes a penalty and is therefore unenforceable under New York law.

300.    The Committee therefore objects to the S3 Manhattan Claim to the extent it includes non-default interest at the rate of 24% and requests that the Court disallow same pursuant to New York law and section 502(b)(1) of the Bankruptcy Code.

**D.    Objection to and disallowance of minimum yield interest (Minimum Interest Shortfall Amount) in the amount of $3,897,790.22 as of December 19, 2022.**

301.    In addition to the interest stated above, the S3 Manhattan Claim asserts that S3 Manhattan is entitled to minimum yield interest in the amount of $3,897,790.22 as of December 19, 2022 (the "Minimum Interest Shortfall Amount").

302.    The terms of the Manhattan Loan Agreement provide, in relevant parts, as follows:

a.    "***Minimum Interest Amount***" shall mean an amount equal to at least $4,450,000.

b.    **2.7.3   Minimum Interest Shortfall Amount.**

(a)    Upon the repayment or prepayment of the last Principal to be repaid or prepaid (including in connection with or following an acceleration of the Loan), Borrower shall pay to Lender an amount, if any (the "***Minimum Interest Shortfall Amount***"), by which (i) the Minimum Interest Amount, exceeds (ii) the aggregate amount of interest payments calculated at the Interest Rate theretofore actually paid by Borrower to Lender with respect to the Loan (including, for the avoidance of doubt, any interest at the Default Rate that is in excess of the Interest Rate). Lender's right to be paid the Minimum Interest Shortfall Amount shall be deemed to be fully earned by Lender as of the date hereof.  Notwithstanding the foregoing, the aggregate amount of payments made by Borrower under this Section 2.7.3, shall not exceed the Minimum Interest Amount.

*Manhattan Loan Agreement* (Exhibit K) at 13, (bold, italics, and underline in original).

303.    The Minimum Interest Amount is approximately 10.11% of the maximum principal

amount stated in the Manhattan Loan Agreement, defined therein as the "Loan Amount."

However, because S3 Manhattan made only the initial advance of $1,160,000.00 at closing of the

Manhattan Loan on November 15, 2019, followed by four (4) construction draws on or about

January 3, 2020, March 24, 2020, May 8, 2020, and June 5, 2020, in the respective amounts of

$95,551.67, $256,990.03, $346,477.61, and $119,353.02, after which S3 Manhattan ceased all

funding, the Minimum Interest Amount is more than double the actual principal balance of

$2,143,085.40, which already includes capitalized interest.

304.    The Minimum Interest Shortfall Amount represents unmatured interest,

unliquidated damages, and/or unreasonable interest, is conspicuously disproportionate to S3

Manhattan's losses, and is subject to disallowance under sections 502(b)(2) and 506(b) of the

Bankruptcy Code, and applicable Third Circuit and other precedent, along with applicable New

York state law.

305.    This Minimum Interest Shortfall Amount is especially egregious when examining

the economic substance of the transaction.  S3 Manhattan cut off and did not make any advances

to the Manhattan Debtor after the fourth draw funded on June 5, 2020 (S3 Manhattan required

draw requests numbers 5 through 12 to be funded by equity).  As a result, the principal balance of

the S3 Manhattan Claim only increased due to capitalization of interest.

306.    The Minimum Interest Shortfall Amount is also a plainly disproportionate amount

of liquidated damages.  The Minimum Interest Shortfall is almost twice the principal balance of

the S3 Manhattan Claim (which itself already includes capitalized interest).

307.    Based on the effective average balance of the loan from inception to the Petition

Date, the Minimum Interest Shortfall Amount results in an effective interest rate of approximately

94.6% per annum, which is unconscionable under applicable law.

308.    The Committee therefore objects to the inclusion of the Minimum Interest Shortfall

Amount in the S3 Manhattan Claim and requests disallowance of the same.

   **E.    Objection to claim on the basis that S3 Manhattan Claim violates New York's
          criminal usury statute and is therefore void.**

309.    As stated above, as filed, the S3 Manhattan Claim seeks payment of interest at an

effective rate of 94.6% per annum.

310.    Charging an interest rate in excess of 25% per annum on a loan less than two million

five hundred thousand dollars is a violation of New York's criminal usury statute, N.Y. Penal Law

§ 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511.  Loans that charge interest in

excess of New York's criminal usury statute are void, are not entitled to retain the lien on collateral,

and are not entitled to receive any further interest payments or the balance of the principal owed.

