**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway
Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to the Plaintiff AIRN Liquidation Trust*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No.:  22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST,<br><br>               Plaintiff,<br>v.<br><br>S3 RE BERGENLINE FUNDING LLC -and-<br>S3 RE 1300 MANHATTAN FUNDING LLC,<br><br>               Defendants. | Adv. Pro. No.:  23-01169-JKS<br><br>**Re:  Docket No. 20**<br>**Hearing:  Oct. 31, 2023 at 10:00 am ET** |

## PLAINTIFF'S OPPOSITION TO S3 RE BERGENLINE FUNDING LLC'S AND S3 RE 1300 MANHATTAN FUNDING LLC'S MOTION TO DISMISS COMPLAINT

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 1

    I.    Procedural Background................................................................................. 1

    II.    Factual Background ..................................................................................... 4

MOTION TO DISMISS STANDARD......................................................................... 5

ARGUMENT ........................................................................................................... 8

    I.    The Complaint Properly—More than Plausibly—States Claims to Avoid the
        Mortgages and Assignments of Rents..................................................... 8

        A.    Summary of Bases for Avoidance ............................................ 7

        B.    The Bergenline Mortgage was Not Properly Executed or Acknowledged
            ....................................................................................... 8

        C.    The Remaining Defective Instruments were Not Properly Executed or
            Acknowledged ......................................................................... 10

        D.    Plaintiff's Claims and Objections Based on Invalidity and Avoidability of
            the Defective Instruments are Not Dependent on Proving Fraud or Forgery
            ....................................................................................

    II.    The Postpetition Interest Payments are Recoverable, to the Extent the Defendants'
        Claims are Unsecured or Undersecured, and with Respect to a Postpetition
        Payment of Prepetition Interest............................................................ 17

    III.    The Plan Explicitly Provides that Substantive Consolidation Had No Impact on
        the Claims Asserted in this Adversary, Which Include the Claims to Avoid and
        Recover Constructively Fraudulent Pre-Petition Transfers. ................................. 23

    IV.    The Complaint Properly States Claims to Avoid the Payments of Prepetition
        Interest to Defendants as Actual Fraudulent Transfers......................................... 27

    V.    The Complaint Plausibly States Objections to: (1) Default Rate Interest as
        Unreasonable and Unenforceable Penalties; (2) the Minimum Yield Interest
        (Minimum Interest Shortfall) as the Economic Equivalent of Unmatured Interest
        and as an Unenforceable Liquidated Damages Provision; and (3) the Defense of
        Criminal Usury Under New York Law................................................................. 33

        A.    The Default Rate of Interest with Respect to the Bergenline Mortgage is
            Plainly Unreasonable and an Unenforceable Penalty ............................. 34

B.    The Default Rate of Interest with Respect to the Manhattan Mortgage is an Unenforceable Penalty and is Disproportionate to S3 Manhattan's Actual and Probable Loss. ...................................................................................... 37

C.    The Minimum Interest Shortfall Amount Should Be Disallowed as the Economic Equivalent of Unmatured Interest Under § 502(b)(2) ............. 39

D.    Alternatively, the Minimum Interest Shortfall Amount Should be Wholly Disallowed as an Unenforceable Liquidated Damages Provision. ........... 43

E.    The Complaint Properly Pleads the Defense of Criminal Usury Under New York Law .......................................................................................... 44

VI.    The Unjust Enrichment Claims are Not Barred as they Are Not Based on a Contractual Agreement, But Rather are Alternative Bases to Recover the Post-Petition Transfers. ........................................................................................... 48

VII.    The Complaint States a Valid Objection to the S3 Lender's Proofs of Claim Which are Not Entitled to Prima Facie Validity Because They are Unsigned as Required by Rule 3001(f) and the Bar Date Order. ............................................... 48

VIII.    Defendants Do Not State an Independent Basis to Dismiss the Claim Objection Counts of the Complaint Based Upon Setoff and Recoupment, and Section 502(d) ...................................................................................................................... 52

CONCLUSION ................................................................................................................ 53

CERTIFICATE OF SERVICE ....................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*,
   25 N.E.3d 952 (N.Y. 2014) ............................................................................................. 37, 43

*A-1 Advanced Moving & Storage, Inc. v. NorVergence, Inc. (In re NorVergence, Inc.)*,
   424 B.R. 663 (Bankr. D.N.J. 2010) ............................................................... 6, 7, 8, 30

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
   37 N.Y.3d 320 (2021) ...................................................................................................... 44

*Afy v. N. Plains Feeders, Inc.*,
   482 B.R. 830 (D. Neb. 2012) .......................................................................................... 50

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ................................. 7, 13, 15

*AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*,
   890 F. Supp. 2d 373 (S.D.N.Y. 2012) ........................................................................... 37

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) ................................... Passim

*Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring, Inc.*,
   105 A.D.3d 178, 961 N.Y.S.2d 86 (N.Y. 1st Dep't 2013) ........................................ 44

*Dencer v. Erb*,
   142 N.J. Eq. 422 (Ch. 1948) ......................................................................................... 13

*Emery v. Fishmarket Inn of Granite Springs, Inc.*,
   173 A.D.2d 765 (N.Y. App. Div. 1991) ....................................................................... 37

*Feller v. Architects Display Bldgs., Inc.*,
   148 A.2d 634 (N.J. App. Div. 1959) ............................................................................ 35

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ............................................................................................ 6

*Heath v. Am. Express Travel Related Servs. Co., Inc. (In re Heath)*,
   331 B.R. 424 (B.A.P. 9th Cir. 2005) ............................................................................. 51

*Heidt v. BV001 Reo Blocker LLC (In re Heidt)*,
   626 B.R. 777 (Bankr. D.N.J. 2021) ..................................................................... 6, 7, 12

*In re Avery*,
   2015 WL 4498181, n.1 (Bankr. N.D. Ohio July 22, 2015) ....................................... 51

*In re Bayou Grp., LLC*,
   362 B.R. 624 (Bankr. S.D.N.Y. 2007) .......................................................................... 30

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011) ........................................................................................... 16

*In re Bohnam*,
   229 F.3d 750 (9th Cir. 2000) .......................................................................................... 25

*In re Buchholz*,
   224 B.R. 13 (Bankr. D.N.J. 1998) ...................................................................... 9, 14, 15

*In re Cluff*,
   313 B.R. 323 (Bankr. D. Utah 2004) ............................................................................ 50

*In re Collins*,
   137 B.R. 754 (Bankr. E.D. Ark.1992) ........................................................................... 16

*In re Doctors Hosp. of Hyde Park, Inc.*,
   508 B.R. 697 (Bankr. N.D. Ill. 2014) ........................................................................... 40

*In re Everfresh Beverages, Inc.*,
   238 B.R. 558 (Bankr. S.D.N.Y. 1999) .................................................................. 16
*In re Fort Dodge Creamery Co.*,
   121 B.R. 831 (Bankr. N.D. Iowa 1990)................................................................. 19
*In re Galbreath*,
   395 B.R. 356 (Bankr. S.D. Tex. 2008) ................................................................ 51
*In re Garcia*,
   167 B.R. 341 (Bankr. E.D.N.Y. 1994) ................................................................ 44
*In re Giller*,
   962 F.2d 796 (8th Cir. 1992) ............................................................................... 25
*In re Hertz Corp.*,
   637 B.R. 781 (Bankr. D. Del. 2021)..................................................................... 40
*In re J.T.L., Inc.*,
   36 B.R. 860 (Bankr. E.D. Mo. 1984).................................................................... 18
*In re M. Paolella & Sons, Inc.*,
   85 B.R. 965 (Bankr. E.D. Pa 1988) ................................................................ 21, 22
*In re Manhattan Inv. Fund Ltd.*,
   310 B.R. 500 (Bankr. S.D.N.Y. 2002) ................................................................ 16
*In re Miller Min., Inc.*,
   219 B.R. 219 (Bankr. N.D. Ohio 1998)................................................................ 20
*In re Motors Liquidation Co.*,
   552 B.R. 253 (Bankr. S.D.N.Y. 2016) ................................................................ 20
*In re Nittany Enterprises*,
   502 B.R. 447 (Bankr. W.D. Va. 2012) ................................................................ 51
*In re NJ Affordable Homes Corp.*,
   Case No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013).......... 5, 9, 16, 29
*In re Parkway Calabasas, Ltd.*,
   89 B.R. 832 (Bankr. C.D. Cal. 1988) .................................................................. 25
*In re Partial Hosp. Inst. of Am.*,
   281 B.R. 728 (Bankr. S.D. Ala. 2001) ............................................................ 21, 22
*In re Pearlman*,
   450 B.R. 219 (Bankr. M.D. Fla. 2011).................................................................. 25
*In re Pengo Indus., Inc.*,
   962 F.2d 543 (5th Cir. 1992) ............................................................................... 42
*In re Plassein Int'l Corp.*,
   352 B.R. 36 (Bankr. D. Del. 2006)......................................................................... 7
*In re Rehman*,
   479 B.R. 238 (Bankr. D. Mass. 2012) ................................................................. 50
*In re Rockefeller Ctr. Props. Secs. Litig.*,
   311 F.3d 198 (3d Cir.2002) ................................................................................... 8
*In re Route One W. Windsor Ltd. P'ship*,
   225 B.R. 76 (Bankr. D.N.J. 1998) ....................................................................... 35
*In re Sch. Specialty, Inc.*,
   2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013)................................................. 43
*In re Seven Hills, Inc.*,
   403 B.R. 327 (Bankr. D.N.J. 2009) ..................................................................... 51
*In re TennOhio Transp. Co.*,
   269 B.R. 775 (Bankr. S.D. Ohio 2001) ............................................................... 22

*In re Timberline Prop. Dev., Inc.*,
  136 B.R. 382 (Bankr. D.N.J. 1992) ............................................................ 35
*In re UNR Industries, Inc.*,
  212 B.R. 295 (Bankr. N.D. Ill. 1997) ......................................................... 26
*In re Venture Mortg, Find, L.P.*,
  245 B.R. 460 (Bankr. S.D.N.Y. 2000) ........................................................ 44
*In re Wingerter*,
  594 F.3d 931 (6th Cir. 2010) .................................................................... 51
*In re Zazzali v. 1031 Exch. Group LLP (In re DBSI, Inc.)*,
  476 B.R. 413 (Bankr. D. Del. 2012) .......................................................... 32
*Jarro Bldg. Indus. Corp. v. Schwartz*,
  54 Misc. 2d 13 (N.Y. App. Div. 1967) ....................................................... 38
*JMD Holding Corp. v. Cong. Fin. Corp.*,
  828 N.E.2d 604 (N.Y. 2005) ................................................................. 37, 43
*LG Capital Funding, LLC v. Sanomedics Intern. Holdings, Inc.*,
  2015 WL 7429581 (N.Y. Sup. Ct. Nov. 23, 2015) ..................................... 47
*LTV v. Gulf States Steel, Inc.*,
  969 F.2d 1050 (D.C. Cir. 1992) ................................................................. 52
*MetLife Cap. Fin. Corp. v. Washington Ave. Assocs. L.P.*,
  732 A.2d 493 (N.J. 1999) ......................................................................... 35
*Money Life Ins. v. Paramus Parkway* Bldg*., Ltd.*,
  834 A.2d 475 (N.J. App. Div. 2003) .......................................................... 35
*Moore v. Riddle*,
  82 N.J.Eq. 197, 87 A. 227 (Ch. 1913) ....................................................... 14
*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
  331 F.3d 406 (3d Cir. 2003) ........................................................................ 7
*Northwest Bank Minn. v. Blair Road Assocs., L.P.*,
  252 F. Supp. 2d 86 (D.N.J. 2003) ............................................................. 35
*O.P.M. Leasing Servs., Inc. v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*,
  23 B.R. 104 (Bankr. S.D.N.Y. 1982) ......................................................... 38
*Ohio Med. Instrument Co. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*,
  270 B.R. 842 (Bankr. S.D. Ohio 2001) ...................................................... 26
*Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) ....................................... 30
*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) .................................................... 6, 7, 12, 15
*Potter v. Steer*,
  95 N.J. Eq. 102 (Ch. 1923) ....................................................................... 13
*Prof'l Merchant Advance Capital, LLC v. C Care Serv's, LLC*,
  2015 WL 4392081 (S.D.N.Y. July 15, 2015) ............................................. 44
*Schuchardt v. President of the United States*,
  839 F.3d 336 (3d Cir. 2016) ...................................................................... 15
*Seville Indus. Mach. Corp.*,
  742 F.2d 786 (3d Cir.1984) ......................................................................... 8
*Shasho v. Pruco Life Ins. Co. of New Jersey*,
  67 A.D.3d 663, 888 N.Y.S.2d 557 (2009) .................................................. 46
*Spiotta v. Wilson*,
  179 A.2d 49 (N.J. App. Div. 1962) ............................................................ 36

*Spradlin v. Khouri (In re Bruner)*,
    561 B.R. 397 (B.A.P. 6th Cir. 2017) ...................................................................... 20
*Star Funding, Inc. v. Vault Mins., LLC*,
    2017 WL 7791558 (S.D.N.Y. Aug. 10, 2017) ....................................................... 46
*Stuchin v. Kasirer*,
    568 A.2d 907 (N.J. App. Div. 1990) ..................................................................... 36
*Terry v. MEB Loan Trust II (In re Terry)*, Adv. Pro. No. 22-02093, 2023 WL 6052509 (Bankr.
    D. Utah Sept. 14, 2023) ........................................................................................... 6
*Tides Edge Corp. v. Cent. Fed. Sav., F.S.B.*,
    151 A.D.2d 741 (1989) ........................................................................................... 46
*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*,
    361 N.E.2d 1015 (N.Y. 1977) ................................................................................ 37
*Ujueta v. Euro-Quest Corp.*,
    29 A.D.3d 895, 814 N.Y.S.2d 551 (2006) ............................................................. 46
*Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors (In re Ultra Petroleum
    Corp.)*, 51 F.4th 138 (5th Cir. 2022) .............................................................. 40, 42
*Walkowitz v. Walkowitz*,
    95 N.J. Eq. 249 (1923) ........................................................................................... 13
*Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*,
    No. 21-50995 (MFW), 2022 Bankr. LEXIS 3358 (Bankr. D. Del. Nov. 21, 2022) .................. 40
*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
    522 F.3d 315 (3d Cir. 2008) .................................................................................... 6
*Willner v. Willner*,
    145 A.D.2d 236 (N.Y. App. Div. 1989) ........................................................... 38, 44