*See, e.g.*, *Barr v. Greater N.Y. Sav'gs Bank (In re McCorhill Pub., Inc.)*, 86 B.R. 783, 794 (Bankr.

S.D.N.Y. 1988).

311.    After the fourth draw funded on June 5, 2020, S3 Manhattan refused to advance

further funds and required all subsequent draws to be funded by equity.

312.    At no point during the life of the Manhattan Loan did the principal balance exceed

two million five hundred thousand dollars (even accounting for capitalized interest).

313.    On June 1, 2022, S3 Manhattan sent the Manhattan Debtor a notice of default,

asserting that the Manhattan Loan had matured and demanding a payment of all amounts due,

including the minimum interest yield.  As of that date, S3 Manhattan had refused further funding

under the Manhattan Loan and knew that the unpaid principal balance was less than two million five hundred thousand dollars.

314.    On December 20, 2022, S3 Manhattan filed the S3 Manhattan Claim, which again demanded payment of the minimum interest yield.  S3 Manhattan had refused further funding under the Manhattan Loan and knew that the unpaid principal balance was less than two million five hundred thousand dollars.

315.    S3 Manhattan intended to charge, and has asserted the Manhattan Debtor owes, interest in an amount that violates the New York criminal usury statute.  The Manhattan Loan Documents, coupled with the actual administration and enforcement of the Manhattan Loan Documents by S3 Manhattan, are usurious given that the required payment of interest thereunder is in excess of the criminal usury rate.

316.    The Committee therefore objects to the S3 Manhattan Claim, in its entirety (including all liens in connection thereto, the Manhattan Mortgage and Manhattan Assignment of Rents), on the basis that it violates the New York criminal usury statute, that violation of N.Y. Penal L. § 190.40 results in the entire Manhattan Loan (and all Manhattan Loan Documents) being void, and therefore the Committee requests that the S3 Manhattan Claim be disallowed in its entirety pursuant to section 502(b)(1) of the Bankruptcy Code.

**F.**    **Objection to inclusion of postpetition interest in the S3 Manhattan Claim based upon the invalidity, avoidability, and voidability of the mortgage and resultant unsecured status of the claim, or, in the alternative, based on the undersecured status of the claim.**

317.    The S3 Manhattan Claim asserts that S3 Manhattan is entitled to postpetition default rate interest on the principal balance of its claim, which totaled $275,743.65 as of December 16, 2022 (prior to accounting for postpetition adequate protection and interest payments received from the Debtors), with such postpetition default rate interest continuing to accrue.

318.    As stated above, the Manhattan Mortgage is invalid and should be avoided, and is void, which would render the S3 Manhattan Claim unsecured.

319.    The Committee therefore objects to the inclusion of postpetition interest in the S3 Manhattan Claim and requests that the Court disallow the same pursuant to section 502(b) and section 506 of the Bankruptcy Code as further addressed in Count XIV below.

320.    In the alternative, to the extent that the Manhattan Mortgage is not invalid or avoided, or is not determined to be void, and to the extent the S3 Manhattan Claim and/or the Minimum Interest Shortfall Amount is not disallowed, the S3 Manhattan Claim is, based upon information obtained and provided to the Committee postpetition concerning the market value of the Manhattan Property, undersecured, and the Committee therefore objects to the inclusion of postpetition interest in the S3 Manhattan Claim and requests that the Court disallow the same pursuant to section 502(b) and section 506 of the Bankruptcy Code as further addressed in Count XIV below.

**G.**    **Objection to the S3 Manhattan Claim based upon defenses of setoff and recoupment.**

321.    To the extent S3 Manhattan received payments that it was either not authorized to receive or are otherwise recoverable or avoidable as set forth herein, the Debtors should be entitled to setoff or recoup such payments against any amounts ultimately due and owing to S3 Manhattan on account of the S3 Manhattan Claim.

322.    The Committee therefore objects to the S3 Manhattan Claim and reserves any right of setoff or recoupment based upon the relief otherwise granted based on the claims asserted herein.