**Statutes**                                                                                    **Page(s)**

11 U.S.C. § 365(e)(1) ................................................................................................. 51
11 U.S.C. § 502(b) and (d) ........................................................................................... 2
11 U.S.C. § 502(b)(1) ................................................................................................. 14
11 U.S.C. § 502(b)(2) ............................................................................... 39, 40, 42, 43
11 U.S.C. § 502(d) ...................................................................................................... 52
11 U.S.C. § 506 ............................................................................................................ 2
11 U.S.C. §§ 542 and 549 ............................................................................................ 2
11 U.S.C. § 542(a) ...................................................................................................... 21
11 U.S.C. § 544 ............................................................................................................ 2
11 U.S.C. § 544(a) ........................................................................................... 9, 10, 12
11 U.S.C. § 544(b) ...................................................................................................... 29
11 U.S.C. §§ 544 and 548 ............................................................................................ 2
11 U.S.C. § 548(a)(1)(A) ............................................................................................ 29
11 U.S.C. §§ 550 and 551 ...................................................................................... 2, 29
N.J.S.A. 25:2-25(a)(1) ................................................................................................ 29
N.J.S.A. 46:14-2.1 ............................................................................................ 9, 10, 11
N.Y. General Obligations Law § 5-501(6)(b) ...................................................... 45, 47
N.Y. General Obligations Law §§ 5-501 and 5-511 .................................................. 44
N.Y. Penal Law § 190.40 ..................................................................................... 44, 45

## Rules

Page(s)

Fed. R. Civ. P. 8 .................................................................................................................... 15

Fed. R. Civ. P. 8(a)(2) ............................................................................................................. 7

Fed. R. Civ. P. 9 ...................................................................................................................... 7

Fed. R. Civ. P. 9(b) .......................................................................................................... Passim

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 5, 6, 7, 50

Fed. R. Bankr. P. 3001 ........................................................................................................... 52

Fed. R. Bankr. P. 3001(b) ................................................................................................. 49, 51

Fed. R. Bankr. P. 3001(f) ............................................................................................. 48, 49, 51

Fed. R. Bankr. P. 3004 ........................................................................................................... 49

Fed. R. Bankr. P. 3005 ........................................................................................................... 49

Fed. R. Bankr. P. 7012 ......................................................................................................... 5, 6

Fed. R. Bankr. P. 9009 ..................................................................................................... 51, 52

Fed. R. Bankr. P. 9011 ..................................................................................................... 51, 52

Fed. R. Bankr. P. 9011(a) ...................................................................................................... 51

Fed. R. Bankr. P. 9011(b) ................................................................................................. 49, 50

## Other Authorities

Page(s)

17A Am.Jur.2d, Contracts §§ 337, 359 .................................................................................. 26

Plaintiff AIRN Liquidation Trust (the "Plaintiff"), by and through AIRN Liquidation Trust Co., LLC, in its capacity as the Liquidation Trustee, hereby opposes the Motion to Dismiss Complaint (the "Motion to Dismiss") [Docket No. 20] filed by Defendants, S3 RE Bergenline Funding LLC ("S3 Bergenline") and S3 RE 1300 Manhattan Funding LLC ("S3 Manhattan" and with S3 Bergenline, the "Defendants" and the "S3 Lenders"). In support of this Opposition, Plaintiff states as follows:

## PRELIMINARY STATEMENT

1.      Many of the S3 Lender's arguments appear to be that Plaintiff has not yet *proven* its claims, not that it has *failed to state* its claims. That is no basis to dismiss the claims asserted in the Complaint. A complaint does not have to plead evidence, although at 70 pages the allegations in the Complaint are well-supported, and the S3 Lenders do not come close to successfully arguing that the Complaint does not state claims upon which relief can (and should) be granted. As movants, the S3 Lenders have the burden to demonstrate as to each claim that *no* claim for which any relief can be granted has been presented. The Motion to Dismiss fails to satisfy the requisite burden and should be denied for the reasons set forth below.

## BACKGROUND

### I.      Procedural Background

2.      On June 7, 2022 (the "Petition Date"), National Realty Investment Advisors, LLC ("NRIA") and each of the affiliated Debtor entities (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      On June 30, 2022, The United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"). *See* Notice of Appointment [Docket No. 94].

4.      On November 22, 2022, the Court entered the *Consent Order and Stipulation (A)*
*Providing Adequate Protection, and (B) Granting Related Relief* [Docket No. 1573] (the
"Consent Order"), which was executed by Debtors, Bergenline Capital 4901 LLC (the
"Bergenline Debtor") and Manhattan Avenue Capital 1300 LLC (the "Manhattan Debtor"), and
the S3 Lenders.  Pursuant to the Consent Order, the Committee was granted standing to assert the
claims set forth in the Complaint.

5.      On June 29, 2023, the Committee filed the Complaint [Docket No. 1][2] initiating
this adversary proceeding, following an investigation of the S3 Lenders' alleged claims and
liens, supported by the Committee's financial and forensic investigators (Alvarez & Marsal).

6.      The Committee's investigation involved significant efforts to obtain discovery
from the S3 Lenders, which culminated in the Court's entry of the *Order Compelling S3 RE*
*Bergenline Funding LLC and S3 RE Manhattan Funding LLC to Produce Documents*
*Commanded Pursuant to Subpoenas for Rule 2004 Examinations, Dated January 13, 2023*
[Docket No. 2238][3] (the "Order to Compel").  Notably, even after the Order to Compel was
entered, it does not appear that the S3 Lenders turned over all of their communications with the
Debtors concerning the loans at issue, by way of a comparison between what the S3 Lenders
produced and documents that were already in the Committee's (and now the AIRN Liquidation
Trust's) possession.[4]  It is especially troubling that the S3 Lenders suggest in their Motion to

---

[2] The full title, which is itself a summary, not a verbatim recitation of all Counts, is the Complaint for: (I) Avoidance of Mortgages and Assignments of Rents Under 11 U.S.C. § 544 and State Law, and Recovery and Preservation Under 11 U.S.C. §§ 550 and 551; (II) Avoidance of Prepetition Transfers Under 11 U.S.C. §§ 544 and 548 and State Law, and Recovery and Preservation Under 11 U.S.C. §§ 550 and 551; (III) Recovery of Postpetition Transfers Under 11 U.S.C. §§ 542 and 549, and Recovery and Preservation Under 11 U.S.C. §§ 550 and 551; (IV) Unjust Enrichment; (V) Objections to Claims [] Under 11 U.S.C. § 502(b) and (d); (VI) Determination of Secured Status of Claims Under 11 U.S.C. § 506; and (VII) for Related Relief (referred to herein as the "Complaint").
[3] All references to "Docket" numbers relate to filings in the main chapter 11 bankruptcy case.  All references to "AP Docket" numbers relate to filings in this adversary proceeding.
[4] Plaintiff intends on soon serving follow-up discovery to the S3 Lenders within this adversary proceeding, along with additional third-party subpoenas.

Dismiss (albeit incorrectly) that there are not sufficient facts alleged in the Complaint, while at the same time the S3 Lenders appear to have (and indeed were previously found by the Court to have) not fully produced documents and communications relating to these disputes.

7.     Meanwhile, in the main case, the Debtors, S3 Lenders, and Committee focused on, addressed, and negotiated resolutions of issues concerning the S3 Lenders' ability to vote on the Plan, the S3 Lenders' objections to the Plan, and votes against the Plan.  The parties' rights vis-à-vis this adversary proceeding were expressly reserved by: (a) the parties' *Consent Order and Stipulation Pursuant to D.N.J. LBR 9021-1(b) Regarding: (I) S3 RE Bergenline Funding LLC's and S3 RE 1300 Manhattan Funding LLC's Joint Objections to Proposed Joint Chapter 11 Plan; and (II) Motion for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Proposed Plan* [Docket No. 3587], dated July 21, 2023; and (b) Article III.B.3 (at 20-21) of the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 3256] (the "First Amended Plan"), filed on July 25, 2023, which governs the treatment of the S3 Lenders' Class 3A Claims.

8.     The treatment of the S3 Lenders' Class 3A Claims under the First Amended Plan, as relevant to the claims asserted in this adversary proceeding, are set forth in Section III below.

9.     On August 10, 2023, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 3599] (the "Confirmation Order").

10.     On Friday, August 25, 2023, the Plan became effective, and the AIRN Liquidation Trust succeeded to the rights of both the Debtors and the Committee in this adversary proceeding.[5]

11.     The parties have addressed pretrial and discovery issues, holding the Civil Rule 26(f) conference on September 19, 2023, submitting the *Joint Order Scheduling Pretrial Proceedings and Trial* [AP Docket No. 26], which was entered by the Court on October 5, 2023, and exchanging Civil Rule 26(a)(1) initial disclosures on October 3 and 5, 2023.  Furthermore, Plaintiff has begun to notice subpoenas to third parties.

## II.    Factual Background

12.     The full factual background alleged in the Complaint is not recited herein, but is expressly incorporated by reference.  A select background is set forth below.

13.     The Complaint is replete with detailed factual allegations concerning the Ponzi scheme and related bad acts committed by NRIA's and Debtors' Managers.  *See* Complaint at ¶¶ 25–70.  In addition, the Complaint specifically incorporates by reference both the Summary Cease and Desist Order (the "Summary Order") [Docket No. 60] issued by the New Jersey Bureau of Securities and the Administrative Consent Order [Docket No. 1651] entered by this Court.  This is the underlying and pervasive fraud, pled in detail.  And notably, the Motion to Dismiss does not seriously dispute that NRIA and its affiliated Debtors were operated by their principals as a Ponzi scheme.

---

[5] *See* Notice of (I) Entry of Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors; and (II) Occurrence of Effective Date [Docket No. 3711]; Amended Notice of Substitution of Plaintiff, Notice of Appearance of Counsel, and Request for Service of Papers [AP Docket No. 22].

## <u>MOTION TO DISMISS STANDARD</u>

Defendants' Motion to Dismiss, which attempts to address every Count of the Complaint,
indicates it is filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "<u>Civil
Rules</u>"), as made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the
"<u>Bankruptcy Rules</u>").  *See* Motion at 5.  Specifically, it seeks dismissal on the following bases:

- Counts I, VI.B, VII, VIII, XIII.B, and XIV on the basis that they fail to state a claim with respect to avoidance of the Defendants' respective mortgages and assignments of rents, presumably as required by Rule 8 (though Rule 8 is never cited).  Motion at 7.

- Counts I, VI.B, VII, VIII, XIII.B, and XIV on the basis that they fail to plead fraud or forgery with particularity as required by Rule 9.  Motion at 9.

- Counts IV, VI.D, XI, and XIII.F on the basis that they fail to state a claim for recovery of postpetition interest payments, presumably as required by Rule 8 (though Rule 8 is never cited).  Motion at 15.

- Counts III and X on the basis that they fail to state a claim as a matter of law in light of substantive consolidation.  Motion at 17.

- Counts II and IX on the basis that they fail to plead a connection between the transfers at issue and the Ponzi scheme with particularity as required by Rule 9. Motion at 19.

- Counts VI.C., XIII.C, XIII.D, and XIII.E on the basis that they fail to state a claim for avoidance of default interest or minimum yield interest, presumably as required by Rule 8 (though Rule 8 is never cited).  Motion at 20.

- Counts V and XII on the basis that they fail to state a claim for unjust enrichment, presumably as required by Rule 8 (though Rule 8 is never cited).  Motion at 27.

- Counts VI.A. and XIII.A on the basis that proof of claims do not need to be signed.  Motion at 28.

- Count VI.E., Count VI.F, Count XIII.G., and Count XIII.H on the basis that said counts rely on other counts upon which Defendants assert Plaintiff has failed to state a claim.  Motion at 29.

14.    As this Court has previously summarized, "[o]n a motion to dismiss, this court
must assume the truth of all allegations in [the] complaint, their reasonable inferences, and any
documents incorporated by reference therein."  *In re NJ Affordable Homes Corp.*, Case No.
05-60442 (DHS), 2013 WL 6048836, at *3 (Bankr. D.N.J. Nov. 8, 2013).

15.     To survive dismissal under Rule 12(b)(6), as made applicable by Bankruptcy Rule 7012, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Heidt v. BV001 Reo Blocker LLC (In re Heidt)*, 626 B.R. 777, 788 (Bankr. D.N.J. 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973, 167 L.Ed.2d 929 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). To determine if a complaint is plausible on its face, a court must draw on its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. *In re Heidt*, 626 B.R. at 788. This does not impose a "probability requirement" at the pleading stage but requires a showing of "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id*. (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233-34 (3d Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1965)). "The Third Circuit has interpreted *Twombly* as requiring that '[t]he allegations of the complaint should 'plausibly suggest' the pleader is entitled to relief.' " *A-1 Advanced Moving & Storage, Inc. v. NorVergence, Inc. (In re NorVergence, Inc.)*, 424 B.R. 663, 686 (Bankr. D.N.J. 2010) (quoting *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (citing *Twombly*, 127 S.Ct. at 1966)). This "requires a showing of 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.' " *In re Heidt*, 626 B.R. at 788 (quoting *Phillips*, 515 F.3d at 233-34 (quoting *Twombly*, 127 S.Ct. at 1964)). *See, e.g.*, *Terry v. MEB Loan Trust II (In re Terry)*, Adv. Pro. No. 22-02093, 2023 WL 6052509, at *3 & n.6 (Bankr. D. Utah Sept. 14, 2023) (" 'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.' " (quoting *Sutton v. Utah State Sch for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted)).

16.     In summary, in ruling on a motion to dismiss, a court must accept all well-pleaded

allegations in the complaint as true, view them in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief.  *See Phillips*, 515 F.3d at 233; *see also In re Heidt*, 626 B.R. at 788.

17.     Rule 8(a)(2) of the Federal Rules of Civil Procedure, as made applicable by Rule

7008(a) of the Federal Rules of Bankruptcy Procedures, "states in relevant part that a pleading

stating a claim for relief must also contain 'a short and plain statement of the claim showing that

the pleader is entitled to relief,' . . . in order to provide 'the defendant fair notice of what

the . . . claim is and the grounds upon which it rests.' "  *In re NorVergence, Inc.*, 424 B.R. at 687

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 1961, 173 L.Ed.2d 868 (2009)).

"To comply with Rule 8(a)(2)'s notice pleading requirements and to prevent a dismissal of a

complaint based on Rule 12(b)(6), '[a] plaintiff need not set out in detail the facts upon which he

bases his claim, so long as he gives the defendant(s) fair notice of the claim' and the reasons

giving rise to the claim to permit a defendant to answer and to prepare for trial."  *In re*

*NorVergence, Inc.*, 424 B.R. at 687 (quoting *In re Plassein Int'l Corp.*, 352 B.R. 36, 42 (Bankr.

D. Del. 2006) (internal citations omitted)).

18.     The only counts of the Complaint to which Civil Rule 9 is applicable are Counts

II and IX for the avoidance of prepetition transfers as "actual" fraudulent transfers.[6]  Civil Rule

9(b) requires a party alleging fraud to "state with particularity the circumstances constituting

fraud. . . .  Malice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."  Fed. R. Civ. P. 9(b).  The purpose of the heightened pleading requirement of Civil

Rule 9(b) "is to provide notice, not to test the factual allegations of the claim."  *Morganroth &*

---

[6] Defendants attempt to characterize Counts I and VIII as based upon fraud or forgery, but those are not the bases alleged, and need not be proven, in order to avoid the mortgages and assignments of rent.

*Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003).

Generally, fraud allegations of date, place, and exact manner qualify for purposes of meeting the

Rule 9(b) standard.   *Seville Indus. Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984); *In re*

*Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir.2002) (who, what, when, where

and how of events at issue may serve as adequate support for a fraud claim).   A plaintiff is free,

however, to utilize "alternative means of injecting precision and some measure of substantiation"

into a fraud allegation.   *Seville Indus. Mach. Corp.*, 742 F.2d at 791.   It is also customary in the

context of bankruptcy to interpret Civil Rule 9 liberally, particularly when a third-party outsider

to the fraudulent transaction is bringing the action, as is true in this case.   *In re NorVergence,*

*Inc.*, 424 B.R. at 688.

## **ARGUMENT**

### I.   **The Complaint Properly—More than Plausibly—States Claims to Avoid the Mortgages and Assignments of Rents.**

#### A.   **Summary of Bases for Avoidance**

19.   Counts I, VI.B, VII, VIII, XIII.B, and XIV collectively assert that Plaintiff is

entitled to avoid the Bergenline Mortgage, the Bergenline Assignment of Rents, the Manhattan

Mortgage, and the Manhattan Assignment of Rents (collectively the "Defective Instruments")

because they were not properly acknowledged before recording.[7]   The legal basis for the claims

is straightforward.   To acknowledge an instrument, the maker must appear before a notary or

other authorized individual and acknowledge that it was executed as the maker's own act or that

the maker had the requisite authority to execute the instrument on behalf of an entity and did so.

---

[7] Counts I and VIII assert the substantive claims to avoid the Defective Instruments.   Section I of the Motion also
seeks dismissal of Counts VI.B (Objection to Claim – S3 RE Bergenline Funding LLC), VII (Declaratory Judgment
as to Determination of Secured Statement – S3 RE Bergenline Funding LLC), XIII.B (Objection to Claim – S3 RE
1300 Manhattan Funding LLC), and XIV (Declaratory Judgment as to Determination of Secured Statement – S3 RE
1300 Manhattan Funding LLC), apparently on the basis that they rely upon avoidance of the Defective Instruments.
For the reasons set forth in this section, all of these Counts are properly pleaded and the Motion's requested relief
related thereto should be denied.

N.J.S.A. 46:14-2.1.  The recording of a defectively acknowledged instrument in violation of New Jersey's recording statutes does not perfect a lien, and does not provide notice or constructive notice to, and is ineffective to perfect a lien or security interest both outside of bankruptcy and as to a bankruptcy trustee exercising the rights and powers of a creditor or bona fide purchaser under 11 U.S.C. § 544(a).  *In re Buchholz*, 224 B.R. 13 (Bankr. D.N.J. 1998) and *In re NJ Affordable Homes Corp.*, 2013 WL 6048836.  The Complaint relies on two separate yet sufficient sets of facts to support avoidance.

**B.      The Bergenline Mortgage Was Not Properly Executed or Acknowledged.**

20.      First, the Complaint alleges in detail that the Bergenline Mortgage was not properly acknowledged because Defendants' counsel cut and pasted the executed acknowledgement page of a different document into the instrument that was ultimately filed. The first page of the copy of the Bergenline Mortgage filed with the Hudson County Register is dated July 17, 2018, but the acknowledgement page is dated July 13, 2018.  *See* Complaint at ¶ 129.  Grabato's signature purports to be on the July 13, 2018 Acknowledgement Page, which was purportedly notarized by Carolyn Pinkus ("Pinkus").  *Id.*  However, as the Complaint makes abundantly clear, the version of the Bergenline Mortgage recorded on July 17, 2018 did not exist on July 13, 2018.  This fact should be beyond dispute because Pinkus emailed an executed, standalone version of the acknowledgment page to a prior version of the Bergenline Mortgage on July 13, 2018, to attorneys at Seyfarth Shaw, counsel to the Defendants in this very adversary proceeding.  *See* Complaint at ¶ 134.

21.      Between July 13 and July 17, the parties to the transaction proceeded to further revise the Bergenline Mortgage, creating both a version 4 and version 5.  Complaint at ¶¶ 137–140.  Yet Grabato never executed and Pinkus never notarized any new versions of the Bergenline Mortgage.  Instead, on July 17, 2018, an attorney at Seyfarth Shaw instructed Gotham Abstract,

the title company for the transaction, to use version 5 "in lieu of the version you have and resend a pdf of the signed version to be recorded."  Complaint at ¶ 139.  For some reason, Gotham Abstract inserted the July 13 acknowledgment page not into version 5 but instead a redline of version 4 to version 5, which is ultimately what was recorded with the Hudson County Register. Complaint at ¶ 140.

22.     If, in fact, Grabato signed anything, it was either a copy of version 3 of the Bergenline Mortgage, or more likely, a standalone signature page with no mortgage in front of him at all.  In either event, Grabato never appeared before Pinkus to execute or acknowledge the redline that was recorded as required by N.J.S.A. 46:14-2.1.  Since a defectively acknowledged mortgage is not effective, is invalid, and is subordinate to Plaintiff's rights under the strong-arm provisions of 11 U.S.C. § 544(a), the recorded Bergenline Mortgage can and should be avoided.

23.     Plaintiff summarized the bases for avoidance of the Bergenline Mortgage very early in the Complaint.  *See* Complaint at ¶¶ 3-7.  And the S3 Lenders, to this day, have failed to explain why they never produced the recorded copy of the Bergenline Mortgage in response to the Rule 2004 Subpoena, or the communications that reveal what transpired.  Moreover, in the Motion to Dismiss S3 Bergenline does not seriously contest that Mr. Grabato did not sign the recorded final version of the mortgage.  Whether it was a redline or not, by itself, is not the issue. But the fact that it is a redline, along with the other facts pled, confirms that Mr. Grabato could not have signed it.  The Motion to Dismiss devotes a single paragraph to this topic in which S3 Bergenline claims it is a "red herring," (*see* § I.C. at 14) but then does not explain why that is, and does not cite any facts or law to support its assertion.  On this basis alone, the Motion to Dismiss should be denied as to Count I.

**C.**     **The Remaining Defective Instruments Were Not Properly Executed or Acknowledged.**

24.     Second, the Complaint alleges in detail additional facts that would establish the Defective Instruments were not properly acknowledged.  Grabato, who is currently facing a multitude of criminal fraud charges and was one of the principal bad actors behind the NRIA Ponzi scheme, is the person whose signature purports to be on all the Defective Instruments.  *See* Exhibits F, G, H, I, J, M, N, O, and P.  In conducting its investigation, the Committee learned that Grabato had a history of signing separate signature pages without the entire document in front of him or prior to the document being finalized, or worse, Nick Salzano would instruct others to sign or stamp Grabato's signature on documents (including documents requiring a notary).  Complaint ¶ 128.  On this latter point, the Committee learned that Natalie Petruic, a former NRIA employee, purportedly acknowledged Grabato's signature outside of his presence in other deals.  Complaint at ¶ 127.  And counsel for the Debtors acknowledged at the 341 meeting of creditors that a stamp of Grabato's signature existed and was often used by other employees of NRIA.

25.     Based upon all of these indicia of suspicion, the Complaint plausibly pleads that Grabato likely executed only standalone signature pages for, or did not appear before Pinkus to acknowledge, the Defective Instruments.  If Grabato executed and Pinkus notarized only standalone signature pages without a full copy of each instrument in front of him, then he was not acknowledging the entire instrument that was ultimately recorded, which would not comply with N.J.S.A. 46:14-2.1.  Likewise, if Grabato did not appear before Pinkus at all, the requirements of N.J.S.A. 46:14-2.1 would not be met.

26.     With respect to the Bergenline Mortgage and Bergenline Assignment of Rents, Seyfarth Shaw's own emails suggest that Grabato signed only separate standalone signature pages.  Complaint at ¶ 134.  With respect to the Manhattan Property, the Defendants have not yet

produced emails or other transmittals showing how they came into possession of fully executed copies of the Manhattan Mortgage and Manhattan Assignment of Rents (even though such documents must exist and were clearly within the scope of the Committee's Rule 2004 discovery requests).

27.     Nonetheless, the Complaint pleads sufficient facts to plausibly suggest a finding that the Defective Instruments were not properly acknowledged.  And as above, if the Defective Instruments were not properly acknowledged, they are both invalid and subordinate to Plaintiff's rights under the strong-arm provisions of 11 U.S.C. § 544(a) and can be avoided.

28.     The S3 Lenders focus their attention on the claim to avoid the Manhattan Mortgage, barely mentioning the claims to avoid the Bergenline Mortgage.  For example, the opening comments on page 2 of the Motion to Dismiss cherry pick topics for which the Liquidation Trust does not yet have all the details, but conveniently ignore all the facts already known that give basis to avoid the Bergenline Mortgage and support the allegations that plausibly suggest the Manhattan Mortgage suffers from the same defects.  Moreover, the main point is that, at this stage, it is not a question of proof or probability, it is one of allegation and plausibility.  Plaintiff has cleared the bar of plausible suggestion in this regard.

29.     While it is true that the S3 Lenders have not yet produced any communications that concern how the Manhattan Mortgage was executed, there is a sufficient amount of evidence of NRIA's operations and business practices to draw the reasonable inference—to plausibly suggest—that it also was not properly executed.  Plaintiff anticipates that the facts it has already alleged " 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.' "   *In re Heidt*, 626 B.R. at 788 (quoting *Phillips*, 515 F.3d at 233-34 (quoting *Twombly*, 127 S.Ct. at 1964)).  This is what discovery is for and Plaintiff has already undertaken discovery on this issue.

**D.    Plaintiff's Claims and Objections Based on Invalidity and Avoidability of the Defective Instruments Are Not Dependent on Proving Fraud or Forgery.**

30.    Each and every element of Plaintiff's claims in Counts I, VI.B., VII, VIII, XIII.B, and XIV is clearly pleaded with supporting facts.  Such pleading is more than enough to meet the plausibility standard of *Iqbal* and *Twombly*.  Perhaps realizing this, Defendants attempt to craft three unorthodox theories to support their Motion to Dismiss.  Each theory fails.

31.    First, Section I.A of the Motion incorrectly suggests the Court should impose the heightened pleading standard of Rule 9(b), notwithstanding the fact that none of Counts I, VI.B, VII, VIII, XIII.B, or XIV plead or rely on an allegation of fraud.  This case, in fact, involves defective instruments.  But Defendants attempt to paint the recoveries sought in the Complaint as based solely on allegations of fraud, which a simple review of the Complaint confirms is not true.  Defendants' attempted slight of hand is the insertion of a few additional words into an otherwise uncontroversial legal standard:

> A notary's acknowledgment is *prima facie* evidence of the due execution of an instrument.  *See Dencer v. Erb*, 142 N.J. Eq. 422, 426 (Ch. 1948); see also *Walkowitz v. Walkowitz*, 95 N.J. Eq. 249, 250 (1923) (collecting cases).   Thus, New Jersey recognizes a "strong presumption" that a notarized signature is precisely what it purports to be.  *See Dencer*, 142 N.J. Eq. at 426 (citing *Potter v. Steer*, 95 N.J. Eq. 102, 104 (Ch. 1923)).  Although it is true that the presumption may be overcome, [FN6: On the merits, to overcome such a presumption, "the proof must be clear, satisfactory, and convincing." *Id.*] it **requires proof of fraud or forgery**, *see id.*, and Federal Rule of Civil Procedure 9(b) requires that fraud and forgery be pled with particularity (i.e., the "who, what, when, where and why").

Motion at 9–10 (bold and underlined added).  While the cases cited by Defendants appear to stand for the proposition that clear, satisfactory, and convincing evidence is needed to overcome the presumption that a notarized signature is genuine, none of them states that such evidence requires proof of fraud or forgery.  In fact, the assertion that overcoming the presumption

"requires proof of fraud or forgery" is wholly unsupported by case law.  As a prime example, the *Buchholz* case cited in the Complaint discusses the *prima facie* validity and overcoming the presumption based on evidence that "that mortgage was not executed in the notary's presence," not based upon fraud or forgery.  *In re Buccholz*, 224 B.R. 13, 23 (Bankr. D.N.J. 1998).  And on that basis this Court concluded as follows:

> In conclusion, this court finds that Empire's claim is unsecured as of the date the petition was filed, as the mortgage was defectively acknowledged and failed to perfect Empire's security interest. Thus, the debt is unsecured under applicable New Jersey state law. Accordingly, Empire's claim is disallowed pursuant to 11 U.S.C. § 502(b)(1) as a secured claim.  This is not to say; however, that the debtor's obligation to pay Empire is eliminated under state law. *See e.g.*, *Moore v. Riddle*, 82 N.J.Eq. 197, 203, 87 A. 227 (Ch. 1913) (acknowledgment is not essential to the validity of an instrument as between the parties to it.)  Rather, the claim is unsecured.  Accordingly, the reorganization plan must be modified to calculate the amount to which Empire is entitled as a member of the unsecured class.[8]

*In re Buccholz*, 224 B.R. at 23.

32.     Defendants nonetheless double down and repeatedly try to argue, notwithstanding the actual allegations and the case law, that Counts I, VI.B, VII, VIII, XIII.B, and XIV need to have pled "false signature" and "forgery."  But Plaintiff does not need to plead a false signature or forgery to prevail.  Because Plaintiff pleads that Grabato and Pinkus only signed standalone signature pages later affixed to the Defective Instruments, which were signed before the final versions even existed (were not to the finals) and that Pinkus notarized the acknowledgment without Grabato present, amongst other things and reasonable inferences that can be drawn from the detailed allegations in the Complaint and this Opposition, the S3 Lenders' Motion must be

---

[8] This is why Defendants' protest that the Complaint does not assert a challenge to the other loan documents does not impact the Counts to avoid the Mortgages and Assignments of Rent.  What matters is whether the Mortgage and Assignment of Rents were properly acknowledged.

denied.[9]  In fact, this was the circumstance in the *Buchholz* case, which did not involve or require

proof of fraud or forgery.  *See id.*

33.    To be clear, the "clear, satisfactory, and convincing" standard, if applicable at all,

is a burden of proof that would only apply to adjudication of facts—it is not a pleading standard.

The pleading standard that should apply to Counts I, VI.B., VII, VIII, XIII.B, and XIV—Rule 8

as interpreted by *Twombly* and *Iqbal*—requires only the assertion of sufficient factual matter to

make the allegations in the Complaint plausible on their face.  *Iqbal*, 556 U.S. at 679, 129 S.Ct.