**H.**    **Objection to the S3 Manhattan Claim pursuant to 11 U.S.C. § 502(d) of the Bankruptcy Code, unless and until S3 Manhattan pays or turns over the**

**property for which it is determined liable under sections 542, 550, and/or 553 of the Bankruptcy Code.**

323.     Under section 502(d), the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

324.     The Committee hereby objects to the S3 Manhattan Claim and, in addition to any declarations that may be rendered based upon Count XIV below, requests complete disallowance of the S3 Manhattan Claim unless and until S3 Manhattan pays all amounts or turns over all such property as demanded herein that it is liable for under the above-referenced code sections pursuant to the preceding Counts of this Complaint directed to S3 Manhattan.

### COUNT XIV
### DECLARATORY JUDGMENT FOR DETERMINATION OF SECURED STATUS UNDER 11 U.S.C. § 506 AND FED. R. BANKR. P. 3012
### (against Defendant S3 RE 1300 Manhattan Funding LLC)

325.     The Committee repeats and realleges paragraphs 1 through 324 as if fully set forth herein.

326.     Pursuant to Bankruptcy Rule 7001(9) and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

327.     The Committee has standing to assert any and all claims and defenses the Debtors may have against S3 Manhattan by virtue of the Consent Order.

328.     As stated above, the Manhattan Mortgage and Manhattan Assignment of Rents is invalid and should be avoided, and is void, which would render any remaining S3 Manhattan Claim unsecured.

329.    In addition, to the extent the Manhattan Loan is void pursuant to the N.Y. Penal Law § 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511, then S3 Manhattan should not hold any claim against the estate and its Manhattan Mortgage, Manhattan Assignment of rents, and any UCC-1 financing statement should be, and the Committee seeks a determination that the same be, voided pursuant to section 506(d) of the Bankruptcy Code and applicable state law.

330.    In the alternative, to the extent that the Manhattan Mortgage is not invalid or avoided, or void pursuant to the N.Y. Penal Law § 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511, and to the extent the S3 Manhattan Claim and/or the Minimum Interest Shortfall Amount is not disallowed, the S3 Manhattan Claim is, based upon information obtained and provided to the Committee postpetition concerning the market value of the Manhattan Property, undersecured.

331.    As a result, the Committee also seeks, and is entitled to, a declaratory judgment that S3 Manhattan does not hold a lien on the Manhattan Property.

332.    Accordingly, the Committee further seeks, and is entitled to, a declaratory judgment that S3 Manhattan does not hold a secured claim or, in the alternative, that S3 Manhattan holds an undersecured claim, pursuant to section 506(a) of the Bankruptcy Code and other applicable law, and S3 Manhattan is not entitled to postpetition interest, fees, costs or charges on account of the Manhattan Loan, pursuant to section 506(b) of the Bankruptcy Code or otherwise.

## PRAYER FOR RELIEF

**WHEREFORE,** the Official Committee of Unsecured Creditors respectfully requests the entry of a final judgment in its favor, for the benefit of the Debtors' estates and any successors in interest thereto, against each of the Defendants, S3 RE Bergenline Funding LLC and S3 RE 1300 Manhattan Funding LLC, as follows:

A.      On Count I, a judgment against S3 RE Bergenline Funding LLC (1) determining

the Bergenline Mortgage and Bergenline Assignment of Rents are invalid under applicable New

Jersey law, (2) avoiding the Bergenline Mortgage and Bergenline Assignment of Rents under

applicable New Jersey law and section 544(a) of the Bankruptcy Code, and (3) preserving the lien

for the benefit of the estate and recovering any proceeds of the lien on the Bergenline Property for

the benefit of the estate under sections 550 and 551 of the Bankruptcy Code;

B.      On Count II, a judgment against S3 RE Bergenline Funding LLC (1) avoiding the

Bergenline Two Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code, (2) avoiding

all of the Bergenline Prepetition Transfers under section 544(b) of the Bankruptcy Code and New

Jersey Revised Statutes § 25:2-25(a)(1), and (3) recovering and preserving for the benefit of the

estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code;

C.      On Count III, a judgment against S3 RE Bergenline Funding LLC (1) avoiding the

Bergenline Two Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code; (2) avoiding

all the Bergenline Prepetition Transfers under section 544(b) of the Bankruptcy Code and New

Jersey Revised Statutes §§ 25:2-25(a)(1) and 25:2-27(a); and (3) recovering and preserving for the

benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code;