1937.    As the Third Circuit has cautioned, "the plausibility standard does not impose a

heightened pleading requirement, and [Rule 8] continues to require only a 'showing' that the

pleader is entitled to relief."  *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d

Cir. 2016); *see also Phillips*, 515 F.3d at 233–34 ("The [Supreme] Court emphasized . . . that it

was neither demanding a heightened pleading of specifics nor imposing a probability

requirement.").    Indeed, although *Twombly* and *Iqbal* emphasized the plaintiff's burden of

pleading sufficient "factual matter," the Supreme Court also expressly "disavow[ed]" the

requirement that a plaintiff plead "specific facts."  *Schuchardt*, 839 F.3d at 347.  The Complaint

meets and exceeds this standard.

34.    Even if Rule 9(b) were to apply to Counts I, VI.B, VII, VIII, XIII.B, and XIV, the

Motion to Dismiss should still be denied because the Complaint asserts the who, what, when,

where, and why through pages of detailed allegations (in short, Grabato did not properly

acknowledge any of the Defective Instruments at the time they were signed).  Further, where a

plaintiff (such as the Committee and now the AIRN Liquidation Trust) brings claims in the role

of a trustee in bankruptcy who was not privy to the transactions at issue, courts generally relax

---

[9] This is not meant to be a limitation of any other ways in which discovery might reveal that the instruments were
defectively acknowledged and the AIRN Liquidation Trust reserves all rights in this regard.

the pleading requirements of Rule 9(b). *In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at

*12; *In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002) ("bankruptcy

courts take a liberal approach in construing allegations of actual fraud pled by a trustee, because

the trustee is a third party outsider to the transaction and must plead fraud based upon second

hand knowledge") (citing *In re Everfresh Beverages, Inc.*, 238 B.R. 558 (Bankr. S.D.N.Y. 1999);

*In re Collins*, 137 B.R. 754, 755 (Bankr. E.D. Ark.1992)).

35.     Such leeway is especially warranted here where (1) the Committee was subject to

a challenge deadline and could not complete an investigation into all the facts surrounding the

Bergenline and Manhattan properties prior to filing the Complaint, partly due to the time and

effort it took to obtain documents and communications from the S3 Lenders, and (2)

notwithstanding the entry of an order to compel, Defendants did not fully comply with the

Committee's discovery requests prior to the challenge deadline expiring. Defendants should not

be able to use their own discovery delays or Grabato's bad acts as a sword to attack factual

allegations that are not yet in Plaintiff's possession. As the Second Circuit noted in an appeal

filed in the Madoff Ponzi case involving leeway for the SIPA trustee, "[f]raud is endlessly

resourceful and the unraveling of weaved-up sins may sometimes require the grant of a measure

of latitude . . . ." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 n.7 (2d Cir. 2011).

36.     Second, Section I.B of the Motion spends multiple pages claiming "[Plaintiff]

argues that the Instruments are subject to avoidance because the opening pages and signature

pages contain different dates" and then trying to refute that argument. Motion at 12. Of course,

as is set forth in detail above (and in the Complaint), the reasons the Defective Instruments are

avoidable go far beyond differing dates. Still, it is important to note that the reasons those dates

differ in the first place is <u>because Grabato never actually signed or acknowledged the version of</u>

<u>the Bergenline Mortgage that was ultimately filed.</u>

37.     Third, Section I.C of the Motion similarly tries to mischaracterize the basis upon which the Complaint seeks to avoid the Defective Instruments.  Again, Plaintiff does not argue (and the Complaint does not allege) that the Bergenline Mortgage is defective simply because it is a redline.  But the fact the Bergenline Mortgage is a redline is important because that redline did not exist on the date the acknowledgement page was executed.

38.     Put another way, the S3 Lenders do not contest the authority of this Court pursuant to New Jersey law and the Bankruptcy Code to avoid the mortgages; rather, the S3 Lenders incorrectly present the facts supporting avoidance, contrary to how they are alleged in the Complaint.

39.     Ultimately, the Motion's request to dismiss Counts I, VI.B, VII, VIII, XIII.B, and XIV must be denied.  The Complaint is replete with facts supporting each of these counts, and each count plausibly states a claim for relief whether judged under Rule 8 or Rule 9(b), even if Rule 9(b) were to apply (which it does not).

**II.     The Postpetition Interest Payments are Recoverable, to the Extent the Defendants' Claims are Unsecured or Undersecured, and with Respect to a Postpetition Payment of Prepetition Interest.**[10]

40.     In Section II of the Motion to Dismiss, Defendants argue that the claims to avoid post-petition interest must be dismissed because those payments were either (1) made in the ordinary course or (2) made pursuant to an order by this Court.  Defendants' arguments ignore that: (a) by their own assertions, albeit incorrect, the loans had matured and therefore were no longer in the ordinary course of repayment; and (b) that the payments were made under an express reservation of rights to the Committee that they agreed to.  And to the extent Plaintiff is

---

[10] One of the post-petition payments to Defendants in the amount of $443,783.84, which was made on June 17, 2022 as shown in Exhibit C to the Complaint, and $32,137.35 on June 17, 2002 as shown in Exhibit D to the Complaint, was actually in payment of pre-petition interest and therefore it was not authorized under the Consent Order or otherwise.

successful in proving the underlying liens were defective or avoidable, or that Defendants were undersecured, Defendants are not entitled to post-petition interest. *See In re J.T.L., Inc.*, 36 B.R. 860, 862 (Bankr. E.D. Mo. 1984).

41.    The claims in the Complaint directed at the recovery of post-petition interest payments—Counts IV, VI.D, XI, and XIII.F—relate to whether such payments were made on account of debts secured by Mortgages and Assignments of Rents that are avoidable, or on debts that were undersecured, such that the S3 Lenders were not entitled to those payments of adequate protection.  The parties expressly agreed that these claims would be preserved.

42.    On November 22, 2022, upon the consent of Debtors and the S3 Lenders, the Court entered the Consent Order [Docket No. 1573], which provided that the Bergenline Debtor and the Manhattan Debtor would make payments of interest at the non-default contract rate set forth in the Loan Documents (as defined therein) that would: (1) catch up for the post-petition period of July 2022 through October 2022, and (2) going forward, be made monthly.  Consent Order at 4, ¶¶ 1–2.

43.    However, entry of the Consent Order, as stipulated to by the Debtors and S3 Lenders, was expressly:

> without prejudice to only the right of the . . . Committee . . . to examine and challenge the extent, validity and/or priority of the [S3] Lenders' interest, if any, in the Properties,[11] as well as to raise any claim against the [S3] Lenders in the nature of a setoff, counterclaim, or defense to the indebtedness under the Loan Documents, or any other causes of action (each and collectively, a "Challenge") . . . .

Consent Order at 4, ¶ 4.  Paragraph 4 means that any payments of adequate protection made under authority of the Consent Order are expressly subject to any claims or causes of action that

---

[11] In the Consent Order, the properties located at 4901 Bergenline Avenue, West New York, New Jersey and 1300 Manhattan Avenue, Union City, New Jersey are defined, collectively, as the "Properties."

the Committee had standing to assert, which it did assert in the Complaint.  In other words, all payments were expressly subject to disgorgement—to being returned—if it turned out that said payments were not warranted as the result of one or more Challenges brought by the Committee. This fact alone requires denial of the Motion to Dismiss, particularly Section II thereof, with respect to Counts IV, VI.D., XI, and XIII.F, as no basis exists to dismiss those Challenges.

44.    The payments were not made within the ordinary course of business.  *See id.* (payment of post-petition interest is not "in the ordinary course"); *In re Fort Dodge Creamery Co.*, 121 B.R. 831, 835 (Bankr. N.D. Iowa 1990) (same).  None of the post-petition interest here was paid until after the Court entered the Consent Order, as confirmed by the fact that the Consent Order provided for the payment of post-petition interest that had accrued July 2022 through October 2022.  On June 1, 2022, S3 Manhattan had sent the Manhattan Debtor a notice of default, asserting that the Manhattan Loan, had matured and demanding payment of all amounts.  *See* Complaint at ¶ 313.  And although the S3 Lenders' claim that it is "undisputed" that the Bergenline Loan matured almost a year prior to the Petition Date, which they know is not true,[12] the Bergenline Loan maturity date of July 31, 2022 did occur post-petition several months before any payments of interest were made under the Consent Order.  *See* Motion to Dismiss at 20.  As the S3 Lenders know, and as alleged in the Complaint, NRIA paid a loan extension fee of $390,000.00 owed by the Bergenline Debtor to S3 Bergenline on February 19, 2021.  *See* Complaint at 36, ¶ 149.  This was paid in order to invoke a one-year extension of the maturity date pursuant to the terms of an Extension Side Letter that was allegedly entered into on or about July 13, 2018, the same date the other Bergenline Loan Documents were allegedly

---

[12] In fact, the maturity date of July 31, 2021 set forth in the Bergenline Promissory Note had been extended by the agreement of the parties as the S3 Lenders are fully aware.  This had not been specifically alleged in the Complaint as it did appear to bear upon the claims asserted; however, this glaring misstatement cannot be left to stand.  In fact, the maturity date of the Bergenline Loan was extended from July 31, 2021 to July 31, 2022, such that it did not mature prepetition.

executed, which S3 Bergenline produced as part of the closing binder in response to the Rule

2004 Subpoena.[13]  Regardless, because the maturity dates had passed by the time the Consent

Order was entered, and no post-petition payments were made before then, the payments were not

made in the ordinary course of business.  Moreover, payments that are in the nature of a

voluntary adequate protection payment may not be made in the absence of a court order

authorizing them.  *In re Miller Min., Inc.*, 219 B.R. 219, 223 (Bankr. N.D. Ohio 1998).

45.  Even where a bankruptcy court order authorizes a post-petition payment, courts

have found that Section 549 applies when the court order authorizing a payment is conditional or

provisional, such as when it is made under a reservation of rights.  For example, in *In re Motors

Liquidation Co.*, 552 B.R. 253, 277 (Bankr. S.D.N.Y. 2016), post-petition payments were made

pursuant to a provision in a post-petition financing order that, like the one here, reserved to the

Committee the right to challenge the lender's claim.  The court held that this reservation of rights

was a "provisional" authorization only.  In other words, that court held "[i]f the Trust is

successful in challenging the postpetition transfers, the subject transfers would have been

unwarranted and, thus, unauthorized because the transferees would have been unsecured

creditors." *Id*.  The same is true here.

46.  As the Complaint makes clear, recovery of the post-petition interest here is based

not just upon Section 549 but also on Section 542 as well as common-law theories of unjust

enrichment.  Section 542 is an appropriate remedy to recover post-petition payments where the

estate has reserved an interest in those payments, as it did in this case, because they are made

subject to later challenge.  *Spradlin v. Khouri (In re Bruner)*, 561 B.R. 397, 408 (B.A.P. 6th Cir.

---

[13] There is an email and accompanying invoice dated February 18, 2021, in which Jonathan Deluty at S3 Capital
Partners "grants the borrower's request for extension of the maturity date to July 31, 2022 pursuant to the terms of
the extension letter dated as of July 17, 2018," provided that borrower pays the $390,000.00 extension fee and funds
the next $1,483,000 of construction costs to rebalance the loan.

2017) (holding that § 542(a) permits the recovery of funds transferred postpetition if the estate retained an interest at the time of the transfer).

47.     A contrary outcome would render the reservation of rights in the Consent Order meaningless, even though the S3 Lenders expressly agreed to permit the Committee (and thus Plaintiff) to reserve its rights broadly to challenge the Defendants' claims and secured status and bring any other causes of action, so that the S3 Lenders could obtain adequate assurance payments before the Committee was able to conduct any investigation into the validity of the S3 Lenders' allegedly secured claims.

48.     Because the Consent Order and the rights granted to the Defendants thereunder were expressly without prejudice to the rights of the Committee to "challenge the extent, validity and/or priority of the Lenders' interest, if any, in the Properties, as well as to raise any claim against the Lenders in the nature of a setoff, counterclaim, or defense to the indebtedness under the Loan Documents, or any other causes of action," the adequate protection payments authorized by the Consent Order were interlocutory in nature because they remained subject to further review.   And if, upon further review, the Defendants received more than they were entitled to receive, this Court has the power to address that inequity.  *In re Partial Hosp. Inst. of Am.*, 281 B.R. 728, 734 (Bankr. S.D. Ala. 2001) (citing *In re M. Paolella & Sons, Inc.*, 85 B.R. 965, 971 (Bankr. E.D. Pa 1988)) ("any distribution made to MNC would likely be interim and recoverable by the trustee, if MNC is shown to have received a sum greater than that to which i[t] was entitled.").

49.     In *Partial Hospital*, a creditor had filed a motion for relief from stay seeking disbursement of funds received by the debtor that were proceeds of its accounts receivable, in which the creditor claimed a lien.  The motion was not served upon the IRS, which also claimed a lien.  The motion was granted and funds were disbursed.  When the IRS subsequently moved

for relief from that order, asserting that the failure of service rendered the order void, the court held that it did not have to determine the voidness issue, because the order stated that the payment of the receivables to the creditor was subject to a potential award of commissions and expenses to the trustee. *Id.* at 734. This, the court held, meant that the distribution was not final. A creditor who receives an interim distribution takes it subject to "the risk that the distribution will have to be refunded to the estate if necessary for final distribution." *In re Partial Hosp.*, 281 B.R. at 734.[14]

50.     Moreover, where a creditor has received adequate protection payments, and the facts ultimately demonstrate that it received more than it was entitled to, the estate is entitled to recover the excess amounts. *In re TennOhio Transp. Co.*, 269 B.R. 775, 782 (Bankr. S.D. Ohio 2001) (where secured creditor received more in adequate protection than it was entitled to receive, it had to return the excess).

51.     The Defendants suggest that because the confirmed First Amended Plan contemplates that all of their allowed claims will be paid in full, avoidance and recovery of these payments would serve no purpose. But Article III.B.3 of the First Amended Plan provides that the S3 Lenders' claims will be paid in full only to the extent that they are "Allowed," as defined therein. And Article III.B.3 of the First Amended Plan also provides that to the extent that those claims are allowed but found not to be secured, they will be treated as Class 4 unsecured non-investor claims for which the First Amended Plan does not provide payment of post-petition interest. *See* First Am. Plan at 22, Art. III.B.4 and 43, Art. V.G. Accordingly, to the extent the S3 Lenders' claims are ultimately not "Allowed" based upon the claim objections asserted in the Complaint, or are rendered unsecured (or undersecured) and therefore not entitled to be paid

---

[14] *In re M. Paolella & Sons, Inc.* also involved a claim that estate funds had been distributed on an interim basis subject to a reservation of rights in other creditors and the trustee. 85 B.R. at 971.

post-petition interest, avoidance and recovery of interest payments will benefit the remaining creditors, particularly the Holders of the Class 5 Investor Claims who, unlike the Holders of Class 4 Non-Investor General Unsecured Claims, are not projected to receive payment in full. *See* First Am. Plan at 22-23, Art. III.B.5.