D.      On Count IV, a judgment against S3 RE Bergenline Funding LLC (1) ordering the

return of or avoiding the Bergenline Postpetition Transfers under sections 542 and/or 549 of the

Bankruptcy Code, and (2) recovering and preserving for the benefit of the estate any such avoided

transfers under sections 550 and 551 of the Bankruptcy Code;

E.      On Count V, if complete relief is not granted on Count IV, a judgment against S3

RE Bergenline Funding LLC awarding damages for unjust enrichment in the amount of the

Bergenline Postpetition Transfers and requiring S3 RE Bergenline Funding LLC to return those amounts;

F.      On Count VI, a judgment against S3 RE Bergenline Funding LLC sustaining the Committee's objections to the S3 Bergenline Claim and disallowing the same to the extent set forth herein;

G.      On Count VII, a declaratory judgment against S3 RE Bergenline Funding LLC finding that the S3 Bergenline Claim is not a secured claim, S3 Bergenline does not hold a lien on the Bergenline Property, and S3 Bergenline is not entitled to postpetition interest, fees, costs or charges on account of the Bergenline Loan, pursuant to section 506(b) of the Bankruptcy Code or otherwise;

H.      On Count VIII, a judgment against S3 RE 1300 Manhattan Funding LLC (1) determining the Manhattan Mortgage and Manhattan Assignment of Rents are invalid under applicable New Jersey law, (2) avoiding the Manhattan Mortgage and Manhattan Assignment of Rents under applicable New Jersey law and section 544(a) of the Bankruptcy Code, and (3) preserving the lien for the benefit of the estate and recovering any proceeds of the lien on the Manhattan Property for the benefit of the estate under sections 550 and 551 of the Bankruptcy Code;

I.      On Count IX, a judgment against S3 RE 1300 Manhattan Funding LLC (1) avoiding the Manhattan Prepetition Transfers under section 548(a)(1)(A) of the Bankruptcy Code, and section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (2) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code;

J.      On Count X, a judgment against S3 RE 1300 Manhattan Funding LLC (1) avoiding the Manhattan Prepetition Transfers under section 548(a)(1)(B) of the Bankruptcy Code, and section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(1) and 25:2-27(a), and (2) recovering and preserving for the benefit of the estate all such avoided transfers under sections 550 and 551 of the Bankruptcy Code;

K.      On Count XI, a judgment against S3 RE 1300 Manhattan Funding LLC (1) returning or avoiding the Manhattan Postpetition Transfers under sections 542 and/or 549 of the Bankruptcy Code, and (2) recovering and preserving for the benefit of the estate any such avoided transfers under sections 550 and 551 of the Bankruptcy Code;

L.      On Count XII, if complete relief is not granted on Count XI, a judgment against S3 RE 1300 Manhattan Funding LLC awarding damages for unjust enrichment in the amount of the Manhattan Postpetition Transfers and requiring S3 RE 1300 Manhattan Funding LLC to return those amounts;

M.      On Count XIII, a judgment against S3 RE 1300 Manhattan Funding LLC sustaining the Committee's objections to the S3 Manhattan Claim and disallowing the same to the extent set forth herein;

N.      On Count XIV, a declaratory judgment against S3 RE 1300 Manhattan Funding LLC finding that the S3 Manhattan Claim is not a secured claim, S3 Manhattan does not hold a lien on the Manhattan Property or, in the alternative, finding that the S3 Manhattan Claim is an undersecured claim, and S3 Manhattan is not entitled to postpetition interest, fees, costs or charges on account of the Manhattan Loan, pursuant to section 506(b) of the Bankruptcy Code or otherwise.

O.      Awarding the Committee its attorney's fees, to the extent permitted by law;

P.      Awarding the Committee interest on all sums awarded at the applicable judgment rate, plus the costs of suit; and

Q.      Awarding such other and further relief as the Court may deem just and proper.

**ICE MILLER LLP**

Dated:  June 29, 2023                      _/s/ Louis T. DeLucia_____
                                          Louis T. DeLucia, Esq.
                                          Alyson M. Fiedler, Esq.
                                          1500 Broadway
                                          Suite 2900
                                          New York, NY 10036
                                          Phone: (212) 835-6312
                                          louis.delucia@icemiller.com
                                          alyson.fiedler@icemiller.com

                                          *Counsel to the Official Committee of
                                           Unsecured Creditor*