52.     Finally, Defendants contend that the specific alternative allegations in the Complaint which aver that the S3 Manhattan Claim is undersecured (based on the conditions stated therein (Complaint at ¶ 320)), are not sufficient because "the Committee fails to allege what information was obtained, from whom, and what makes such information credible and reliable." *See* Motion at 16.  As the S3 Lenders are fully aware, and without disclosing any information that could potentially affect the sale value of the 1300 Manhattan Property, the market value (as confirmed by recent efforts to sell the 1300 Manhattan Property) would not produce sufficient proceeds to pay the S3 Manhattan Claim in full, to the extent the S3 Manhattan Claim and/or the Minimum Interest Shortfall Amount is not disallowed.  Moreover, the S3 Lenders have ample opportunity and knowledge to assess the market value of the property, and do not suggest that they have any knowledge or facts to the contrary.  This is not a "boilerplate" allegation, it is specific to this circumstance based upon documents.

**III.    The Plan Explicitly Provides that Substantive Consolidation Had No Impact on the Claims Asserted in this Adversary, Which Include the Claims to Avoid and Recover Constructively Fraudulent Pre-Petition Transfers.**

53.     In Section III of the Motion to Dismiss, Defendants contend that Counts III and X of the Complaint, which state claims to avoid the Prepetition Transfers to both the S3 Lenders as constructively fraudulent cannot be maintained due to substantive consolidation under the First Amended Plan.  *See* First Am. Plan at 40-41, Art. IV.H [Docket No. 3256], filed July 25, 2023. But the provisions of the First Amended Plan, negotiated and agreed to by the S3 Lenders, contain language that specifically limits the effect of substantive consolidation on the claims that

had already been asserted and were pending in this Adversary Proceeding prior to confirmation

of the First Amended Plan.  *See* Complaint at 41-42 (Count III) and 53-54 (Count X) [Docket

No. 1], filed June 29, 2023.  And these provisions negate application of the case law relied upon

by Defendants.

54.     Here, the Plan is clear about how Defendants are to be treated.  Article III.B.3, in

fact, recognizes that this Adversary was pending and contains language that specifically provides

that substantive consolidation will not have any impact on the claims in this Adversary.   It

provides, in relevant part:

> . . . . The Liens of the Holders of Allowed Class 3 Claims will
> continue to attach to their respective Collateral and proceeds from
> such Collateral after the Effective Date, subject to the Avoidance
> Actions, Causes of Action, and objections to Claims asserted by
> the Committee in Adversary Proceeding No. 23-01169 (the "S3
> Adversary") and that have been reserved under the Plan and in the
> Plan Supplement, and to the extent such Class 3 Claims are
> ultimately Allowed.  Class 3 is Impaired under the Plan.
>
> Class 3A:  S3 RE Bergenline Funding LLC and S3 RE
> 1300 Manhattan Funding LLC agree that the Third-Party Mortgage
> Claims asserted by S3 RE Bergenline Funding LLC and S3 RE
> 1300 Manhattan Funding LLC (collectively, the "S3 Third-Party
> Mortgage Claims") will be paid in full in Cash when such S3
> Third-Party Mortgage Claims become Allowed Class 3 Claims as
> determined by a Final Order entered by the Bankruptcy Court and
> that the injunction provisions of Article VIII.C shall apply to S3
> RE Bergenline Funding LLC and S3 RE 1300 Manhattan Funding
> LLC and to any and all successors, assigns, loan participants, and
> Affiliates until such Final Order is entered, provided that ***nothing
> herein shall be deemed to prejudice, waive, or moot the
> Avoidance Actions, Causes of Action, claims, and objections to
> the S3 Third-Party Mortgage Claims asserted against S3 RE
> Bergenline Funding LLC and S3 RE 1300 Manhattan Funding
> LLC in the S3 Adversary.***  For the avoidance of doubt: . . . (ii) to
> the extent any portion of the S3 Third-Party Mortgage Claims is
> Allowed but determined not to be a Secured Claim, such portion
> shall be classified and afforded the treatment of Class 4 Non-
> Investor General Unsecured Claims to the extent so Allowed; and
> (iii) ***nothing in this Plan***, including without limitation, any
> limitation on the effect of substantive consolidation as set forth in
> Article IV, Section H *infra*, ***is intended to or shall impair the***

*rights, remedies, claims or defenses of the Committee, the
Liquidation Trust, the Liquidation Trustee, S3 RE Bergenline
Funding LLC and/or S3 RE 1300 Manhattan Funding LLC in
the S3 Adversary* or as preserved under this Plan and the Plan
Supplement.

First Am. Plan at 21-22, Art. III.B.3 (emphasis added).   Taken together, these provisions

establish that (1) how the Defendants' claims will ultimately be treated depends upon the

outcome of this Adversary, and (2) the substantive consolidation resulting from the Plan will not

impair the claims that were asserted and pending in this adversary proceeding before the First

Amended Plan was even negotiated, in relevant part, in resolution of the confirmation objections

asserted by the S3 Lenders.

55.   Courts have upheld limitations on the effects of substantive consolidation similar

to those contained in the First Amended Plan in this case and have noted that such limitations

will negate the impact upon fraudulent transfer claims that substantive consolidation might

otherwise have.  *In re Bonham*, 229 F.3d 750, 768-69 (9th Cir. 2000), *In re Giller*, 962 F.2d 796,

798-99 (8th Cir. 1992).[15]  This principle applies here given the language of Article III.B.3 (Class

3A) of the First Amended Plan, and this Court must give effect to the limitations on substantive

consolidation negotiated and agreed to by the S3 Lenders.[16]

56.   The cases relied upon by Defendants are simply not relevant here.  Indeed, one of

the leading cases they rely upon, *In re Parkway Calabasas, Ltd.*, 89 B.R. 832, 839 (Bankr. C.D.

Cal. 1988), itself recognizes that courts have the power to place conditions on consolidation,

---

[15] While there are cases such as *In re Pearlman*, 450 B.R. 219 (Bankr. M.D. Fla. 2011) which state that
consolidating debtors but preserving fraudulent transfer claims is "not appropriate," they do so in the context of
refusing to grant substantive consolidation.  Here, the issue of substantive consolidation has already been resolved—
the Plan has been confirmed and it has become effective, the time to contest its terms has passed and the
preservation of rights was pursuant to a resolution with the Defendants.  It is thus too late to debate whether the
limitation on consolidation should have been ordered.

[16] The S3 Lenders characterize the effect of Article III.B.3 (Class 3A) of the First Amended Plan as impairing,
through substantive consolidation, the claims that were already pending in this adversary proceeding, stating "the
effect of substantive consolidation on the merits is what it is," but, respectfully, that does not square with the
language of the First Amended Plan.  Motion to Dismiss at 18, n.10 [Docket No. 20-1].

although that case noted the substantive consolidation order at issue in that case did not do so. Defendants thus miss the critical point—here, Article III.B.3.A.iii of the Plan preserves the avoidance claims from any impairment as a result of substantive consolidation.

57.     So far as this adversary is concerned, it is as though the substantive consolidation did not occur. "It is fundamental in bankruptcy law that a confirmed Chapter 11 plan is to be regarded as a contract. *In re UNR Industries, Inc.*, 212 B.R. 295, 301 (Bankr. N.D. Ill. 1997). Where the words of a contract have a plain meaning, the court has no alternative but to interpret the plan in accordance with that plain meaning." *Ohio Med. Instrument Co. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 270 B.R. 842, 844 (Bankr. S.D. Ohio 2001) (citing 17A Am.Jur.2d, Contracts §§ 337, 359).   Here, Article III.B.3 is clear—nothing in the First Amended Plan shall impair any of the claims asserted in the S3 Adversary (as defined therein). Accordingly, the Court should enforce the plain language of the First Amended Plan to deny Section III of Defendants' Motion to Dismiss on this issue concerning Counts III and X of the Complaint.

58.     Finally, although Article III.B.3 does provide that nothing in the First Amended Plan will impair the defenses of the Defendants in the S3 Adversary, that does not mean that at the time the parties were negotiating the language in Article III.B.3 that the S3 Lenders held such a defense.   Absent the substantive consolidation provisions in the First Amended Plan, which became effective on August 25, 2023, subsequent to both the S3 Adversary filed on June 29, 2023 and the First Amended Plan filed on July 25, 2023, the argument that substantive consolidation wipes out the constructive fraudulent transfer claim would not be available to them.   Thus, nothing in the Plan impairs any defenses that were held by the S3 Defendants, and, "for the avoidance of doubt" it specified that the Plan would not change the status quo of those defenses (as well as the Plaintiff's claims).   The S3 Lenders' argument to the contrary would

26

render the language of Article III.B.3 of the First Amended Plan a nullity and would potentially permit the First Amended Plan to impair the claims of the Committee, and now Plaintiff, in Counts III and X of the Complaint, which is precisely the outcome that the Committee sought to avoid through language agreed to by the S3 Lenders.

59.     Accordingly, Section III of the Motion to Dismiss, which is solely based upon the alleged effect of substantive consolidation upon Counts III and X of the Complaint, should be denied.

## IV.   **The Complaint Properly States Claims to Avoid the Payments of Prepetition Interest to Defendants as Actual Fraudulent Transfers.**

60.     The claims alleged that are based on actual fraud are Counts II and IX of the Complaint for avoidance and recovery of actual fraudulent prepetition transfers as against Defendants S3 Bergenline and S3 Manhattan, respectively.  And in that regard, it is the fraud of NRIA—the Ponzi scheme—that forms the basis for those claims.  In other words, S3 was the recipient and beneficiary of funds that were fraudulently obtained from investors as laid out, in great detail, in the Complaint, including but not limited to the factual allegations in the section titled "NRIA's Fraudulent Operations—The Ponzi Scheme," paragraphs 42 through 64, as well as the allegations set forth in the section titled "New Jersey Bureau of Securities Cease and Desist Order," paragraphs 68 through 70.  Moreover, what is known and undisputed, is that both S3 Lenders received the majority of payments on the construction loans directly from NRIA and not from their actual borrowers or guarantors.  And it is undisputed that the S3 Lenders received payments of money that were from investor funds fraudulently obtained by NRIA.

61.     The S3 Lenders' assertion that there are no facts alleged to tie the payments received by them to the fraud conducted by NRIA is not credible.  The background on NRIA's Fraudulent Operations—The Ponzi Scheme (Complaint at 11-17), as well as the New Jersey Bureau of Securities Cease and Desist Order (Complaint at 17-19) set forth the backdrop to the

source of the payments received by the S3 Lenders, not from the actual borrowers, but rather from the non-guarantor parent entities—NRIA and the Fund—directly from investor monies for obligations they did not owe.

62. The financing obtained from the S3 Lenders, as well as the Prepetition Transfers made to the S3 Lenders, was in furtherance of and perpetuated NRIA's ability to continue the Ponzi scheme and its fraud upon the investors. *See* Complaint at 41, ¶ 175. And, in fact, as set forth in prior filings, namely the *Reply of the Official Committee of Unsecured Creditors in Support of Motion to Compel Production of Documents by S3 RE Bergenline Funding LLC and S3 RE 1300 Manhattan Funding LLC, Pursuant to Subpoenas for Rule 2004 Examinations, Dated January 13, 2023* [Docket No. 2167] and the *Certification in Support* [Docket No. 2167-1]:

> 8. Almost all of the advances made by the S3 Lenders on the Loans were **not** paid to either of the property-owning (project-level) Debtors—the Bergenline Debtor and the 1300 Manhattan Debtor—as the S3 Lenders assert in the Opposition. Opposition at 4, n.2. Instead, as confirmed by the First Republic Bank account statements produced by the S3 Lenders to the Committee on March 1, 2023 after the Motion to Compel had been filed, as well as by the Committee's professionals' review of the Debtors' bank records, except for the first four (4) payments to the Bergenline Debtor, which were transferred the same day to National Realty Investment Advisors, LLC ("NRIA"), **all other** advances under the Loans were paid to Debtor NRIA, up until September 2021, and then to NRIA Partners Portfolio Fund I, LLC (the "Fund"). In total, on both Loans, there were twenty-three (23) such advances, none of which were made to the Debtors that were the Borrowers on the Loans.

Certification in Support [Docket No. 2167-1] at 3, ¶ 8. Thus, advances on the Loans were paid directly to Debtor, NRIA, and later to Debtor, the Fund, so those commingled funds could be used for the repayments to investors amongst other costs and expenses, including those of other projects. In the absence of the financing, NRIA likely would not have had the ability to fund its

projects due to the use of investor monies for other purposes.  Nonetheless, as it concerns the

fraudulent transfer claims, it is not the S3 Lenders' fraud, but the Debtors' fraud, that matters, for

purposes of avoiding and recovering transfers of investor monies to the S3 Lenders.

63.   Specifically, Counts II and IX of the Complaint assert that certain payments of

prepetition interest to the Defendants (referred to in the Complaint as the Bergenline Prepetition

Transfers and the Manhattan Prepetition Transfers, and collectively herein the "Prepetition

Transfers") were made by NRIA and/or the Fund with the actual intent to hinder, delay, or

defraud creditors because they were made in furtherance of and perpetuated the Ponzi scheme.

As a result, under 11 U.S.C. § 544(b), N.J.S.A. 25:2-25(a)(1), 11 U.S.C. § 548(a)(1)(A), and 11

U.S.C. §§ 550 and 551, the Prepetition Transfers can be avoided and the payments or the value

thereof can be recovered for the benefit of the estates.

64.   Section IV of the Motion to Dismiss asserts that the Complaint fails to allege any

facts that would establish that the Prepetition Transfers "occurred in the context of a Ponzi

scheme or were in any way related to the alleged Ponzi scheme at NRIA."  Motion at 19 (internal

quotes omitted).  But the Complaint does plead such a relationship and more than adequately

pleads a Ponzi scheme, so the Motion to Dismiss should be denied.

65.   This Court has defined a Ponzi scheme as:

> A fraudulent investment scheme in which money contributed by
> later investors generates artificially high dividends or returns for
> the original investors, whose example attracts even larger
> investments. Money from the new investors is used directly to
> repay or pay interest to earlier investors, usually without any
> operation or revenue-producing activity other than the continual
> raising of new funds[.]

*In re NJ Affordable Homes Corp.*, 2013 WL 6048836, at *18 (quoting Black's Law Dictionary

(9th ed. 2009)).  The SEC similarly defines a Ponzi scheme as an operation "that pays existing

investors with funds collected from new investors" and recruits new investors with promises of

"high returns with little or no risk" while stealing some of the money for the Ponzi scheme organizers. *Ponzi Schemes*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/glossary/ponzi-schemes (last visited October 10, 2023).   And this Court has found that the definition of Ponzi scheme may be broadened if the circumstances of a case so warrant. *In re NorVergence*, 405 B.R. at 730–32; *see also In re Bayou Grp., LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ("the label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.").

66.    Paragraphs 26 through 70 of the Complaint set forth in detail how Grabato, Salzano, and others operated NRIA as a Ponzi scheme.   Even more detail is provided in the Summary Cease and Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities June 21, 2022) (the "Summary Order") and the Administrative Consent Order between the New Jersey Bureau of Securities, NRIA, the Fund, and NRIA Structured Credit Strategies, LLC (the "Administrative Consent Order") [Docket Nos. 60 and 1651], each of which are expressly incorporated by reference into the Complaint.   These facts more than establish that investors were being paid with other investor's funds and that NRIA was being operated as a Ponzi scheme.   *See also* Indictment filed in *USA v. Salzano and Grabato* (D.N.J. Case No. 2:22-cr-00690-EP, Doc. No. 19) (referring to NRIA as a Ponzi scheme, pp. 2 and 12, and as "Ponzi-like," p. 11); Complaint filed in *SEC v. National Realty Investment Advisors LLC et al.* (D.N.J. 2:22-cv-06066, Doc. No. 1) (referring to NRIA as a "Ponzi-like scheme" on pp. 2 and 8).[17]

---

[17] The Court may take judicial notice of these public records in considering this Opposition.  *See* Fed. R. Evid. 201; *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

67.     With respect to furthering the Ponzi scheme, the facts set forth in the Complaint, Summary Order, and Administrative Consent Order make clear that the Debtors' real estate operations, including with respect to the Bergenline Property and Manhattan Property, were integral parts of the Ponzi scheme.  This is true for at least two reasons.

68.     First, the Debtors' real estate operations provided cover for the operation of the Ponzi scheme.  NRIA claimed to operate as a real estate investment, management, and development firm.  Complaint at ¶ 31.  In reality, it was a Ponzi scheme wherein investor funds were used to pay other investors a phony return and pay Salzano, Grabato, and others for their personal benefit.  *Id.*  The Debtors' complicated corporate structure undoubtedly aided in their ability to conceal the fraud.  Notably, both the Debtors and the Defendants appeared to disregard the corporate separateness of NRIA, the Fund, the Manhattan Debtor, and the Bergenline Debtor. The Prepetition Transfers for each of these properties were made not by the respective borrowers—the Bergenline Debtor and Manhattan Debtor—but instead by NRIA or the Fund using investor funds.  Complaint at ¶¶ 148, 154.  Indeed, both the Bergenline Debtor and the Manhattan Debtor were insolvent, generated virtually no revenue, and could not service their debts.  Complaint at ¶¶ 76, 78, 93, 95, 186, 262.

69.     Second, the real estate operations provided an air of legitimacy needed to continue obtaining new investors to perpetuate the fraud.  The primary way that Grabato, Salzano, and the other bad actors kept their Ponzi scheme alive was to have new investors put money into the scheme. They accomplished this by spending millions on promotion costs, expanding their real estate holdings, and using straw purchasers to complete transactions to give the false appearance of high demand for NRIA properties.  *See, e.g.*, Complaint at ¶ 46, 52.  The real estate projects enabled NRIA to continue to represent to investors that their money was

being used for legitimate purposes when in reality it was being misused to profit Salzano, Grabato, and others.  Complaint at ¶ 54.

70.     In their Motion, Defendants quote language from *In re Zazzali v. 1031 Exch. Group LLP (In re DBSI, Inc.)*, 476 B.R. 413, 422 (Bankr. D. Del. 2012) for the proposition that the "applicability of the Ponzi scheme presumption turns on a plaintiff's ability to demonstrate both that a Ponzi scheme existed and that the specific transfers at issue were in furtherance of the Ponzi scheme." Motion at 19.  Upon close examination, this case supports denial of the Motion. In *DBSI, Inc.*, the court denied a motion to dismiss finding that the trustee had sufficiently pleaded the existence of a Ponzi scheme where "money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme." *DBSI, Inc.*, 476 B.R. at 422.  The court further found that the transfers at issue were made in furtherance of the Ponzi scheme because they were used to generate cash flow and keep the Ponzi scheme afloat.  This is precisely what happened in this case and the Complaint alleges that both the Bergenline Prepetition Transfers and the Manhattan Prepetition Transfers were made in furtherance of and perpetuated the Ponzi scheme.  *See* Complaint at ¶¶ 175 (Count II) and 251 (Count IX).  It is also reasonable to infer this from the overall context of the main case and the Ponzi scheme in which NRIA was engaged.

71.     The Prepetition Transfers in this case are essentially the same as the transfers at issue in *DBSI*.  The Ponzi scheme here could not continue without the acquisition of additional investors and financing.  And additional investors were specifically lured in with promises of high returns from real estate projects like the Bergenline Property and the Manhattan Property. Those moneys were all commingled and used to pay creditors.  Accordingly, the payments of the Prepetition Transfers from NRIA to the Defendants (on a debt NRIA and the Fund did not owe),

borne of fraudulently obtained investor funds, are thus intrinsically intertwined with the overall fraudulent scheme.  Defendants may wish to attempt to contest these facts, but for now the allegations are taken as true and such contests are not considered on a motion to dismiss.  The Complaint sufficiently pleads both the existence of the Ponzi scheme and the relationship of the Prepetition Transfers to the Ponzi scheme.

72.    Moreover, the S3 Lenders, in their Motion to Dismiss, do not even address the legal effect of the Ponzi scheme presumption.  The most the S3 Lenders can muster in this regard is the unsupported assertion that "the Complaint does not allege any facts that would establish that the transfers at issue in this action occurred 'in the context of a Ponzi scheme' or were in any way related to the alleged Ponzi scheme at NRIA."  Mot. to Dismiss at 19.  This misses the point.  NRIA's entire business operation was a Ponzi scheme, and the S3 Lenders were direct beneficiaries of the Ponzi scheme, as that enabled NRIA's repayment of its subsidiaries' obligations to the S3 Lenders.  The "intent" that matters is not the S3 Lenders', it is the intent of NRIA, from which the S3 Lenders were direct recipients, transferees, and beneficiaries.  Further, discovery is on-going and could reveal further knowledge by the S3 Lenders of NRIA's business and operations.  To date these are the fraudulent allegations and the S3 Lenders' connection is as the recipient.  For the foregoing reasons, Section IV of the Motion to Dismiss should be denied.

**V.    The Complaint Plausibly States Objections to: (1) Default Rate Interest as Unreasonable and Unenforceable Penalties; (2) the Minimum Yield Interest (Minimum Interest Shortfall) as the Economic Equivalent of Unmatured Interest and as an Unenforceable Liquidated Damages Provision; and (3) the Defense of Criminal Usury Under New York Law.**

73.    Section V of the Motion to Dismiss takes issue with Counts VI.C (objection to default rate interest of 24% asserted in the S3 Bergenline Claim as an unenforceable penalty under New Jersey law (Complaint at 47)), and Counts XIII.C (objection to default rate interest of 24% asserted in the S3 Manhattan Claim as an unenforceable penalty under New York law

(Complaint at 59-60)), XIII.D (objection to minimum yield interest (Minimum Interest Shortfall Amount) in the amount of $3,897,790.22 as of December 19, 2022 (Complaint at 60-62)), and XIII.E (objection to claim on the basis that the S3 Manhattan Claim violates New York's criminal usury statute and is therefore void (Complaint at 62-63)).

### A. The Default Rate of Interest with Respect to the Bergenline Mortgage is Plainly Unreasonable and an Unenforceable Penalty

74.     The S3 Lenders assert, in Section V.A of the Motion to Dismiss that, with respect to the Bergenline Mortgage, the Complaint has failed to plead facts to support its contention that the 24% default rate of interest "is 'unreasonable' and is 'unenforceable' as a 'penalty.' " Motion to Dismiss at 21.  In support, the S3 Lenders allege under New Jersey law default interest rates are presumed reasonable in commercial loans and that a default interest rate will only be voided if there is punitive intent.  *See* Motion to Dismiss at 21.  However, the S3 Lenders omit a few critical points which make their arguments fall short and, to the contrary, support a finding that under New Jersey law the default rate of interest can and should be disallowed.

75.     Moreover, boiled down to its essence, the S3 Lenders' argument is that the Complaint allegations just use "buzzwords," which is inaccurate.  *See* Motion to Dismiss at 21. Conveniently, the S3 Lenders omit reference to the bases alleged in the Complaint, amongst others incorporated by reference, that the default rate interest of 24% was almost double the regular non-default rate of interest at the time the Complaint was filed (12.375%), and was 15 points higher than the minimum non-default interest rate (9.25%) under the Bergenline Loan Documents (as defined therein).  *See* Complaint at 47, Count VI.C.  These are not "buzzwords," they are facts alleged based on the documents attached to the Complaint.  And they support that under New Jersey law the default rate interest can and should be determined to not be reasonable and to be unenforceable.

76.    New Jersey courts recognize that a default provision providing for an *unreasonable* increase in a contract rate is unenforceable as a penalty. *MetLife Cap. Fin. Corp. v. Washington Ave. Assocs. L.P.*, 732 A.2d 493, 502 (N.J. 1999). While a default rate of interest enjoys a presumption of reasonableness in the commercial setting, that presumption is not without its limits. *See In re Route One W. Windsor Ltd. P'ship*, 225 B.R. 76, 88 (Bankr. D.N.J. 1998) ("[T]here is no question that default interest is . . . ***difficult to obtain under New Jersey law***.") (emphasis added). "New Jersey cases have invalidated enhanced default rates if their size suggests a punitive intent." *MetLife Cap. Fin. Corp.*, 732 A.2d at 502.

77.    In assessing whether a default rate is a penalty, New Jersey courts will evaluate its reasonableness by taking into account the totality of the circumstances. *Money Life Ins. v. Paramus Parkway* Bldg*., Ltd.,* 834 A.2d 475, 481 (N.J. App. Div. 2003); *Northwest Bank Minn. v. Blair Road Assocs., L.P.*, 252 F. Supp. 2d 86, 93 (D.N.J. 2003) ("[A] default interest rate, like late fees, is subject to the test of reasonableness."). In assessing reasonableness, no single factor is dispositive. *Northwest Bank Minn.* 252 F. Supp. 2d at 93–94.

78.    Courts have, among other things, considered whether the default rate of interest is a reasonable estimate of the potential costs of administering a defaulted loan, and the potential difference between the contract rate and the rate that a lender might pay to secure a commercial loan replacing the lost funds*. MetLife Cap. Fin. Corp.,* 732 A.2d at 502. Accordingly, the default rate must bear some relationship to the actual expenses of administration incurred by the lender and not merely serve as a means to induce payment. *See In re Timberline Prop. Dev., Inc*., 136 B.R. 382, 386 (Bankr. D.N.J. 1992).

79.    Here, the default rate of interest is unreasonable and its size alone suggests a punitive intent. The minimum non-default interest rate under the Bergenline Loan Documents is 9.25%, and the current non-default interest rate thereunder is 12.375%. However, the 24%

default rate greatly exceeds both figures and is almost 15 percentage points higher than the minimum non-default interest rate and almost double the current non-default interest rate. Moreover, the default rate interest is in addition to, and not a substitute for, costs and expenses that S3 Bergenline may seek to recover under the Bergenline Loan Documents. *See* Building Loan and Term Loan Agreement, Ex. E at 10-11.

80.    Indeed, New Jersey courts have invalidated comparable increases in interest rates from non-default to default. *See Spiotta v. Wilson,* 179 A.2d 49 (N.J. App. Div. 1962) (invalidating 8.58% increase from 30.18% to 38.76 %); *Feller v. Architects Display Bldgs., Inc.,* 148 A.2d 634 (N.J. App. Div. 1959) (invalidating increase of interest rate during default from 17% to approximately 33%); *see also Stuchin v. Kasirer*, 568 A.2d 907 (N.J. App. Div. 1990) (remanding for consideration of reasonableness of fifteen percent increase).   Accordingly, the default rate of interest should be disallowed.

81.    Further, while the S3 Lenders allege the Complaint "merely recites buzzwords" and does not sufficiently support its contention that the default rate of interest at issue is a penalty, this is not the case.   And put simply, the S3 Lenders overstate Plaintiff's burden.   To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and that suggests discovery will reveal evidence of the element. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007).   Although the S3 Lenders should have already provided documentation of the actual costs of administration, discovery herein should reveal that those expenses do not justify a 24% default rate of interest.   But for now, Plaintiff has stated its claims by pleading the default rate of interest almost doubled the current non-default interest rate and is almost 15 percentage points higher than the minimum non-default interest rate, which has been sufficient under similar case law.   These facts alone state a plausible claim for relief under prevailing New Jersey law.

B. **The Default Rate of Interest with Respect to the Manhattan Mortgage is an Unenforceable Penalty and is Disproportionate to S3 Manhattan's Actual and Probable Loss.**

82.     The S3 Lenders also assert that Plaintiff has failed to establish the default rate of interest with respect to the Manhattan Mortgage constitutes an unenforceable penalty under New York law.  In support, the S3 Lenders state "[t]he Court must sustain the contractual provision fixing damages in the event of a breach if the amount liquidated bears a reasonable proportion to the probable loss and the amount of the actual loss is incapable or difficult of precise estimation."  Motion to Dismiss at 22 (internal quotations omitted).  In this case, the default rate of interest at issue does not bear any reasonable relation to the probable loss and amount of actual loss upon default.

83.     Under New York law, parties are free to agree to a contract rate of interest which shall increase upon default so long as the interest rate is not usurious or a penalty.  *Emery v. Fishmarket Inn of Granite Springs, Inc.*, 173 A.D.2d 765, 767 (N.Y. App. Div. 1991).  Default interest rates are subject to the same level of scrutiny as other varieties of liquidated damages provisions.  *AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012).  A liquidated damages provision is enforceable only if "the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation."  *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005) (quoting *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 1018 (N.Y. 1977)).

84.     If liquidated damages are "plainly or grossly disproportionate to the probable loss," the provision is considered a penalty and unenforceable.  *Id.*; *see also 172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 957 (N.Y. 2014) ("Liquidated damages that constitute a penalty . . . violate public policy, and are

37

unenforceable."). "[W]here there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damage clause, it should be resolved in favor of a construction which holds the provision to be a penalty." *Willner v. Willner*, 145 A.D.2d 236, 240–41 (N.Y. App. Div. 1989).

85.     Here, the default rate of interest included in the Manhattan Loan Documents is plainly disproportionate to the probable loss and actual loss.  The minimum non-default interest rate under the Manhattan Loan Document is 8.85%, and the current non-default interest rate thereunder is 12.125%.  However, the stated default rate of interest is 24%, which is almost double the current non-default interest rate.  Additionally, the default rate of interest is over 15 percentage points higher than the minimum non-default interest rate under the Manhattan Loan Documents.  The exorbitant increase in the interest rate has only one logical explanation, it is used as a penalty which is conspicuously disproportionate to any conceivable losses of S3 Manhattan.

86.     The Manhattan Loan Agreement itself exemplifies the default right of interest does *not* bear any relationship to the amount of S3 Manhattans probable and actual loss.  Under Section 9.2.2 of the Manhattan Loan Agreement, all of S3 Manhattan's remedies are cumulative and S3 may exercise all of its rights and remedies in the event of default.  *See* Complaint, Ex. K-3, Construction Loan Agreement at 99-100.  Accordingly, S3 Manhattan has the right to seek compensation for actual damages in the event of default in addition to the default rate of interest.

87.     Where a contract provides for the ability to recover actual damages, additional provisions allegedly compensating for the probable loss in the event of default suggest a punitive intent.  *See Jarro Bldg. Indus. Corp. v. Schwartz*, 54 Misc. 2d 13, 15 (N.Y. App. Div. 1967) ("If appellant here could recover both liquidated damages and actual damages, there would be no question that the 'liquidated damages' provision was a penalty."); *O.P.M. Leasing Servs., Inc. v.*

*Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.)*, 23 B.R. 104, 112 (Bankr. S.D.N.Y. 1982) (finding a contractual provision could not be a reasonable estimation of actual damages and was instead a penalty where the contract provided the right to recover actual damages).  Therefore, the default rate of interest does not serve to compensate S3 Manhattan for probable and actual losses, but to serve as a penalty.  As the 24% default rate of interest is purely intended to be a punitive measure, it must be disallowed.

### C. The Minimum Interest Shortfall Amount Should Be Disallowed as the Economic Equivalent of Unmatured Interest Under § 502(b)(2).

88.    It is hard to overstate how egregious it is for S3 Manhattan to charge the Minimum Interest Shortfall Amount in this situation.  After funding the acquisition amount at closing in November 2019, of $1,160,000.00, S3 Manhattan advanced only four draws on the construction loan, during the period from January to June, 2020, totaling $818,372.63, which along with loan draw fees of $17,700.00, administrative fees of $925.00, and capitalized interest of $36,778.89, resulted in a total "principal" balance of $2,033,776.52 as of July 1, 2020, which rose to $2,143,085.40 as of February 1, 2021 and remained at that amount on the Petition Date of June 7, 2022, due to six payments of interest by Debtor, NRIA to S3 Manhattan.  *See* Complaint at 61.  In other words, for almost two years S3 Manhattan made no advances on the construction loan, advanced only $818,372.63 of the total $42,840,000 of construction reserves, which is less than 2%, yet S3 Manhattan still wants to be paid 100% of the interest it would have earned had it advance the other 98+% of the construction draws.  Egregious, not to mention conspicuously (plainly) disproportionate.

89.    S3 Manhattan argues that this is all a happy coincidence, that Plaintiff again only provided "buzzwords," notwithstanding the detailed analysis of the economic substance, and that nothing can legally be done about it recovering interest that is almost double the amount of principal advanced, which, as set forth in the Complaint, equates to an effective interest rate of

approximately 94.6% per annum, which is unconscionable and is well in excess of criminal usury limits. *See* Complaint at 61-63. It strains all semblance of logic to believe that S3 Manhattan will have losses that approach anything close to the Minimum Interest Shortfall Amount.

90.     The Minimum Interest Shortfall Amount is clearly designed to provide S3 with the economic equivalent of future interest payments that they expected to receive in the absence of default—if the entirety of the principal had been advanced under the Manhattan Loan. Under § 502(b)(2), which should apply in this situation regardless of whether the maturity date has occurred, the Minimum Interest Shortfall Amount *must* be disallowed.

91.     Pursuant to § 502(b)(2) of the Bankruptcy Code, any claim for "unmatured interest" is disallowed. 11 U.S.C. § 502(b)(2). While "unmatured interest" is not defined in the Bankruptcy Code, courts have explained that term covers all transactions that constitute the economic equivalent of unmatured interest. *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 705 (Bankr. N.D. Ill. 2014) ("[C]ourts look to the economic substance of the transaction to determine what counts as interest."); *In re Hertz Corp.*, 637 B.R. 781, 791 (Bankr. D. Del. 2021) (adopting the "economic equivalent of unmatured interest" interpretation of § 502(b)(2)).

92.     Whether a "make whole payment" or some other prepayment premium is the economic equivalent of unmatured interest depends on the facts of each case. *Wells Fargo Bank, N.A. v. Hertz Corp. (In re Hertz Corp.)*, No. 21-50995 (MFW), 2022 Bankr. LEXIS 3358, at *9–*10 (Bankr. D. Del. Nov. 21, 2022). "And when the reality of things—the economic fact of the matter—is that a particular claim is *really* just the functional equivalent of unmatured interest, § 502(b)(2) disallows it." *Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138, 147 (5th Cir. 2022).

93.     Here, the Minimum Interest Shortfall Amount is nothing more than a guarantee that S3 Manhattan will recover all interest that they expected to earn in the absence of default had they extended the full amount of principal on the loan, which S3 Manhattan, or its management, decided not to (which is the significance of S3 Manhattan making only four (4) advances).  This is clear from the calculation of the Minimum Interest Shortfall Amount, which is directly tied to the outstanding amount of unmatured interest under the Manhattan Loan Agreement.  Specifically, the amount due on the Minimum Interest Shortfall Amount is equivalent to the difference between the Minimum Interest Amount of $4,450,000—which is approximately 10.11% of the maximum principal amount stated in the Manhattan Loan Agreement—and the aggregate amount of interest payments actually made to S3.  As such, the Minimum Interest Shortfall Amount is explicitly designed to serve as the economic equivalent of unmatured interest.  *See In re Hertz Corp.*, 2022 Bankr. LEXIS 3358, at *13 (finding the formula for calculating a "Redemption Price" was "tied entirely to the unpaid interest" and was thus disallowed).

94.     In their Motion to Dismiss, the S3 Lenders allege that "the Minimum Interest Shortfall Amount" is akin to a so-called "make whole payment" and that "a substantial majority of courts" have held that such payments are claims for liquidated damages, not for unmatured interest.  Motion to Dismiss at 24.  Broad generalizations asserting the Minimum Interest Shortfall Amount is similar to other types of make whole payments does not render it enforceable.  *Id.* at *9–*10 ("Determining whether a make-whole premium is the economic equivalent of interest, however, depends on the facts of each case.").  Formalistic labels or dictionary definitions are not controlling. *See id.* at *12.  Because the Minimum Interest Shortfall amount is the equivalent of unmatured interest based on all relevant considerations, it must be disallowed.

95.     Additionally, and of critical importance, S3 fails to recognize that recent case law in the Third Circuit and Fifth Circuit Court of Appeals have found make-whole premiums to be disallowed unmatured interest.  *In re Ultra Petroleum Corp.*, 51 F.4th at 148–49 (finding make-whole premium at issue was the economic equivalent of unmatured interest); *In re Hertz Corp.*, 2022 Bankr. LEXIS 3358, at *14 ("Because all the components of the Redemption Price are unmatured interest or its economic equivalent, the Court concludes that the claim is disallowed under the provisions of section 502(b)(2)").  While the S3 Lenders cite a number of cases finding make-whole premiums to be legitimate liquidated damages provisions, these cases do not reflect the current state of the law, nor the law applicable to this circumstance.

96.     Further, S3's argument that the Minimum Interest Shortfall Amount cannot be considered unmatured interest because it matured pre-petition should not apply here.  As discussed above, "unmatured interest" is not explicitly defined in the Bankruptcy Code and formalistic or dictionary definitions are not controlling. *In re Pengo Indus., Inc.,* 962 F.2d 543, 546 (5th Cir. 1992) (acknowledging the term "unmatured interest" is not defined in the Bankruptcy Code). Rather, courts must look to the economic substance of the transaction. *In re Hertz Corp.*, 2022 Bankr. LEXIS 3358, at *10.

97.     Here, S3 Manhattan sent the Debtors a notice of default a mere six days before the Petition Date to demand a payment of all amounts due.  However, S3 Manhattan had refused further funding under the Manhattan Loan Documents since the fourth draw it made on July 1, 2020 and knew the unpaid principal balance was less than two million five hundred thousand dollars.  Because the Manhattan Loan Agreement plainly uses the Minimum Interest Shortfall Amount to compensate for future interest payments, default was declared a mere six days prior to the Petition Date, and S3 Manhattan had refused further funding at the time they sent a notice of

default, the economic substance of the transaction exemplifies the Minimum Interest Shortfall

Amount is the economic equivalent of unmatured interest.

> **D.      Alternatively, the Minimum Interest Shortfall Amount Should be Wholly Disallowed as an Unenforceable Liquidated Damages Provision.**

98.      Even if this Court finds that the Minimum Interest Shortfall Amount were not

disallowed under § 502(b)(2), it would still be an unenforceable liquidated damages provision

under New York law.[18]  "Under New York law, prepayment provisions and early termination

fees are analyzed under the standards applicable to liquidated damages." *In re Sch. Specialty,*

*Inc.*, No. 13-10125 KJC, 2013 WL 1838513, at *2 (Bankr. D. Del. Apr. 22, 2013) (citing *JMD*

*Holding Corp.*, 828 N.E.2d 604 (N.Y. 2005)).  If liquidated damages are "plainly or grossly

disproportionate to the probable loss," the provision is considered a penalty.  *Id*.  And, as

discussed in above, a liquidated damages provision will not be upheld if it constitutes a penalty.

*172 Van Duzer Realty Corp.*, 25 N.E.3d at 957. !

99.      If the Minimum Interest Shortfall Amount is to be considered a liquidated

damages provision, it is a plainly disproportionate, unconscionable and egregious amount of

liquidated damages.  The Minimum Interest Shortfall is almost twice the principal balance of the

S3 Manhattan Claim.  As discussed above, this is particularly egregious in light of the fact that

S3 Manhattan made only the initial advance of $1,160,000.00 at closing of the Manhattan Loan

on November 15, 2019, followed by four (4) construction draws on or about January 3, 2020,

March 24, 2020, May 8, 2020, and June 5, 2020, in the respective amounts of $95,551.67,

$256,990.03, $346,477.61, and $119,353.02, after which S3 ceased all funding.

100.      Additionally, as S3 Manhattan cut off and did not make any advances to the

Manhattan Debtor after the fourth draw funded on June 5, 2020 (S3 Manhattan required draw

---

[18] New York law governs here pursuant to the Manhattan Loan Documents, as acknowledged in the Motion to Dismiss.

requests numbers 5 through 12 to be funded by equity; so, funded by NRIA most likely from investor monies), the principal balance of the S3 Manhattan Claim *only* increased due to capitalization of interest.  Based on the effective average balance of the loan from inception to the Petition Date, the Minimum Interest Shortfall Amount results in an effective interest rate of approximately 94.6% per annum.  At the very least, this exorbitant amount presents doubt as to whether the Minimum Interest Shortfall Amount can be a proper liquidated damages clause, meaning it must be resolved in favor of a construction which holds it to be a penalty.  *See Willner,* 145 A.D.2d at 240–41.  For these reasons Count XIII.D states a valid and plausible claim objection and Section V.C of the Motion to Dismiss should be denied. !

E.    **The Complaint Properly Pleads the Defense of Criminal Usury Under New York Law.**

101.    Count XIII.E of the Complaint asserts an objection to the S3 Manhattan Claim on the grounds that the 94.6% effective per annum interest rate charged by S3 Manhattan far exceeds the 25% per annum criminal usury rate for loans under $2.5 million found under New York law.  *See* N.Y. Penal Law § 190.40 and N.Y. General Obligations Law §§ 5-501 and 5-511.

102.    To successfully assert criminal usury as a defense, the following must alleged: (1) the existence of a loan or forbearance of money; (2) usurious intent of the lender (i.e., the lender knowingly charged, or received a usurious rate); and (3) annual interest at a rate exceeding the statutory amount (25%).  *Prof'l Merchant Advance Capital, LLC v. C Care Serv's, LLC*, 2015 WL 4392081, at *4 (S.D.N.Y. July 15, 2015); *see also in re Venture Mortg, Find, L.P*, 245 B.R. 460 (Bankr. S.D.N.Y. 2000).  Critically, in assessing a usury defense, a court must "look to the nature of the transaction and not to the form in determining whether such transaction was usurious."  *Pro. Merch. Advance Cap.*, LLC 2015 WL 4392081, at *4 (citing *In re Garcia*, 167 B.R. 341, 347 (Bankr. E.D.N.Y. 1994)).  If a loan is usurious on its face, intent will be implied, and usury will be found as a matter of law.  *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring,*

*Inc.*, 105 A.D.3d 178, 183, 961 N.Y.S.2d 86 (N.Y. 1st Dep't 2013). Criminally usurious loans made to corporate borrowers are void when a successful usury defense, based on the criminal usury rate, is raised. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021).

103.    The S3 Manhattan Loan is facially usurious. The Manhattan Loan Agreement provides a Minimum Interest Amount of $4,450,000, and the S3 Manhattan Claim seeks payment of minimum yield interest in the amount of $3,897,790.22 as of December 19, 2022. Complaint at ¶¶ 301 and 302. Nothing in the Manhattan Loan Agreement or any of the other loan documents reduces the Minimum Interest Amount in the event S3 Manhattan ceases or refuses to advance further funds. Here, S3 Manhattan advanced a total of only $2,143,085.40 and then refused to make any further advances. Complaint at ¶¶ 303, 311. And at no point during the life of the loan did the principal balance exceed $2.5 million, even accounting for capitalized interest. Complaint at ¶ 312.

104.    To get around the fact that the amount of interest sought is usurious on its face, Defendants attempt to characterize the loan as one exceeding $2.5 million. N.Y. General Obligations Law § 5-501(6)(b) that states that N.Y. Penal Law § 190.40 does not apply to "any loan or forbearance in the amount of two million five hundred thousand dollars or more." N.Y. General Obligations Law § 5-501(6)(b). That section further states:

> Loans or forbearances aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement by one or more lenders shall be deemed to be a single loan or forbearance for the total amount which the lender or lenders have agreed to advance or make pursuant to such agreement on the terms and conditions provided therein.

*Id.* The Motion to Dismiss string cites a series of trial court cases for the proposition that "usury is examined at the inception of the transaction." Motion to Dismiss at 26. These cases are not, however, binding precedent and therefore do not support Defendants' arguments.

105.     For example, *Tides Edge Corp. v. Cent. Fed. Sav., F.S.B.*, 151 A.D.2d 741, 742

(1989), did not turn on the amount of the loan in question.  In that case, the plaintiff brought a

criminal usury claim against the defendant bank who "agreed to lend" the appellant $4.25

million, but for "reasons that are unclear from the record, construction did not proceed and no

further amounts where advanced." *Id*. at 742.  The Appellate Division found against the plaintiff

because a corporation cannot assert a civil usury claim and banks cannot be charged with

criminal usury. *Id.*  While the Appellate Division does state in dicta that "given the fact that the

amount that respondent agreed to advance exceeded $2,500,000, the transaction is

exempt . . . from the operation of any law regulating the payment of interest," it did so with no

analysis and no citation to authority. *Id*.

106.     The other cases cited by Defendants are similarly flawed.  *Star Funding, Inc. v.*

*Vault Mins., LLC*, an unpublished case out of the Southern District of New York interpreting a

supply agreement and not a loan agreement, relies on *Tides Edge Corp.* and is therefore similarly

flawed.  *Star Funding, Inc. v. Vault Mins., LLC*, No. 15CV03026GBDSN, 2017 WL 7791558, at

*5 (S.D.N.Y. Aug. 10, 2017).  Likewise, *Shasho v. Pruco Life Ins. Co. of New Jersey* relies upon

*Tides Edge Corp.* for a similar proposition.  *Shasho v. Pruco Life Ins. Co. of New Jersey*, 67

A.D.3d 663, 665, 888 N.Y.S.2d 557 (2009).  Importantly, *Shasho* cites favorably to *Ujueta v.*

*Euro-Quest Corp.*, which holds "[w]hen determining whether a transaction constitutes a usurious

loan" it must be "considered in its totality and judged by its real character, rather than by the

name, color, or form which the parties have seen fit to give it."  *Ujueta v. Euro-Quest Corp.*, 29

A.D.3d 895, 814 N.Y.S.2d 551 (2006) (noting that whether "a transaction constitutes a 'cover for

usury' is a question of fact").  Moreover, the fact that criminal usury is a defense suggests that it

is dependent upon the actions of the lender in enforcing the loan.  And here, there is no doubt

that the S3 Manhattan chose a course that resulted in an embarrassingly draconian rate of interest.

107.    Defendants also cite to *LG Capital Funding, LLC v. Sanomedics Intern. Holdings, Inc.* for the proposition that "[w]here a usurious rate is not found on the face of the note, the defendant has the burden of proving that [the] plaintiff intended for the transaction to be usurious at the inception."   *LG Capital Funding, LLC v. Sanomedics Intern. Holdings, Inc.*, No. 508410/2014, 2015 WL 7429581, at *10 (N.Y. Sup. Ct. Nov. 23, 2015). But even if such proposition is correct, it does not defeat Count XIII.E.  The Manhattan Loan Documents, from their inception, contemplated S3 Manhattan receiving usurious rate of interest by virtue of the Minimum Interest Amount.  Mathematically, the only way the Minimum Interest Amount would not be usurious would be for S3 Manhattan to advance most of the principal amount of the loan, which did not happen here—not even close—S3 Manhattan having actually advanced less than $2 million on an "up to" $44 million construction loan, or only 10.11%, including capitalized interest.

108.    Defendants' interpretation of N.Y. General Obligations Law § 5-501(6)(b) cannot be what the legislature intended. If it is, nearly any otherwise usurious loan would be protected if the lender included a provision providing that, even in the most remote circumstance, the amount that could potentially be advanced under the loan exceeds $2.5 million. Allowing any lender, including Defendants, to game the law in this way would be putting form over substance.

109.    This is not the case where a lender might possibly receive a usurious amount of interest.  It is the very opposite—a case where, by virtue of the Minimum Interest Amount, the loan was usurious from the start, and might only have become non-usurious if S3 Manhattan actually funded the majority of advances.  But it chose not to.  For that reason and the reasons above, Section V.D of the Motion to Dismiss should be denied.

**VI.** **The Unjust Enrichment Claims are Not Barred as they Are Not Based on a Contractual Agreement, But Rather are Alternative Bases to Recover the Post-Petition Transfers.**

110.    The unjust enrichment counts (Counts V and XII) seek, as an alternative remedy to Counts IV and XI, respectively, recovery of post-petition payments in the event that the mortgages and assignments of rents are found to be invalid, avoidable, or void, it would render the Defendants' claims unsecured, or, as to the S3 Manhattan Claim, also potentially undersecured, and therefore S3 Bergenline and S3 Manhattan received a benefit that would be unjust to retain—the payments of post-petition interest.   Counts V and XII thus turn not on whether there were contractual agreements with the Defendants, as they argue, but on whether there is some basis to conclude that the Defendants were not entitled to receive post-petition interest.   Thus, unjust enrichment is available as an alternative basis to recover the Bergenline and Manhattan Postpetition Transfers.   These counts are not asserting claims for recovery at odds with the terms of any written agreements.   If anything, they are asserting claims that are fully in keeping with the reservations of rights to the Committee to bring "Challenges" under the original Consent Order, and as subsequently preserved in the First Amended Plan, Article III.B.3.   As such, Section VI of the Motion to Dismiss as directed to these Counts should be denied.

**VII.** **The Complaint States a Valid Objection to the S3 Lender's Proofs of Claim Which are Not Entitled to Prima Facie Validity Because They are Unsigned as Required by Rule 3001(f) and the Bar Date Order.**

111.    As it concerns the failure to sign the proofs of claim, unlike numerous other claims filed in this case that were signed, this Court's order establishing the bar date required that proofs of claim be signed.   *See* Bar Date Order [Docket No. 1016] at 4., ¶ 5(e) (stating "Proofs of claim or interest must (i) be signed . . . .").   The Order also states the consequences of not following the requirements to file a compliant proof of claim, as follows:

> 12.    Any person, entity, or governmental unit that is required to file a proof of claim in the ***form*** and ***manner*** specified

> in this Order and that fails to do so on or before the applicable Bar
> Date, shall not, with respect to such claim, be treated as a creditor
> or equity security holder of the Debtors for the purpose of voting
> upon any chapter 11 plan, shall not receive or be entitled to receive
> any payment or distribution of property from the Debtors, their
> estates, their property, or their successors or assigns with respect to
> such alleged claim or interest, and shall be forever barred from
> asserting such alleged claim against or interest in the Debtors, their
> estates, or their successors or assigns, unless otherwise ordered by
> this Court.

Bar Date Order [Docket No. 1016] at 6–7, ¶ 12.  Moreover, the Proof of Claim or Interest Form

(Exhibit 1) attached to the Bar Date Order and approved by the Court, states in Part 3 thereof

(mirroring the requirements of current Official Form 410) that "The person completing this proof

of claim must sign and date it.  Fed. R. Bankr. P. 9011(b)."  Moreover, the *Notice of Bar Dates*

*for Submitting Proofs of Claim Against or Interests in the Debtors* approved by this Court states

several times that proofs of claim, even those submitted "electronically using the interface

available on Omni's website at: https://omniagentsolutions.com/NRIA . . . must be signed . . . ."

113.    Moreover, Rule 3001(f) of the Federal Rules of Bankruptcy Procedure states that

"[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie

evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  Rule 3001(b)

states that "[a] proof of claim shall be executed by the creditor or the creditor's authorized agent

except as provided in Rules 3004 and 3005."[19] Fed. R. Bankr. P. 3001(b).

113.    Counts VI.A and XIII.A of the Complaint specifically cite the foregoing

provisions, as well as the language of this Court's Bar Date Order, which required that claims be

signed.  Furthermore, the approved proof of claim form, as well as the standard form, both

require that the claim be signed under penalty of perjury.  Failure to do so renders the claim not

---

[19] Neither of Rules 3004 nor 3005 apply to this circumstance.

entitled to prima facie validity, as asserted in the Complaint.  On the face of the claims, they are not signed.

114.    Whether the Court should disallow the claim on this basis, as opposed to determining that it is not entitled to prima facie validity such that the S3 Lenders still have the initial burden to prove their claims, may ultimately be within the discretion of the Court; however, it may well depend on whether the facts alleged in the Motion to Dismiss are accurate and if there is satisfactory explanation for the failure to sign the proofs of claim submitted, which, at a minimum, establish that there is no declaration and they are not entitled to prima facie validity.  But that is not a Rule 12(b)(6) issue.

115.    Collier on Bankruptcy states as follows:

> A proof of claim must comply with the rules in order to be *prima facie* valid.  If a claim does not enjoy *prima facie* validity, many courts hold that the burden of proof following an objection falls on the claimant to prove the validity of its claim.

9 Collier on Bankruptcy ¶ 3001.09[2] (citing *In re Cluff*, 313 B.R. 323, 332 (Bankr. D. Utah 2004); *Afy v. N. Plains Feeders, Inc.*, 482 B.R. 830, 840-41 (D. Neb. 2012); *In re Rehman*, 479 B.R. 238, 242 (Bankr. D. Mass. 2012)).

116.    Furthermore, Rule 3001 "requires that proofs of claim be signed under penalty of perjury and pursuant to Federal Rule of Bankruptcy Procedure 9011(b).  This strengthens the penalties that may be imposed on creditors who file improper claims."  9 Collier on Bankruptcy ¶ 3001.RH[5].

117.    These bases of objection to the claims are part and parcel of the remaining claim objections and are fairly straightforward; however, if Defendants have defenses to present based upon facts, they can do so; however, this is not a failure to state a basis of a claim objection.  Simple review of the proofs of claim, which Defendants do not contest are unsigned on their faces, supports Plaintiff's assertions.

118.     This first case cited by the S3 Lenders is not applicable to this circumstance.  *See In re Seven Hills, Inc.*, 403 B.R. 327, 335 (Bankr. D.N.J. 2009) (quoting "the maxim that '[a] court of equity abhors forfeitures'" in the context of preventing the tenant/debtor from losing an option to renew a lease, which result was also supported by 11 U.S.C. § 365(e)(1) on invalidating *ipso facto* clauses).  In fact, signatures under penalty of perjury on proofs of claim are required, as plainly stated in Bankruptcy Rule 3001(b), and the absence of a signature or a signature validly authorized, is a basis to find the proof of claim is not entitled to prima facie validity.

119.     As to a case that Defendants cite regarding signatures not being required, *In re Nittany Enterprises*, 502 B.R. 447, 454 (Bankr. W.D. Va. 2012), there is disagreement on that point.  *See, e.g.*, *In re Avery*, Case No. 15-30074, 2015 WL 4498181, at *2, n.1 (Bankr. N.D. Ohio July 22, 2015) (noting that "[t]his court disagrees with this statement [that '[a] signature on a proof of claim is not required by either the Bankruptcy Code or the Bankruptcy Rules'], as it is hard to interpret Rule 3001(b) (through the use of the words 'shall be executed by the creditor') and Rule 9011(a) (through use of the words "shall be signed") as not requiring a signature by somebody.").  As the *Avery* case further analyzes, "the most serious omission of compliance is the lack of any signature certifying the claim as true, accurate and correct as required by Official Form 10 [now B 410] and the applicable rules of procedure" being Rules 9009 (requiring use of Official Forms), 3001(b) (requiring that a proof of claim be executed), and 9011 (requiring bankruptcy court filings to be signed by counsel or the party) of the Federal Rules of Bankruptcy Procedure, as well as Official Form 10.  "The effect of non-compliance is not necessarily, however, disallowance of the claim[;]" rather, under some case law "the proof of claim is deprived of the benefit under Rule 3001(f) of being prima facie evidence of the validity and amount of the claim."  *Id.* at *3 (citing *In re Wingerter*, 594 F.3d 931, 941 (6th Cir. 2010); *Heath v. Am. Express Travel Related Servs. Co., Inc. (In re Heath)*, 331 B.R. 424, 433 (B.A.P. 9th Cir.

2005)).  And, "[a]s a result, Debtor has no evidentiary burden to carry in objecting and Claimant has the burden of both going forward and proving its claim by a preponderance of the evidence." *Id.* (citing *LTV v. Gulf States Steel, Inc.*, 969 F.2d 1050, 1058 (D.C. Cir. 1992); *In re Galbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008)).

120.    Plaintiff has not failed to state the basis for this objection to the proofs of claim, which is based upon the plain language of the Bar Date Order and is supported by Rules 3001, 9009, and 9011 of the Federal Rules of Bankruptcy Procedure and Form 410, as well as the proof of claim form approved by this Court.  Accordingly, Section VII of the Motion to Dismiss, which concerns Counts VI.A. and XIII.A. of the Complaint, should be denied.

## VIII.    Defendants Do Not State an Independent Basis to Dismiss the Claim Objection Counts of the Complaint Based Upon Setoff and Recoupment, and Section 502(d)

121.    In the final Section VIII of the Motion to Dismiss, Defendants do not assert that any of the claim objection Counts, based on the defenses of setoff and recoupment—Counts VI.E. and XIII.G—or based upon 11 U.S.C. § 502(d)—Counts VI.F. and XIII.H., fail to state claims in and of themselves; rather, in a brief paragraph Defendants stand on their challenges to other Counts of the Complaint.  Because those challenges fail, so do Defendants' challenges to these claim objection Counts.  Further, Defendants have not stated any independent bases to dismiss these claim objection Counts of the Complaint and the final Section VIII of the Motion to Dismiss should therefore be denied.  And, again, the original Consent Order provided that the Committee, Plaintiff's predecessor in interest, could raise "any claim against the [S3] Lenders in the nature of a setoff, counterclaim, or a defense to the indebtedness" and the First Amended Plan was clear that "nothing herein shall be deemed to prejudice, waive, or moot the Avoidance Actions, Causes of Action, claims, and objections to the S3 Third-Party Mortgage Claims asserted against [the S3 Lenders] in the S3 Adversary."  First Am Plan at 21, Art. III.B.3.

## CONCLUSION

WHEREFORE, for the reasons stated above in this Opposition, Plaintiff, the AIRN Liquidation Trust submits that the Motion to Dismiss should be denied, in its entirety, and respectfully request that the Court grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: October 20, 2023
New York, New York

**ICE MILLER LLP**

*/s/ Louis T. DeLucia*
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway Suite 2900
New York, NY 10036
Tel: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

Tyson A. Crist, Esq. (Pro Hac Vice)
John C. Cannizzaro, Esq. (Pro Hac Vice)
250 West Street, Suite 700
Columbus, OH 43215
Tel: (614) 462-2700
tyson.crist@icemiller.com
john.cannizzaro@icemiller.com

*Counsel to the Plaintiff AIRN Liquidation Trust*

## CERTIFICATE OF SERVICE

I, Louis T. DeLucia, hereby certify that on October 20, 2023, a true copy of the foregoing was served by the Court's CM/ECF system upon registered persons and by email upon the following at the addresses listed below:

James S. Yu
M. Ryan Pinkston (*Pro Hac Vice*)
SEYFARTH SHAW LLP
620 8th Avenue
New York, NY 10018
jyu@seyfarth.com
rpinkston@seyfarth.com

*Attorneys for S3 RE Bergenline Funding LLC*
*and SE RE 1300 Manhattan Funding LLC*

Kate Roggio Buck
Stephanie A. Pisko
Adam M. Swanson (*Pro Hac Vice*)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
kbuck@mccarter.com
spisko@mccarter.com
aswanson@mccarter.com

*Attorneys for SE RE 1300 Manhattan Funding LLC*

/s/ Louis T. DeLucia
Louis. T. DeLucia, Esq.

4879-1055-1430.9